**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. |
| | ) | |
| DAVID THERRELL COLLIER | ) | |
| ROBERT HOWELL PRICE III | ) | 18 U.S.C. §§ 1001, 2 |
| | ) | |
| Defendants. | ) | |
| | ) | |

**INFORMATION**

The United States charges:

COUNT ONE

CAUSING FALSE STATEMENTS

A.    Introduction

At all times material to this Information:

1.    In or about late 1997, defendant DAVID THERRELL COLLIER began a business relationship with Indian Tribe A, a federally recognized Tribe of Native Americans whose reservation is located in the State of South Carolina. Defendant COLLIER and Indian Tribe A formed a joint venture entitled New River Management & Development Company LLC (New River), and Indian Tribe A contracted with New River to provide management services for a bingo hall owned by the tribe and located in Rock Hill, South Carolina.

2.    Defendant ROBERT HOWELL PRICE III was the chief operating officer of New River, and he was responsible for various activities of the corporation with respect to Indian Tribe A.

B.    The Federal Election Campaign Act

    3.    Under the provisions of the Federal Election Campaign Act ("FECA"):

        (a)    it was unlawful for any person to contribute more than $2,000 to the campaign of a candidate for federal office for the candidate's primary election;

        (b)    it was unlawful for any person to contribute more than $2,000 to the campaign of a candidate for federal office for the candidate's general election; and

        (c)    it was unlawful for any person to make a contribution in the name of another person to the campaign of a candidate for federal office.

    4.    The Federal Election Commission ("FEC") was the agency of the United States that was responsible for administering and enforcing the FECA. The FEC was also responsible for providing accurate information to the public about the amounts and sources of campaign contributions.

    5.    Under the provisions of the FECA, the Treasurer of the principal campaign committee supporting a candidate for federal office was required to file periodic reports with the FEC listing the contributions received by the campaign. In each report, the Treasurer was required to state the following for all contributions that were made by a person who contributed more than $200 during the calendar year:

        (a) the identity of the contributor;

        (b) the date of the contribution; and

        (c) the amount of the contribution.

6.    From in or about March 2000 until in or about September 2004, defendants COLLIER and PRICE did make and cause other individuals to make campaign contributions totalling between $30,000 and $70,000, to various candidates for election to federal offices. The contributions were made with funds of Indian Tribe A which were either advanced to those individuals before the contribution was made, or used to reimburse those individuals after the contribution was made. Sometimes the funds of Indian Tribe A were provided to those individuals by means of an intermediary corporation of defendant COLLIER.

7.    Beginning in or about March 2000 and continuing through in or about September 2004 in the District of Columbia and elsewhere, the defendants DAVID THERRELL COLLIER and ROBERT HOWELL PRICE III did knowingly and willfully cause materially false statements and representations to be made to the Federal Election Commission, in that they caused the treasurers of the principal campaign committees of various candidates for federal office unwittingly to file periodic reports with the FEC falsely identifying the defendants and various other individuals as having made campaign contributions during the reporting period when, in truth and in fact, as the defendants well knew, the campaign contributions had been made using funds of Indian Tribe A, which had been advanced to defendants or the other individuals for the purpose of making the contributions, or which had reimbursed the defendants or the other individuals for their contributions.

All in violation of Title 18, United States Code, Sections 1001 and 2.

3

WILLIAM M. WELCH II
Chief
Public Integrity Section

*Eileen Gleason*

EILEEN GLEASON
JOHN P. PEARSON
Trial Attorneys
Public Integrity Section
Criminal Division
U.S. Department of Justice
1400 New York Avneue, N.W.
Suite 12100
Washington, D.C.  20530
(202) 514-1412

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA, )
           )
    v.       )  Criminal No.
           )
DAVID THERRELL COLLIER  )  18 U.S.C. §§ 1001, 2
           )
   Defendant.    )
_____)

## PLEA AGREEMENT

The United States of America and David Therrell Collier (hereinafter referred to as the "defendant") enter into the following agreement:

### Charges and Statutory Penalties

1. The defendant agrees to plead guilty to Count One of the Information, Causing False Statements, in violation of Title 18, United States Code, Sections 1001 and 2.

2. The defendant understands that Count One has the following essential elements, each of which the United States would be required to prove beyond a reasonable doubt at trial:

 a. First, the defendant willfully caused a statement to be made;

 b. Second, that the statement was false;

 c. Third, that the falsity related to a material matter; and

 d. Fourth, that the false statement was made or used in relation to a matter within the jurisdiction of a department or agency of the United States.

1

3.    The defendant understands that pursuant to 18 U.S.C. § 1001, Count One carries a

maximum sentence of five years of imprisonment, a fine of $250,000 or a fine of

twice the pecuniary gain or loss pursuant to 18 U.S.C. § 3571(d), a $100 special

assessment, and a three year term of supervised release, an order of restitution, and

an obligation to pay any applicable interest or penalties on fines or restitution not

timely made.

**Factual Stipulations**

4.    The defendant agrees that the attached Factual Basis for Plea fairly and

accurately describes the defendant's actions and involvement in the offense to which the defendant

is pleading guilty.  The defendant knowingly, voluntarily, and truthfully admits the facts set forth in

the Factual Basis for Plea.

**Sentencing**

5.    The defendant is aware that the sentence will be imposed by the court after

considering the Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing

Guidelines").  The defendant acknowledges and understands that the court will compute an advisory

sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by

the court relying in part on the results of a Pre-Sentence Investigation by the court's probation office,

which investigation will commence after the guilty plea has been entered.  The defendant is also

aware that, under certain circumstances, the court may depart from the advisory sentencing guideline

range that it has computed, and may raise that advisory sentence up to and including the statutory

maximum sentence or lower that advisory sentence.  The defendant is further aware and understands

that the court is required to consider the advisory guideline range determined under the Sentencing

2

Guidelines, but is not bound to impose that sentence; the court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory sentence. Knowing these facts, the defendant understands and acknowledges that the court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense identified in paragraph 1 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

6.      The Public Integrity Section, Criminal Division, United States Department of Justice (hereinafter "Public Integrity") reserves the right to inform the court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this agreement, Public Integrity further reserves the right to make any recommendation as to the quality and quantity of punishment.

7.      The defendant is aware that any estimate of the probable sentence or the probable sentencing range relating to the defendant pursuant to the advisory Sentencing Guidelines that the defendant may have received from any source is only a prediction and not a promise, and is not binding on the United States, the probation office, or the court, except as expressly provided in this plea agreement.

**Sentencing Guidelines Stipulations**

8.      The defendant understands that the sentence in this case will be determined by the Court, pursuant to the factors set forth in 18 U.S.C. § 3553(a), including a consideration of the guidelines and policies promulgated by the United States Sentencing Commission Guidelines

3

Manual 2006 (hereinafter "Sentencing Guidelines" or "U.S.S.G").  Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), and to assist the Court in determining the appropriate sentence, the parties stipulate to the following:

a. Factors Affecting Offense Level under the Guidelines:  The amount of conduit campaign contributions in this case was between $30,000 and $70,000.  No adjustment for role in the offense under U.S.S.G. §§ 3B1.1 or 3B1.2 of the Sentencing Guidelines is appropriate.

b. Acceptance of Responsibility:  Provided that the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of Public Integrity, through the defendant's allocution and subsequent conduct prior to the imposition of sentence, Public Integrity agrees that a 2-level reduction would be appropriate pursuant to U.S.S.G § 3E1.1(a).

Public Integrity, however, may oppose any adjustment for acceptance of responsibility if the defendant:

i. fails to admit a complete factual basis for the plea at the time the defendant is sentenced or at any other time;

ii. challenges the adequacy or sufficiency of the United States' offer of proof at any time after the plea is entered;

iii. denies involvement in the offense;

iv. gives conflicting statements about that involvement or is untruthful with the Court, the United States or the Probation Office;

4

v.      fails to give complete and accurate information about the defendant's financial status to the Probation Office;

vi.     obstructs or attempts to obstruct justice, prior to sentencing;

vii.    has engaged in conduct prior to signing this Plea Agreement which reasonably could be viewed as obstruction or an attempt to obstruct justice, and has failed to fully disclose such conduct to the United States prior to signing this Plea Agreement;

viii.   fails to appear in court as required;

ix.     after signing this Plea Agreement, engages in additional criminal conduct; or

x.      attempts to withdraw the plea of guilty.

If the defendant has accepted responsibility as described above, and the defendant's offense level is sixteen or greater, Public Integrity agrees that an additional 1-level reduction would be appropriate, pursuant to U.S.S.G. § 3E1.1(b) because the defendant has assisted authorities by providing timely notice of the defendant's intention to enter a plea of guilty, thereby permitting Public Integrity to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

c.   <u>Government's Sentencing Guidelines Calculations, Not Agreed to by Defendant:</u>

The United States stipulates that it will contend the following Sentencing Guidelines calculation under §§ 2B1.1(c)(3) and 2C1.1 is applicable to this case:

| | |
|---|---|
| Base Offense Level | 8 |
| Specific Offense Level, Contributions $30,000 - $70,000 | 6 |

| | |
|---|---|
| Number of Illegal Transactions - More than 30 | 2 |
| Reduction for Acceptance of Responsibility | -3 |
| Total Offense Level | 13 |

Should the Court determine that the Total Offense Level is Level 13, then the Government will recommend a sentence at the bottom of the guideline range. Should the Court determine that the Total Offense Level is less than Level 13, then the Government is not bound to recommend a sentence at the bottom of the guideline range. The defendant does not agree with the Government's calculation of the Sentencing Guidelines in this paragraph.

9.      Except as stipulated herein, the defendant and the Government reserve the right to make additional arguments to the Court and on appeal concerning the appropriate sentence to be imposed under the advisory Sentencing Guidelines, as well as Title 18, United States Code, Section 3551.

**Court Not Bound by the Plea Agreement**

10.     It is understood that pursuant to Federal Rules of Criminal Procedure 11(c)(1)(B) and 11(c)(3)(B) the Court is not bound by the above stipulations, either as to questions of fact or as to the parties' determination of the applicable Guidelines range, or other sentencing issues. In the event that the Court considers any Guidelines adjustments, departures, or calculations different from any stipulations contained in this Agreement, or contemplates a sentence outside the Guidelines range based upon the general sentencing factors listed in Title 18, United States Code, Section 3553(a), the parties reserve the right to answer any related inquiries from the Court.

**Partial Waiver of Right to Appeal**

11.     The defendant is aware that the defendant has the right to challenge the defendant's

sentence and guilty plea on direct appeal. The defendant is also aware that the defendant may, in some circumstances, be able to argue that the defendant's guilty plea should be set aside, or sentence set aside or reduced, in a collateral challenge (such as pursuant to a motion under 28 U.S.C. § 2255). Knowing that, and in consideration of the concessions made by Public Integrity in this Agreement, the defendant knowingly and voluntarily waives his right to appeal or collaterally challenge the defendant's guilty plea and any other aspect of the defendant's conviction, including, but not limited to, any rulings on pretrial suppression motions or any other pretrial dispositions of motions and issues. The defendant retains and reserves the right to appeal the calculation of his sentence under the United States Sentencing Guidelines, or the application of the sentencing factors listed in 18 U.S.C. § 3553.

12.    The defendant further understands that nothing in this agreement shall affect Public Integrity's right and/or duty to appeal as set forth in Title 18, United States Code, Section 3742(b). However, if Public Integrity appeals the defendant's sentence pursuant to Section 3742(b), the defendant shall be released from the above waiver of appellate rights. By signing this agreement, the defendant acknowledges that the defendant has discussed the appeal waiver set forth in this agreement with the defendant's attorney. The defendant further agrees, together with Public Integrity, to request that the district court enter a specific finding that the waiver of the defendant's right to appeal the sentence to be imposed in this case was knowing and voluntary.

13.    The defendant's waiver of rights to appeal and to bring collateral challenges shall not apply to appeals or challenges based on new legal principles in the D.C. Circuit or Supreme Court cases decided after the date of this Agreement that are held by the D.C. Circuit or Supreme Court to have retroactive effect.

**Restitution**

14.    In addition to the other penalties provided by law, the Court may also order the defendant to make restitution under 18 U.S.C. § 3663A.  The defendant understands that restitution may be ordered by the Court to all victims of the defendant's criminal conduct and not merely for those victims included in the count to which the defendant agrees to plead guilty.

**Breach of Agreement**

15.    The defendant understands and agrees that if, after entering this Plea Agreement, the defendant fails specifically to perform or to fulfill completely each and every one of the defendant's obligations under this Plea Agreement, or engages in any criminal activity prior to sentencing, the defendant will have breached this Plea Agreement.  In the event of such a breach:  (a) Public Integrity will be free from its obligations under the Agreement; (b) the defendant will not have the right to withdraw the guilty plea; (c) the defendant  shall be fully subject to criminal prosecution for any other crimes, including perjury and obstruction of justice; and (d) Public Integrity will be free to use against the defendant, directly and indirectly, in any criminal or civil proceeding, all the defendant's statements made during proceedings before the Court pursuant to Fed. R. Crim. P. 11.

16.    The defendant understands that Federal Rule of Criminal Procedure 11(f) and statements made by the defendant and any of the information or materials provided by the defendant, including such statements, information, and materials provided pursuant to this Agreement or during the course of any debriefings conducted in anticipation of, or after entry of this Agreement, including Federal Rule of Evidence 410 ordinarily limit the admissibility of statements made by a defendant in the course of plea discussions or plea proceedings if a guilty plea is later withdrawn.  The defendant knowingly and voluntarily waives the rights which arise under these rules.

8

17.     The defendant understands and agrees that Public Integrity shall only be required to prove a breach of this Plea Agreement by a preponderance of the evidence.  The defendant further understands and agrees that Public Integrity need only prove a violation of federal, state, or local criminal law by probable cause in order to establish a breach of this Plea Agreement.

18.     Nothing in this Agreement shall be construed to permit the defendant to commit perjury, to make false statements or declarations, to obstruct justice, or to protect the defendant from prosecution for any crimes not included within this Agreement or committed by the defendant after the execution of this Agreement.  The defendant understands and agrees that Public Integrity reserves the right to prosecute the defendant for any such offenses.  The defendant further understands that any perjury, false statements or declarations, or obstruction of justice relating to the defendant's obligations under this Agreement shall constitute a breach of this Agreement.  However, in the event of such a breach, the defendant will not be allowed to withdraw this guilty plea.

### Waiver of Statute of Limitations

19.     It is further agreed that should any conviction following the defendant's plea of guilty pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement (including any counts that Public Integrity has agreed not to prosecute or to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution.  It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

**Complete Agreement**

20.     No other agreements, promises, understandings, or representations have been made by the parties or their counsel than those contained in writing herein, nor will any such agreements, promises, understandings, or representations be made unless committed to writing and signed by the defendant, defense counsel, and a prosecutor for Public Integrity.

21.     The defendant further understands that this Agreement is binding only upon the Public Integrity Section, Criminal Division, United States Department of Justice.  This Agreement does not bind the Civil Division or any other United States Attorney's Office, nor does it bind any other state, local, or federal prosecutor.  It also does not bar or compromise any civil, tax, or administrative claim pending or that may be made against the defendant, including any claims available to the Federal Election Commission based upon the defendant's actions.

22.     If the foregoing terms and conditions are satisfactory, the defendant may so indicate by signing the Agreement in the space indicated below and returning the original to me once it has been signed by the defendant and by you or other defense counsel.

10

Respectfully submitted,

WILLIAM M. WELCH II
Chief
Public Integrity Section

By: _Eileen Gleason_

Eileen Gleason
John P. Pearson
Trial Attorneys
Public Integrity Section
1400 New York Ave. NW
Washington, DC 20005
(202) 514-1412

11

## DEFENDANT'S ACCEPTANCE

I have read this letter in its entirety and discussed it with my attorney. I hereby acknowledge that it fully sets forth my agreement with Public Integrity. I further state that no additional promises or representations have been made to me by any official of the United States in connection with this matter. I understand the crimes to which I have agreed to plead guilty, the maximum penalties for those offenses and Sentencing Guideline penalties potentially applicable to them. I am satisfied with the legal representation provided to me by my attorney. We have had sufficient time to meet and discuss my case. We have discussed the charges against me, possible defenses I might have, the terms of this Plea Agreement and whether I should go to trial. I am entering into this Agreement freely, voluntarily, and knowingly because I am guilty of the offenses to which I am pleading guilty, and I believe this Agreement is in my best interest.

Date: July 27, 2007

**David Therrell Collier**
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read each of the pages constituting this Plea Agreement, reviewed them with my client, and discussed the provisions of the Agreement with my client, fully. These pages accurately and completely set forth the entire Plea Agreement. I concur in my client's desire to plead guilty as set forth in this Agreement.

Date: July 30, 07

**James Hamilton**, Esquire
Attorney for the Defendant

12

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. |
| | ) | |
| DAVID THERRELL COLLIER | ) | 18 U.S.C. §§ 1001, 2 |
| | ) | |
| Defendant. | ) | |
| | ) | |

## FACTUAL BASIS FOR PLEA

The United States of America, by and through its undersigned attorneys within the

United States Department of Justice, Criminal Division, Public Integrity Section, and the

Defendant, DAVID THERRELL COLLIER, personally and through his undersigned counsel,

hereby stipulate to the following facts pursuant to United States Sentencing Guidelines § 6A1.1

and Rule 32(c)(1) of the Federal Rules of Criminal Procedure.

## INTRODUCTION

At all times relevant hereto:

1.    In or about late 1997, defendant DAVID THERRELL COLLIER began a business

relationship with Indian Tribe A, a federally recognized Tribe of Native Americans whose

reservation is located in the State of South Carolina.

2.    Defendant COLLIER and Indian Tribe A formed a joint venture entitled New River

Management & Development Company LLC (New River).  Beginning in or about December

1997, Indian Tribe A contracted with New River to provide management services for a bingo hall

owned by the tribe and located in Rock Hill, South Carolina.

3.      Co-defendant ROBERT PRICE III worked as the Chief Operating Officer of the joint venture, and he also had positions in other corporations in the gaming industry controlled by COLLIER.

4.      In his capacity as COO of New River, PRICE oversaw those employees who ran the day-to-day operations of the Rock Hill bingo hall.  His duties included locating and managing employees and contractors at the hall, as well as identifying additional gaming business opportunities for Indian Tribe A and COLLIER or his associated businesses.

5.      In or about February 2002, the State of South Carolina authorized and began to operate a state-owned lottery.  The state lottery severely impacted the profits of the Rock Hill bingo hall.

6.      In order to offset the reduced profits at the Rock Hill bingo hall, COLLIER and others devised a plan to open and operate a Class II tribal gaming facility in Santee, South Carolina.  This facility (the "Santee Facility") was to be owned by Indian Tribe A and operated by either a company owned or controlled by COLLIER or a joint venture between COLLIER and Indian Tribe A.

7.      The Santee Facility was to provide more and different types of gaming than the Rock Hill bingo hall.  As a result, approval for the Facility was needed from either the United States government or the government of the State of South Carolina.

8.      In order to gain that approval, COLLIER and others realized that they needed the support of elected officials, including federal and state representatives from South Carolina.

9.      To win the support of those elected officials, COLLIER and others decided to make political contributions to those elected officials or their designated political committees.

2

## THE FEDERAL ELECTION COMMISSION

10.    The Federal Election Commission (FEC) was an agency of the United States government, headquartered in Washington, D.C.  It was responsible for enforcing the reporting requirements of the Federal Election Campaign Act (FECA) and for directing, investigating, and instituting civil enforcement actions with respect to violations of the FECA.  In addition, the FEC was responsible for making available to the public specific information about the true amounts and true sources of political contributions to federal candidates and their political committees.

11.    The FECA specifically provided that:

    a.    There were limits on the maximum individual contribution allowed by law to any federal candidate or his authorized political committees per election;

    b.    It was unlawful to make contributions in the name of another person or knowingly permit one's name to be used to effect such contributions; and

    c.    Political committees were required to file periodic reports with the FEC identifying each person who made a contribution during the reporting period whose contribution or contributions for that calendar year aggregated over $200.

12.    COLLIER knew that having contributions made in the names of others would have the effect of shielding the identity of the true contributors, and he took the following actions in order to conceal the true identities of the contributors.

## PROHIBITED CONTRIBUTIONS

13.    Beginning in or about March 2000, and continuing through in or about September 2004, COLLIER and PRICE knowingly solicited and obtained campaign contributions from friends, family members, and business associates with an aggregate amount of $66,500.

14.    COLLIER and PRICE directed those contributions to candidates for federal offices and federal elected officials, and then caused the contributing individuals, or conduits, to be reimbursed with tribal funds.  This in turn caused numerous political committees to submit materially false statements to the FEC, because the political committees identified the individuals as the contributors, rather than Indian Tribe A.

15.    These unlawful contributions were made in the following ways.  COLLIER and PRICE identified certain candidates, elected officials, and political committees that they believed would further the legislative interests of Indian Tribe A, particularly with respect to the Santee Facility.  COLLIER, PRICE, and other individuals associated with COLLIER and PRICE then sought out friends, family members, business associates, and spouses of business associates to make contributions to the candidates, elected officials or committees.  Once the contribution had been made, COLLIER or PRICE would cause reimbursements to be made to the person who made the initial contribution.  These reimbursement checks would be drawn on either a bank account in the name of Tribe A Economic Development, or the accounts of joint ventures between COLLIER and Indian Tribe A.  Ultimately, however, tribal funds were used to reimburse either the individual conduits or the accounts used to initially reimburse the conduits.

16.    For example, in or about January 2003, COLLIER and PRICE solicited and accepted a total of $10,000 in conduit contributions from nine different individuals.  The conduit

4

contributions were all made by personal checks written on or about January 17, 2003 in the amount of either $1,000 or $2,000. The checks were made out to the political committee of an elected official. To reimburse the conduit contributors, COLLIER and PRICE caused checks to be issued to the conduits either from:

> (a)  A bank account in the name of Tribe A Economic Development, which contained funds of Indian Tribe A; or

> (b)  A bank account controlled by a joint venture owned by COLLIER and Indian Tribe A, which bank account was then reimbursed by check from the Tribe A Economic Development bank account.

In some cases, the dates of the reimbursements actually preceded the dates of the campaign contributions and, thus, constituted advances of tribal money for the purpose of enabling the conduit contributors to make the contributions.

17.    The motive for making the contributions by means of conduit contributors was to avoid having it known to the public that Indian Tribe A was supporting particular candidates for federal office and elected officials, as well as to avoid the limits on maximum individual contribution allowed by law to any federal candidate or his authorized political committees per election.

18.    On or about January 31, 2003, COLLIER and PRICE met with an elected official and provided the $10,000 in conduit contributions. At no time did they inform the official or any member of the official's staff that the contributions were illegitimate and that the contributors had been reimbursed for their contributions.

19.    On or about April 15, 2003, the political committee of the elected official filed a

campaign finance report with the FEC.  This report falsely stated that the contributions had been

made by the conduits, rather than stating accurately that the contributions were made with funds

provided by Indian Tribe A.


FOR THE DEFENDANT                    FOR THE UNITED STATES

                                     WILLIAM M. WELCH II
                                     Chief
                                     Public Integrity Section


_James Hamilton_ (signature)         By:    _Eileen Gleason_ (signature)
JAMES HAMILTON                       EILEEN GLEASON
*Counsel for the Defendant*          Trial Attorney
                                     Public Integrity Section
                                     T: 202-305-8294
                                     F: 202-514-3003


_David Therrell Collier_ (signature) By:    _John P. Pearson_ (signature)
DAVID THERRELL COLLIER               JOHN P. PEARSON
*Defendant*                          Trial Attorney
                                     Public Integrity Section
                                     Criminal Division
                                     U.S. Department of Justice
                                     1400 New York Ave., NW -- 12th Floor
                                     Washington, DC  20530
                                     T: 202-307-2281
                                     F: 202-514-3003

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. |
| | ) | |
| ROBERT HOWELL PRICE III | ) | 18 U.S.C. §§ 1001, 2 |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### PLEA AGREEMENT

_____The United States of America and Robert Howell Price III (hereinafter referred to as the "defendant") enter into the following agreement:

### Charges and Statutory Penalties

1.      The defendant agrees to plead guilty to Count One of the Information, Causing a False Statement, in violation of Title 18, United States Code, Sections 1001 and 2.

2.      The defendant understands that Count One has the following essential elements, each of which the United States would be required to prove beyond a reasonable doubt at trial:

      a.      First, the defendant willfully caused a statement to be made;

      b.      Second, that the statement was false;

      c.      Third, that the falsity related to a material matter; and

      d.      Fourth, that the false statement was made or used in relation to a matter within the jurisdiction of a department or agency of the United States.

1

3.      The defendant understands that pursuant to 18 U.S.C. § 1001, Count One carries a

maximum sentence of five years of imprisonment, a fine of $250,000 or a fine of

twice the pecuniary gain or loss pursuant to 18 U.S.C. § 3571(d), a $100 special

assessment, and a three year term of supervised release, an order of restitution, and

an obligation to pay any applicable interest or penalties on fines or restitution not

timely made.

**Factual Stipulations**

4.      The defendant agrees that the attached Factual Basis for Plea fairly and

accurately describes the defendant's actions and involvement in the offense to which the defendant

is pleading guilty.  The defendant knowingly, voluntarily, and truthfully admits the facts set forth in

the Factual Basis for Plea.

**Sentencing**

5.      The defendant is aware that the sentence will be imposed by the court after

considering the Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing

Guidelines").  The defendant acknowledges and understands that the court will compute an advisory

sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by

the court relying in part on the results of a Pre-Sentence Investigation by the court's probation office,

which investigation will commence after the guilty plea has been entered.  The defendant is also

aware that, under certain circumstances, the court may depart from the advisory sentencing guideline

range that it has computed, and may raise that advisory sentence up to and including the statutory

maximum sentence or lower that advisory sentence.  The defendant is further aware and understands

that the court is required to consider the advisory guideline range determined under the Sentencing

2

Guidelines, but is not bound to impose that sentence; the court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory sentence. Knowing these facts, the defendant understands and acknowledges that the court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense(s) identified in paragraph 1 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

6.      The Public Integrity Section, Criminal Division, United States Department of Justice (hereinafter "Public Integrity") reserves the right to inform the court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this agreement, Public Integrity further reserves the right to make any recommendation as to the quality and quantity of punishment.

7.      The defendant is aware that any estimate of the probable sentence or the probable sentencing range relating to the defendant pursuant to the advisory Sentencing Guidelines that the defendant may have received from any source is only a prediction and not a promise, and is not binding on the United States, the probation office, or the court, except as expressly provided in this plea agreement.

### Sentencing Guidelines Stipulations

8.      The defendant understands that the sentence in this case will be determined by the Court, pursuant to the factors set forth in 18 U.S.C. § 3553(a), including a consideration of the guidelines and policies promulgated by the United States Sentencing Commission <u>Guidelines</u>

Manual 2006 (hereinafter "Sentencing Guidelines" or "U.S.S.G"). Pursuant to Federal Rule of

Criminal Procedure 11(c)(1)(B), and to assist the Court in determining the appropriate sentence, the

parties stipulate to the following:

a.     Factors Affecting Offense Level under the Guidelines:  The amount of conduit
campaign contributions in this case was between $30,000 and $70,000.  No
adjustment for role in the offense under U.S.S.G. §§ 3B1.1 or 3B1.2 of the
Sentencing Guidelines is appropriate.

b.     Acceptance of Responsibility:  Provided that the defendant clearly demonstrates
acceptance of responsibility, to the satisfaction of Public Integrity, through the
defendant's allocution and subsequent conduct prior to the imposition of sentence,
Public Integrity agrees that a 2-level reduction would be appropriate pursuant to
U.S.S.G § 3E1.1(a).

Public Integrity, however, may oppose any adjustment for acceptance of
responsibility if the defendant:

i.     fails to admit a complete factual basis for the plea at the time the
defendant is sentenced or at any other time;

ii.    challenges the adequacy or sufficiency of the United States' offer of
proof at any time after the plea is entered;

iii.   denies involvement in the offense;

iv.    gives conflicting statements about that involvement or is untruthful
with the Court, the United States or the Probation Office;

4

v.    fails to give complete and accurate information about the defendant's financial status to the Probation Office;

vi.    obstructs or attempts to obstruct justice, prior to sentencing;

vii.    has engaged in conduct prior to signing this Plea Agreement which reasonably could be viewed as obstruction or an attempt to obstruct justice, and has failed to fully disclose such conduct to the United States prior to signing this Plea Agreement;

viii.    fails to appear in court as required;

ix.    after signing this Plea Agreement, engages in additional criminal conduct; or

x.    attempts to withdraw the plea of guilty.

If the defendant has accepted responsibility as described above, and the defendant's offense level is sixteen or greater, Public Integrity agrees that an additional 1-level reduction would be appropriate, pursuant to U.S.S.G. § 3E1.1(b) because the defendant has assisted authorities by providing timely notice of the defendant's intention to enter a plea of guilty, thereby permitting Public Integrity to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

c.    Government's Sentencing Guidelines Calculations, Not Agreed to by Defendant:

The United States stipulates that it will contend the following Sentencing Guidelines calculation under §§ 2B1.1(c)(3) and 2C1.1 is applicable to this case:

| | |
|---|---|
| Base Offense Level | 8 |
| Specific Offense Level, Contributions $30,000 - $70,000 | 6 |

5

| | |
|---|---|
| Number of Illegal Transactions - More than 30 | 2 |
| Reduction for Acceptance of Responsibility | -3 |
| Total Offense Level | 13 |

Should the Court determine that the Total Offense Level is Level 13, then the Government will recommend a sentence at the bottom of the guideline range. Should the Court determine that the Total Offense Level is less than Level 13, then the Government is not bound to recommend a sentence at the bottom of the guideline range. The defendant does not agree with the Government's calculation of the Sentencing Guidelines in this paragraph. Except as stipulated herein, the defendant and the Government reserve the right to make additional arguments to the Court and on appeal concerning the appropriate sentence to be imposed under the advisory Sentencing Guidelines, as well as Title 18, United States Code, Section 3551.

**Court Not Bound by the Plea Agreement**

9.    It  is understood that pursuant to Federal Rules of Criminal Procedure 11(c)(1)(B) and 11(c)(3)(B) the Court is not bound by the above stipulations, either as to questions of fact or as to the parties' determination of the applicable Guidelines range, or other sentencing issues. In the event that the Court considers any Guidelines adjustments, departures, or calculations different from any stipulations contained in this Agreement, or contemplates a sentence outside the Guidelines range based upon the general sentencing factors listed in Title 18, United States Code, Section 3553(a), the parties reserve the right to answer any related inquiries from the Court.

**Partial Waiver of Right to Appeal**

10.    The defendant is aware that the defendant has the right to challenge the defendant's

6

sentence and guilty plea on direct appeal. The defendant is also aware that the defendant may, in some circumstances, be able to argue that the defendant's guilty plea should be set aside, or sentence set aside or reduced, in a collateral challenge (such as pursuant to a motion under 28 U.S.C. § 2255). Knowing that, and in consideration of the concessions made by Public Integrity in this Agreement, the defendant knowingly and voluntarily waives his right to appeal or collaterally challenge: (a) the defendant's guilty plea and any other aspect of the defendant's conviction, including, but not limited to, any rulings on pretrial suppression motions or any other pretrial dispositions of motions and issues. The defendant retains the right to appeal the calculation of his sentence under the United States Sentencing Guidelines or the application of the sentencing factors listed in 18 U.S.C. § 3553.

11.     The defendant further understands that nothing in this agreement shall affect Public Integrity's right and/or duty to appeal as set forth in Title 18, United States Code, Section 3742(b). However, if Public Integrity appeals the defendant's sentence pursuant to Section 3742(b), the defendant shall be released from the above waiver of appellate rights. By signing this agreement, the defendant acknowledges that the defendant has discussed the appeal waiver set forth in this agreement with the defendant's attorney. The defendant further agrees, together with Public Integrity, to request that the district court enter a specific finding that the waiver of the defendant's right to appeal the sentence to be imposed in this case was knowing and voluntary.

12.     The defendant's waiver of rights to appeal and to bring collateral challenges shall not apply to appeals or challenges based on new legal principles in the U.S. Court of Appeals for the District of Columbia Circuit or Supreme Court cases D.C. Circuit or Supreme Court to have retroactive effect.

**Restitution**

7

13.     In addition to the other penalties provided by law, the Court may also order the defendant to make restitution under 18 U.S.C. § 3663A. The defendant understands that restitution may be ordered by the Court to all victims of the defendant's criminal conduct and not merely for those victims included in the count(s) to which the defendant agrees to plead guilty.

**Breach of Agreement**

14.     The defendant understands and agrees that if, after entering this Plea Agreement, the defendant fails specifically to perform or to fulfill completely each and every one of the defendant's obligations under this Plea Agreement, or engages in any criminal activity prior to sentencing, the defendant will have breached this Plea Agreement. In the event of such a breach: (a) Public Integrity will be free from its obligations under the Agreement; (b) the defendant will not have the right to withdraw the guilty plea; (c) the defendant shall be fully subject to criminal prosecution for any other crimes, including perjury and obstruction of justice; and (d) Public Integrity will be free to use against the defendant, directly and indirectly, in any criminal or civil proceeding, all statements made by the defendant and any of the information or materials provided by the defendant, including such statements, information and materials provided pursuant to this Agreement or during the course of any debriefings conducted in anticipation of, or after entry of this Agreement, including the defendant's statements made during proceedings before the Court pursuant to Fed. R. Crim. P. 11.

15.     The defendant understands that Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 ordinarily limit the admissibility of statements made by a defendant in the course of plea discussions or plea proceedings if a guilty plea is later withdrawn. The defendant knowingly and voluntarily waives the rights which arise under these rules.

8

16.     The defendant understands and agrees that Public Integrity shall only be required to prove a breach of this Plea Agreement by a preponderance of the evidence.  The defendant further understands and agrees that Public Integrity need only prove a violation of federal, state, or local criminal law by probable cause in order to establish a breach of this Plea Agreement.

17.     Nothing in this Agreement shall be construed to permit the defendant to commit perjury, to make false statements or declarations, to obstruct justice, or to protect the defendant from prosecution for any crimes not included within this Agreement or committed by the defendant after the execution of this Agreement.  The defendant understands and agrees that Public Integrity reserves the right to prosecute the defendant for any such offenses.  The defendant further understands that any perjury, false statements or declarations, or obstruction of justice relating to the defendant's obligations under this Agreement shall constitute a breach of this Agreement.  However, in the event of such a breach, the defendant will not be allowed to withdraw this guilty plea.

### Waiver of Statute of Limitations

18.     It is further agreed that should any conviction following the defendant's plea of guilty pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement (including any counts that Public Integrity has agreed not to prosecute or to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution.  It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

9

### Substantial Assistance

19.    The defendant agrees to cooperate fully with Public Integrity by:

a.    providing truthful and complete information and testimony, and producing documents, records and other evidence, when called upon by Public Integrity, whether in interviews, before a grand jury, or at any trial or other court proceeding;

b.    waiving the defendant's right to have counsel present at all debriefings by law enforcement agents and government attorneys in order to facilitate the defendant's cooperation.  The defendant may revoke this waiver at any time by a specific request or through the defendant's counsel without affecting the terms and enforceability of this Agreement;

c.    appearing at such grand jury proceedings, hearings, trials, depositions, and other judicial proceedings, and at meetings, as may be required by Public Integrity;

d.    if requested by Public Integrity, working in an undercover role to contact and negotiate with others suspected and believed to be involved in criminal misconduct under the supervision of, and in compliance with, law enforcement officers and agents; and

e.    waiving any right to a prompt sentencing and joining in any requests by Public Integrity to postpone the defendant's sentencing until the defendant's cooperation is complete.  The defendant understands that the date of sentencing is within the sole discretion of the court, and that this agreement

may require the defendant to cooperate even after the defendant has been sentenced. The defendant's failure to cooperate pursuant to the terms of this Agreement after sentence has been imposed shall constitute a breach of this Agreement.

20.    Public Integrity reserves the right to evaluate the nature and extent of the defendant's cooperation and to make the defendant's cooperation, or lack thereof, known to the court at the time of sentencing. If in the sole and unreviewable judgment of Public Integrity the defendant's cooperation is of such quality and significance to the investigation or prosecution of other criminal matters as to warrant the court's downward departure from *the advisory sentence* calculated under the Sentencing Guidelines, Public Integrity may at or before sentencing make a motion consistent with the intent of Section 5K1.1 of the Sentencing Guidelines prior to sentencing, or Rule 35 of the Federal Rules of Criminal Procedure subsequent to sentencing, reflecting that the defendant has provided substantial assistance and recommending that the defendant's sentence be reduced from the advisory sentence suggested by the Sentencing Guidelines. The defendant acknowledges and agrees, however, that nothing in this Agreement may be construed to require Public Integrity to file any such motion(s) and that Public Integrity's assessment of the nature, value, truthfulness, completeness, and accuracy of the defendant's cooperation shall be binding insofar as the appropriateness of Public Integrity's filing of any such motion is concerned.

21.    The defendant understands and acknowledges that the Court is under no obligation to grant the Section 5K1.1 or Rule 35 motions referenced above should the government exercise its discretion to file any such motion. The defendant also understands and acknowledges that the court is under no obligation to reduce the defendant's sentence because of the defendant's cooperation.

11

**Complete Agreement**

22.     No other agreements, promises, understandings, or representations have been made by the parties or their counsel than those contained in writing herein, nor will any such agreements, promises, understandings, or representations be made unless committed to writing and signed by the defendant, defense counsel, and a prosecutor for Public Integrity.

23.     The defendant further understands that this Agreement is binding only upon the Public Integrity Section, Criminal Division, United States Department of Justice. This Agreement does not bind the Civil Division or any other United States Attorney's Office, nor does it bind any other state, local, or federal prosecutor. It also does not bar or compromise any civil, tax, or administrative claim pending or that may be made against the defendant, including any claims available to the Federal Election Commission based upon the defendant's actions.

24.     If the foregoing terms and conditions are satisfactory, the defendant may so indicate by signing the Agreement in the space indicated below and returning the original to me once it has been signed by the defendant and by you or other defense counsel.

Respectfully submitted,

WILLIAM M. WELCH II
Chief
Public Integrity Section

By: _____
Eileen Gleason
John P. Pearson
Trial Attorneys
Public Integrity Section
1400 New York Ave. NW
Washington, DC  20005
(202) 514-1412

13

_____ DEFENDANT'S ACCEPTANCE _____

I have read this letter in its entirety and discussed it with my attorney. I hereby acknowledge that it fully sets forth my agreement with Public Integrity. I further state that no additional promises or representations have been made to me by any official of the United States in connection with this matter. I understand the crimes to which I have agreed to plead guilty, the maximum penalties for those offenses and Sentencing Guideline penalties potentially applicable to them. I am satisfied with the legal representation provided to me by my attorney. We have had sufficient time to meet and discuss my case. We have discussed the charges against me, possible defenses I might have, the terms of this Plea Agreement and whether I should go to trial. I am entering into this Agreement freely, voluntarily, and knowingly because I am guilty of the offenses to which I am pleading guilty, and I believe this Agreement is in my best interest.

Date: __7/25/07__                    _____
                                     **Robert Howell Price III**
                                     Defendant

_____ ATTORNEY'S ACKNOWLEDGMENT _____

I have read each of the pages constituting this Plea Agreement, reviewed them with my client, and discussed the provisions of the Agreement with my client, fully. These pages accurately and completely sets forth the entire Plea Agreement. I concur in my client's desire to plead guilty as set forth in this Agreement.

Date: __7/25/07__                    _____
                                     **Richard Harpootlian**, Esquire
                                     Attorney for the Defendant

14

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. |
| | ) | |
| ROBERT HOWELL PRICE III | ) | 18 U.S.C. §§ 1001, 2 |
| | ) | |
| Defendant. | ) | |
| | ) | |

### FACTUAL BASIS FOR PLEA

The United States of America, by and through its undersigned attorneys within the

United States Department of Justice, Criminal Division, Public Integrity Section, and the

Defendant, ROBERT HOWELL PRICE III,  personally and through his undersigned counsel,

hereby stipulate to the following facts pursuant to United States Sentencing Guidelines § 6A1.1

and Rule 32(C)(1) of the Federal Rules of Criminal Procedure.

### INTRODUCTION

At all times relevant hereto:

1.    Defendant ROBERT HOWELL PRICE III was employed as the Chief Operating

Officer (COO) of a New River Management & Development Company LLC, a joint venture

between Indian Tribe A and a business operated by PRICE'S co-defendant, DAVID THERRELL

COLLIER.  PRICE also held positions in other corporations in the gaming industry controlled by

COLLIER.

2.    Indian Tribe A was a federally-recognized Tribe of Native American Indians

whose reservation was located in Rock Hill, South Carolina.

3.      Beginning in or about December 1997, Indian Tribe A hired New River to provide management services for a bingo hall owned by the Tribe and located in Rock Hill, South Carolina.

4.      As the COO of the joint venture, PRICE oversaw those employees who ran the day-to-day operations of the Rock Hill bingo hall. His duties included locating and managing employees and contractors at the hall, as well identifying additional gaming business opportunities for the Tribe.

5.      In or about February 2002, the State of South Carolina authorized and began to operate a state-owned lottery. The state lottery severely impacted the profits of the Rock Hill bingo hall.

6.      In order to offset the reduced profits at the Rock Hill bingo hall, PRICE and others devised a plan to open and operate a tribal gaming facility in Santee, South Carolina. This facility (the "Santee Facility") was to be owned by Indian Tribe A and operated by either a company owned or controlled by COLLIER or a joint venture between COLLIER and Indian Tribe A.

7.      The Santee Facility was to provide more and different types of gaming than the Rock Hill bingo hall. As a result, approval for the Facility was needed from either the United States government or the government of the State of South Carolina.

8.      In order to gain that approval, PRICE and others realized that they needed the support of elected officials, including federal and state representatives from South Carolina.

9.      To win the support of those elected officials, PRICE and others decided to make political contributions to those elected officials or their designated political committees.

2

## THE FEDERAL ELECTION COMMISSION

10.    The Federal Election Commission (FEC) was an agency of the United States government, headquartered in Washington, D.C. It was responsible for enforcing the reporting requirements of the Federal Election Campaign Act (FECA) and for directing, investigating, and instituting civil enforcement actions with respect to violations of the FECA. In addition, the FEC was responsible for making available to the public specific information about the true amounts and true sources of political contributions to federal candidates and their political committees.

11.    The FECA specifically provided that:

  a.    There were limits on the maximum individual contribution allowed by law to any federal candidate or his authorized political committees per election;

  b.    It was unlawful to make contributions in the name of another person or knowingly permit one's name to be used to effect such contributions; and

  c.    Political committees were required to file periodic reports with the FEC identifying each person who made a contribution during the reporting period whose contribution or contributions for that calendar year aggregated over $200.

12.    PRICE knew that having contributions made in the names of others would have the effect of shielding the identity of the true contributors, and he took the following actions in order to conceal the true identities of the contributors.

3

## PROHIBITED CONTRIBUTIONS

13.     Beginning in or about March 2000, and continuing through in or about September 2004, PRICE and COLLIER knowingly solicited and obtained campaign contributions from friends, family members, business associates, and members of Indian Tribe A, with an aggregate amount of $66,500.

14.     PRICE and COLLIER directed those contributions to federal elected officials, and then caused the contributing individuals, or conduits, to be reimbursed with tribal funds.  This in turn caused numerous political committees to submit materially false statements to the FEC, because the political committees identified the individuals as the contributors, rather than Indian Tribe A.

15.     These unlawful contributions were made in the following ways.  PRICE and COLLIER identified certain candidates, elected officials, and political committees that they believed would further the legislative interests of Indian Tribe A, particularly with respect to the Santee Facility.  PRICE, COLLIER and other individuals associated with PRICE and COLLIER then sought out friends, family members, business associates, and spouses of business associates to make contributions to the candidates, elected officials or committees.  Once the contribution had been made, PRICE or COLLIER would cause reimbursements to be made to the person who made the initial contribution.  These reimbursement checks would be drawn on either a bank account in the name of Tribe A Economic Development, or the accounts of joint ventures between COLLIER and Indian Tribe A.  Ultimately, however, tribal funds were used to reimburse either the individual conduits or the accounts used to initially reimburse the conduits.

4

16.    For example, in or about January 2003, PRICE and COLLIER solicited and accepted a total of $10,000 in conduit contributions from nine different individuals.  The conduit contributions were all made by personal checks written on or about January 17, 2003 in the amount of either $1,000 or $2,000.  The checks were made out to the political committee of an elected official.  To reimburse the conduit contributors, PRICE and COLLIER caused checks to be issued to the conduits either from:

(a)    A bank account in the name of Tribe A Economic Development, which contained funds of Indian Tribe A; or

(b)    A bank account controlled by a joint venture owned by COLLIER and Indian Tribe A, which bank account was then reimbursed by check from the Tribe A Economic Development bank account.

In some cases, the dates of the reimbursements actually preceded the dates of the campaign contributions and, thus, were advances of tribal money for the purpose of enabling the conduit contributors to make the contributions.

17.    The motive for making the contributions via conduit contributors was to avoid having it known to the public that Indian Tribe A was supporting particular candidates for federal office and elected officials, as well as to avoid the limits on maximum individual contribution allowed by law to any federal candidate or his authorized political committees per election.

18.    On or about January 31, 2003, PRICE and COLLIER met with an elected official and provided him with the $10,000 in conduit contributions.  At no time did they inform the official or any member of the official's staff that the contributions were illegitimate and that the contributors had been reimbursed for their contributions.

5

19.    On or about April 15, 2003, the political committee of the elected official filed a campaign finance report with the FEC.  This report falsely stated that the contributions had been made by the conduits, rather than stating accurately that the contributions were made with funds provided by Indian Tribe A.


FOR THE DEFENDANT                          FOR THE UNITED STATES

                                           WILLIAM M. WELCH II
                                           Chief
                                           Public Integrity Section

                                   By:

RICHARD HARPOOTLIAN                        EILEEN GLEASON
*Counsel for the Defendant*                Trial Attorney
                                           Public Integrity Section

                                   By:

ROBERT HOWELL PRICE III                    JOHN P. PEARSON
*Defendant*                                Trial Attorney Public Integrity Section
                                           Criminal Division
                                           U.S. Department of Justice
                                           1400 New York Ave., NW -- 12th Floor
                                           Washington, DC  20530
                                           T: 202-307-2281
                                           F: 202-514-3003


6