IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Criminal No. 07-182-02 |
| ) | |
| ROBERT HOWELL PRICE III ) | 18 U.S.C. §§ 1001, 2 |
| ) | |
| Defendant. ) | |
| _____ ) | |

FILED
AUG - 3 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

### FACTUAL BASIS FOR PLEA

The United States of America, by and through its undersigned attorneys within the United States Department of Justice, Criminal Division, Public Integrity Section, and the Defendant, ROBERT HOWELL PRICE III, personally and through his undersigned counsel, hereby stipulate to the following facts pursuant to United States Sentencing Guidelines § 6A1.1 and Rule 32(C)(1) of the Federal Rules of Criminal Procedure.

### INTRODUCTION

At all times relevant hereto:

1.  Defendant ROBERT HOWELL PRICE III was employed as the Chief Operating Officer (COO) of a New River Management & Development Company LLC, a joint venture between Indian Tribe A and a business operated by PRICE'S co-defendant, DAVID THERRELL COLLIER. PRICE also held positions in other corporations in the gaming industry controlled by COLLIER.

2.  Indian Tribe A was a federally-recognized Tribe of Native American Indians whose reservation was located in Rock Hill, South Carolina.

3. Beginning in or about December 1997, Indian Tribe A hired New River to provide management services for a bingo hall owned by the Tribe and located in Rock Hill, South Carolina.

4. As the COO of the joint venture, PRICE oversaw those employees who ran the day-to-day operations of the Rock Hill bingo hall. His duties included locating and managing employees and contractors at the hall, as well identifying additional gaming business opportunities for the Tribe.

5. In or about February 2002, the State of South Carolina authorized and began to operate a state-owned lottery. The state lottery severely impacted the profits of the Rock Hill bingo hall.

6. In order to offset the reduced profits at the Rock Hill bingo hall, PRICE and others devised a plan to open and operate a tribal gaming facility in Santee, South Carolina. This facility (the "Santee Facility") was to be owned by Indian Tribe A and operated by either a company owned or controlled by COLLIER or a joint venture between COLLIER and Indian Tribe A.

7. The Santee Facility was to provide more and different types of gaming than the Rock Hill bingo hall. As a result, approval for the Facility was needed from either the United States government or the government of the State of South Carolina.

8. In order to gain that approval, PRICE and others realized that they needed the support of elected officials, including federal and state representatives from South Carolina.

9. To win the support of those elected officials, PRICE and others decided to make political contributions to those elected officials or their designated political committees.

## THE FEDERAL ELECTION COMMISSION

10. The Federal Election Commission (FEC) was an agency of the United States government, headquartered in Washington, D.C. It was responsible for enforcing the reporting requirements of the Federal Election Campaign Act (FECA) and for directing, investigating, and instituting civil enforcement actions with respect to violations of the FECA. In addition, the FEC was responsible for making available to the public specific information about the true amounts and true sources of political contributions to federal candidates and their political committees.

11. The FECA specifically provided that:

   a. There were limits on the maximum individual contribution allowed by law to any federal candidate or his authorized political committees per election;

   b. It was unlawful to make contributions in the name of another person or knowingly permit one's name to be used to effect such contributions; and

   c. Political committees were required to file periodic reports with the FEC identifying each person who made a contribution during the reporting period whose contribution or contributions for that calendar year aggregated over $200.

12. PRICE knew that having contributions made in the names of others would have the effect of shielding the identity of the true contributors, and he took the following actions in order to conceal the true identities of the contributors.

## PROHIBITED CONTRIBUTIONS

13.     Beginning in or about March 2000, and continuing through in or about September 2004, PRICE and COLLIER knowingly solicited and obtained campaign contributions from friends, family members, business associates, and members of Indian Tribe A, with an aggregate amount of $66,500.

14.     PRICE and COLLIER directed those contributions to federal elected officials, and then caused the contributing individuals, or conduits, to be reimbursed with tribal funds. This in turn caused numerous political committees to submit materially false statements to the FEC, because the political committees identified the individuals as the contributors, rather than Indian Tribe A.

15.     These unlawful contributions were made in the following ways. PRICE and COLLIER identified certain candidates, elected officials, and political committees that they believed would further the legislative interests of Indian Tribe A, particularly with respect to the Santee Facility. PRICE, COLLIER and other individuals associated with PRICE and COLLIER then sought out friends, family members, business associates, and spouses of business associates to make contributions to the candidates, elected officials or committees. Once the contribution had been made, PRICE or COLLIER would cause reimbursements to be made to the person who made the initial contribution. These reimbursement checks would be drawn on either a bank account in the name of Tribe A Economic Development, or the accounts of joint ventures between COLLIER and Indian Tribe A. Ultimately, however, tribal funds were used to reimburse either the individual conduits or the accounts used to initially reimburse the conduits.

16. For example, in or about January 2003, PRICE and COLLIER solicited and accepted a total of $10,000 in conduit contributions from nine different individuals. The conduit contributions were all made by personal checks written on or about January 17, 2003 in the amount of either $1,000 or $2,000. The checks were made out to the political committee of an elected official. To reimburse the conduit contributors, PRICE and COLLIER caused checks to be issued to the conduits either from:

    (a) A bank account in the name of Tribe A Economic Development, which contained funds of Indian Tribe A; or

    (b) A bank account controlled by a joint venture owned by COLLIER and Indian Tribe A, which bank account was then reimbursed by check from the Tribe A Economic Development bank account.

In some cases, the dates of the reimbursements actually preceded the dates of the campaign contributions and, thus, were advances of tribal money for the purpose of enabling the conduit contributors to make the contributions.

17. The motive for making the contributions via conduit contributors was to avoid having it known to the public that Indian Tribe A was supporting particular candidates for federal office and elected officials, as well as to avoid the limits on maximum individual contribution allowed by law to any federal candidate or his authorized political committees per election.

18. On or about January 31, 2003, PRICE and COLLIER met with an elected official and provided him with the $10,000 in conduit contributions. At no time did they inform the official or any member of the official's staff that the contributions were illegitimate and that the contributors had been reimbursed for their contributions.

19. On or about April 15, 2003, the political committee of the elected official filed a campaign finance report with the FEC. This report falsely stated that the contributions had been made by the conduits, rather than stating accurately that the contributions were made with funds provided by Indian Tribe A.

| FOR THE DEFENDANT | FOR THE UNITED STATES |
|---|---|
| | WILLIAM M. WELCH II<br>Chief<br>Public Integrity Section |
| _____<br>RICHARD HARPOOTLIAN<br>*Counsel for the Defendant* | By: _____<br>EILEEN GLEASON<br>Trial Attorney<br>Public Integrity Section |
| _____<br>ROBERT HOWELL PRICE III<br>*Defendant* | By: _____<br>JOHN P. PEARSON<br>Trial Attorney Public Integrity Section<br>Criminal Division<br>U.S. Department of Justice<br>1400 New York Ave., NW -- 12th Floor<br>Washington, DC 20530<br>T: 202-307-2281<br>F: 202-514-3003 |