**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 07-182-01 |
| | ) | |
| DAVID THERRELL COLLIER, | ) | Lamberth, J. |
| | ) | |
| Defendant | ) | |
| _____ | ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Undersigned counsel for defendant David Therrell Collier respectfully submit this memorandum of points and authorities with respect to the January 30, 2008 sentencing of Mr. Collier following his plea of guilty to a one-count information alleging violation of 18 U.S.C. §§ 2 & 1001. After a brief summary of the procedural history of this case, we provide detailed information regarding Mr. Collier's personal and professional background, his personal attributes, and the factual circumstances of this case. We then turn to a discussion of the Sentencing Guidelines applicable to this case. We conclude with a specific sentencing recommendation and consideration of the factors specified in 18 U.S.C. §3553.

**I.    PROCEDURAL HISTORY**

Mr. Collier has fully cooperated with the Government since the first day he learned of the investigation in this case. In the course of that cooperation, Mr. Collier pled guilty on August 3, 2007 to aiding and abetting (§ 2) a false statement to a federal agency (§ 1001). This plea responded to the government's theory that his admitted involvement in arranging for individuals to be reimbursed for their contributions to candidates for federal office caused the political committees of those candidates to report falsely to the Federal Election Commission that the contributions came from the individuals when in fact the contributed funds came ultimately from another source. The Government did not assert that Mr. Collier violated 2 U.S.C. §§ 441f and 437g(d) of the Federal Election Act, which expressly address reimbursed political contributions

(also called "conduit" contributions), because that section requires proof that the defendant knew of and intended to violate the statutory prohibition of conduit contributions, and that element, as discussed below, has not been established in this case. The false statement statute, §1001, does not require proof of knowledge of the statutory prohibition or proof of a specific intent to violate that statute. The Court originally scheduled sentencing for November 19, 2007 (and subsequently rescheduled it to January 30, 2008 at the request of the government) to ensure that the Court would have completed a long trial and that it therefore could turn its full attention to the sentencing issues in this case. Following his guilty plea, Mr. Collier has been free on his personal recognizance pending sentencing.

## II.    MR. COLLIER'S PERSONAL HISTORY

Mr. Collier has lived and worked in South Carolina his entire life.    He is 64 years old and was born in 1943 in St. George, SC, a small town in an economically depressed area of the state.    He was the only child of a small businessman.    In the words of one friend who has "known Terry since we were young children growing up in the small town of St. George, S.C.," it was "a family of modest means, but it was a family that valued honesty, trustworthiness, hard work and integrity" (Mr. R. Crook).[1]   He was "a loving son" (Mrs. Summersel) and "a doting son and grandson to his parents and grandmother" (Mrs. Johnston).    By all reports, Mr. Collier, throughout his childhood, adolescence and teenage years, was "highly respected by his classmates and . . . well thought of by our teachers" (Mr. Judy).    Another of his childhood friends, who has known Mr. Collier "since we were together in the nursery at church," recalls that he was "a great 'protector' and guide of me as a somewhat naïve and, often times, reckless teenager." (Mrs. Howell)  Mr. Collier's father and mother died in 1973 and 1982, and Mr. Collier's dedication to them during their extended incapacitation (due to Alzheimer's and a stroke, respectively), as well as to a spinster uncle, has been noted by many of his friends in their

---

[1]   All of the 59 letters written to the Court on Mr. Collier's behalf and discussed hereinafter are attached hereto as Appendix A and are arranged there in alphabetical order.

letters to the Court.

Mr. Collier graduated from high school in St. George in 1961 and then attended college for two years. He enlisted in the Air National Guard in 1963, was stationed in Texas, Mississippi and South Carolina, and was honorably discharged in 1969.

Mr. Collier married in 1969, and he and his wife Rebecca had three children. This marriage ended in divorce in the mid-1980's, due in considerable part to certain financial irresponsibility on the part of Mrs. Collier. Mrs. Tarrant, who has been a friend of Mr. Collier and both of his wives for 37 years, has described Mr. Collier's "anguish over the breakup of his first marriage." Another friend, Mr. Kitchens, noted that his divorce "was very traumatic to him." During this same period of time, Mr. Collier experienced significant financial difficulties arising out of a troubled development project that he undertook to salvage in a principled manner, at significant personal risk and sacrifice (as discussed in the next section). Nevertheless, he displayed "amazing generosity" during the divorce (Mrs. Tarrant). Subsequently, even though "Terry had no further financial obligations to her" after she re-married, when Rebecca divorced her second husband within approximately a year, "Terry was generous financially to her, even in a very difficult situation, and many times it was done without her knowledge." (Mr. M. Schraibman)

Mr. Collier and Dr. Linda Herlong, a professor at Columbia College in Columbia, SC, married in 1999. They have been described by Professor Rebecca Swanson, one of Mrs. Collier's friends and colleagues, as "an inseparable couple who share unconditional love and respect for each other." Mrs. Tarrant has observed that "Terry's marriage to Linda has been a blessing. He is a wonderful, considerate husband. They have a strong and loving relationship." Professor Swanson adds, "Terry brought new confidence, joy, and stability into Linda's life after her divorce from an abusive marital relationship. And Linda herself later provided the same solace for Terry and his children after a difficult marriage."

A/72381379.1

Mr. Collier has three adult children -- a son who is a fishing guide, a daughter who is engaged in the performing arts, and a son who is an attorney and who obtained a masters in Native American law at the University of Tulsa Law School at Mr. Collier's request so that Mr. Collier's companies could better serve the Catawba Indian Nation (CIN) (as discussed below). He also has one grandchild. He "has devoted his life to making a loving home for his children" (Mrs. Tarrant), and was "an exemplary father to his children, and a fine man for my own children to emulate" (Mr. Rowland). "He has raised a wonderful family ..." (Coach Bobby Cremins). His steadfastness on behalf of his children during the difficult divorce and the years immediately thereafter, when he acted "to protect his children from an unpleasant divorce proceeding" (Mrs. Tarrant), is evident in numerous letters which the Court has received.

In sum, the letters submitted to the Court, like Probation Officer Moses-Gregory's Presentence Investigation Report, establish beyond question that Mr. Collier is an exemplary individual with the highest personal qualities. The depth and extent of the love and trust reflected in the letter of his friends (some of whom are lifetime friends), are remarkable by any standards, even for a person who is in his seventh decade. When Mrs. Tarrant writes, "We have laughed, cried and grown old together," the genuine devotion and loyalty reflected by her letter could have been earned only by an eminently decent, caring and principled individual.

III.    **MR. COLLIER'S BUSINESS CAREER**

Mr. Collier began his career with the South Carolina National Bank and eventually became head of its largest branch. He then entered commercial real estate, and his focus subsequently shifted to real estate development. In approximately 1985, a project in which he partnered with Mr. Dan Avant encountered serious difficulties following certain unanticipated changes in the depreciation rates of certain types of residential property. Other investors simply walked away from the situation, and Mr. Collier could have done so as well but, instead, he contributed a substantial amount of additional collateral to the project, thereby "at great personal

sacrifice . . . meeting all of his obligations and commitments . . . although it took several difficult years and many sacrifices." (Mr. Avant)

Following this experience, Mr. Collier turned his full attention to the financial management and related businesses that he had begun to establish in approximately 1979 and that he has expanded over the past two-plus decades. Mr. Collier's primary company, SPM Resorts, is the second largest independent timeshare management company in the United States. SPM Resorts often obtains a client at a point when the timeshare project is struggling financially. SPM Resorts does not take any financial ownership in these projects but, instead, provides its services to the Boards of those entities. These "work-out" or "turn-around" situations usually require four or five years to resolve, and these relationships almost always evolve into essentially permanent management services relationships. SPM Resorts presently manages approximately 30 timeshare properties with a total of approximately 100,000 owners.

In these engagements, SPM takes extraordinary steps to insure financial transparency and accountability. The company insists that each entity utilize an outside CPA, rather than SPM itself, for its monthly financials and that it retain a different CPA firm for annual audits. (Mr. M. Schraibman) Also, Mr. Collier always has "insisted, in our presentations to the boards, that we only state to them absolute facts versus guesses and hunches." (Mr. Goodrich) The result, as one Homeowners Board Chairperson summarizes it, has been that "everything [Mr. Collier] said would occur has occurred, and he has provided these services with complete transparency." (Dr. Chvatal)

SPM takes on the employees of the troubled timeshare owners associations at the time it begins its workout services in order to prevent such employees from being laid off, and these employees normally remain on the company's payroll. SPM Resorts presently employs almost 600 people. Approximately 75% of the employees are blue-collar service personnel for whom Mr. Collier's company has provided extraordinary personal and family support and benefits,

A/72381379.1

educational programs and opportunities, and career development paths.   At Mr. Collier's

insistence -- and reflecting his background and experiences in St. George -- SPM provides

unusually comprehensive benefits for a company in the guest services industry.  Even more

importantly, Mr. Collier has embodied, and demanded of his employees, impeccable standards

and values that have led one former business associate to comment on "the integrity of the

employees he has been able to attract to his team." (Mr. Johnston)

The gratitude to and affection and esteem for Mr. Collier of SPM employees and others

who work with him are unreserved. Mr. Collier is beloved for being "one of the team and not

above anything" (Ms. Doherty), for "his treatment of his employees as equals, regardless of their

rank within the company" (Ms. Shanafelt), for "maintaining a positive and responsive work

environment for his employees" (Mr. Rodgers), and for "making decisions which may not have

been the best economically for his company, but that were in the interest of his employees and

their families"  (Ms. Shanafelt).  Others consider him "a father figure." (Mr. Merchant).

Mr. Collier also has striven to provide opportunities at his companies for

underrepresented segments of the community.  One of the two CPA firms mentioned above is a

female-owned enterprise that Mr. Collier first engaged approximately 20 years ago.  (One of its

principals, Ms. Smith, is indebted to Mr. Collier for mentoring her at the beginning of her career

by "show[ing] me a great deal of respect, even as a young professional, placing much trust and

confidence in me.")  Mr. Collier also is well-known and appreciated for his "prolonged and

active effort to find and promote minority workers into positions of greater management

responsibility within his company." (Mr. Dial)  The latter category includes, but is by no means

limited to, Mr. Walter Merchant, who is now one of the company's Maintenance Supervisors and

Mr. Jake Evans, who started as a desk clerk and now is General Manager of one of the resorts.

## IV.    MR. COLLIER'S COMMUNITY INVOLVEMENT

Two of Mr. Collier's lifelong friends from St. George note that Mr. Collier has been "a

community leader and a long time advocate in helping others who need food, clothing and medical needs." (Mr. Charles Crook and Mr. Clyde Crook)  In addition to his support for minority hiring and advancement as discussed in the preceding section, Mr. Collier has served on the United States Tourism Board, as Vice Chair of the South Carolina Board of Parks, Recreation and Tourism (upon appointment by the Hon. Richard W. Riley, Governor of the State of South Carolina and subsequently Secretary of the Department of Education), and as a bankruptcy court receiver on several occasions.  He also has supported over the years Little League baseball, the United Way, and the Special Olympics and its related College Transition Connection program.  At Mr. Collier's direction, SPM is now finalizing a collaboration with Ronald McDonald House to provide respite vacations for modest income parents of children receiving Ronald McDonald House services.  As recounted in the letters from Mrs. Johnston, the former head of the Episcopal Day School of the Church of the Good Shepherd in Augusta, Georgia and the present Mayor or St. George, and from others, Mr. Collier has also remained active in the life of his hometown, including being instrumental in the restoration of the Lourie Theater and the historic Kroger House and in the development of an Upper Dorchester County heritage center.

## V.     MR. COLLIER'S RELATIONSHIP TO AND INTERACTION WITH EMPLOYEES, FRIENDS, AND OTHERS

Even more noteworthy than his formal civic activities are Mr. Collier's innumerable individual acts of generosity and kindness throughout his entire life.  We have already noted his extraordinary steps on behalf of his incapacitated parents and other family members and his day-to-day treatment of his co-workers as friends, colleagues, and peers rather than as just his employees.  The letters submitted to the Court on Mr. Collier's behalf contain a remarkable number of other such instances.

Mr. Evans reports how Mr. Collier "truly showed how much family means to him" and how he "allowed me to come in to work later than my scheduled time" in order to accommodate

Mr. Evans' child care obligations when he was a single parent. And, when Mr. Evans underwent radiation treatment for prostate cancer over an extensive period at the Duke University Medical Center in Raleigh, NC, Mr. Collier arranged for him to continue to receive his full salary and also provided an additional housing allowance. Mr. Mims reports that Mr. Collier offered employment for the Mims' son when he lost his job at the same time that he and his wife were expecting their first child. Mrs. Johnston reports that Mr. Collier "helped our cousin establish himself in business and served as his mentor." Mrs. Gore reports on Terry's immediate and continuing support of an employee who lost a son. Mrs. Session recounts the small generosity of purchasing a pair of glasses for an employee at a time when she temporarily lacked sufficient funds to do so herself. Mr. McColl notes that Mr. Collier provided financial assistance so that he could attend graduate school. Reverend Hancock reports that Mr. Collier arranged for lodging for him and his wife during his sabbatical from his church at the request on a church member who is a life-long friend of Mr. Collier, even though Mr. Collier was not personally acquainted with Reverend Hancock. Professor Swanson recounts Mr. and Mrs. Collier's support as her husband was succumbing to Lou Gehrig's disease. Messrs. Charles and Clyde Crook emphasize that "Terry has always been there for us when we needed advice or new directions or counseling in our business." Mrs. Quantz describes Mr. Collier's support and generosity during her long wait for a heart transplant.

Even at the present time, when Mr. Collier obviously is gravely concerned about this case, Mr. Howard reports: "As I am writing this letter I am reeling from a great personal tragedy in my life. No one has been more responsive and caring as to my welfare than Terry. I think, however, that I am not a unique target of his concern and largesse as I have witnessed the same response in many situations and venues over the years." Mrs. Tarrant thus is not exaggerating when she describes Mr. Collier as "fiercely loyal to and generous with his friends." Nor is Secretary Riley, who was perhaps the single most respected person in the two Clinton

administrations and who took what he described to us as the unprecedented step of submitting a letter on a defendant's behalf, when he observes that "I have remained in touch with Terry and his family over the years and know him to be a devoted father and a person who is beloved by his employees and greatly respected in the business community."

Mr. Weathers, another friend since childhood, has made the following salient observation in his letter to the Court: "Though I do not know for sure why Terry did what he plead guilty to, I suspect he was trying to help someone in some way." Mrs. Collier, in her deeply thoughtful letter to the Court, adds: "It is my heartfelt belief that this criminal action is a result of his commitment to helping those he works with. . . ." As discussed in the following section of this memorandum, that was indeed the case.

## VI.    MR. COLLIER'S WORK WITH THE CATAWBA INDIAN NATION

Mr. Collier has been instrumental for more than a decade in the economic development efforts of the Catawba Indian Nation (CIN), whose reservation is located near Rock Hill, in the north-central part of South Carolina. The letters from Mrs. Collier and Mr. Dial refer, respectively, to his "ten years of working tirelessly for the Catawba Indian Nation ... [because he] believed in his fight for the Catawba Indians to have a means of being productive citizens" and "his worries about difficulties in communicating with the tribe on their business matters . . . [and] the various steps that Terry took to protect and inform them regarding their business and possible economic shifts." Mrs. Collier and Mr. Dial were referring, *inter alia*, to the following events.

In approximately 1996, Mr. Collier saw in a newspaper article that the CIN was looking for a bingo site. An old friend told Mr. Collier that his son, Bobby Price, Jr., the co-defendant in this case, had been working for the CIN as a consultant. Mr. Collier met with Mr. Price and it became clear to him that neither the CIN nor Mr. Price had any significant real estate experience or expertise. Mr. Collier also was recommended to the Tribe by its banker at the Bank of

America.  The Tribe had just purchased a former mall in Rock Hill and refurbished a Sears store into a bingo hall.  The Tribe also was looking for a second location near the Myrtle Beach area and ultimately purchased a distressed property.  The Tribe was impressed with Mr. Collier's management experience and accepted his proposal, from among several others, to manage its bingo operations.  Mr. Collier and Mr. Price thereupon formed a new company, New River, to manage the bingo operations and hired a manager.

The bingo operations commenced in late December, 1997.  However, within a few months, a prominent CIN member insisted on firing the manager brought in by Mr. Collier and hiring an associate whose only previous gaming background was as a busing coordinator for bingo players.  As Mr. Collier feared, the Rock Hill bingo operation's finances deteriorated throughout 1998.  Consequently, in late 1998, the Tribe's executive committee asked Mr. Collier to re-assume operational responsibilities.

A new day-to-day manager was appointed, and under Mr. Collier and Mr. Price's guidance, the CIN experienced very good years in 1999, 2000 and especially 2001, when approximately $2 million in net revenue was realized for the Tribe.  Throughout this entire period, Mr. Collier insisted to the accounting and financial personnel in his companies, and to Mr. Price and his bingo management staff, that the CIN be presented with timely, comprehensive financial records and projections.  Indeed, Mr. Collier has always personally spent a great deal of time trying to ensure that the CIN Executive Council received, reviewed, understood and approved accounting reports on past and current operations and results, as well as budgets and other projections regarding proposed future expenditures and anticipated revenues.  Mr. Adams, a former member of the Tribal Council and its Executive Committee, underscores Mr. Collier's "concern for fairness," his commitment "to setting up a sound business format and a management team that would be held accountable to the Tribal Council at all times," and his efforts "to train our folks [and] set up financial record keeping ....  Mr. Collier always ... put our

A/72381379.1

interest up front."

As Mr. Collier's and Mr. Price's efforts to put the Tribe's bingo operation back on its feet began to take effect, they devoted increasing amounts of time to the Tribe's Economic Development Program. Former Chief Gilbert Blue recalls that "Terry insisted that we take advantage of these great results by beginning a comprehensive economic development planning program, which he and his colleagues have been heavily involved in ever since." Mr. Collier continued to urge the Tribe to undertake a focused economic development program, including advanced (Class II) gaming. At the beginning of each year, Mr. Collier's lead company for CIN affairs (New River) drew up and provided the tribe with an Annual Economic Development Plan and Budget reflecting the yearly plan adopted by the Tribe's Executive Council on the basis of, *inter alia*, consultations with Mr. Collier's professional staff members.

Unfortunately for the Tribe, a state-run lottery began operations in 2002. Mr. Collier realized that this would have a significant adverse impact on the Tribe's bingo operation and that changes needed to be made. A then-dominant faction of the CIN did not agree with Mr. Collier on the need to be proactive. Consequently, profits dropped by approximately 50% in 2002 and were down to the $200,000-$400,000 range in 2003. At this point, Mr. Collier and his colleagues recommended that the bingo operations be discontinued until a new business model could be developed. However, the dominant faction in the Tribe was resistant; in Mr. Collier's view, it simply did not appreciate the financial realities. The Tribe thus continued to incur losses in its declining bingo operations and belatedly shut them down in 2005. In the last year of operation, Mr. Collier forewent his company's management fee and, in addition, paid all of the bingo operation's salaries and expenses.

There were two potential avenues for obtaining authorization to provide advanced gaming. The first was inclusion in the regime established by the federal Indian Gaming Regulatory Act. (The CIN is one of only two federally recognized Indian nations not included

A/72381379.1

within the Act.) The other possibility was state gaming authorization with a federal signoff. The CIN eventually agreed to set aside a budget for political action and public relations work. Experienced and well-regarded political consultants -- including one of the State's leading Republican political consultants and another well-regarded political consultant who is the son of a former governor -- were retained or employed.

The CIN already had considered a location in Santee, less than 25 miles from St. George, Mr. Collier's home town. Mr. Collier was enthusiastic about this prospect because he felt strongly that a substantial gaming operation in the Santee-St. George area would have important economic benefits for its predominantly African-American community. He believed that the type of benefits package that his management services company offered, when provided to the 2,000 or more employees of the envisioned gaming operations, would greatly benefit that community as a whole and also foster sustained, long-term personal and career development among the employees. Toward this end, Mr. Collier engaged a leading consulting firm specializing in innovative benefits approaches at no expense to the CIN.

During this same period, Mr. Collier took out large personal loans on two different occasions and then loaned the proceeds to the CIN without any collateral and at the same interest rate as he was paying his bank. Mr. Collier and his companies also covered many expenses and losses incurred by the CIN during this period. The funds from Mr. Collier's loans were used to pay property taxes owed by the Tribe and to cover basic Tribal operating expenses. These funds basically kept the Tribe afloat during this difficult time.

Mr. Collier also took the lead in negotiations with an affiliate of Bally's, the gaming management and equipment company, in an effort to obtain for the CIN funds that could be used to cover the costs of the effort to obtain authorization for, and then to implement, advanced gaming. Mr. Collier's actions in this regard resulted in a formal contract "to support CIN's efforts to obtain Legislative Approval" under which the Bally's affiliate paid the Tribe

approximately $1.5 million for past and current Legislative Approval efforts and committed to the future payment of up to another approximately $1 million in return for a commitment to purchase 35% - 95% of the necessary gaming machines from the Bally's affiliate if the legislative efforts were successful.  Mr. Collier neither sought nor received any compensation for this work or remuneration from the disbursements under the contract.  (The Court's attention is respectfully directed to the previously mentioned letter from Chief Blue, which provides additional information and perspective on many of the foregoing matters and related issues.)

## VII.  THE POLITICAL CONTRIBUTIONS AND THE QUESTION OF CRIMINAL KNOWLEDGE OR INTENT

The principal original advocates of the political contributions involved here were the two political consultants who had been retained or employed for the legislative effort, as discussed above.  Throughout the period at issue, Mr. Collier relied upon and responded to their recommendations and requests for contributions.  Although Mr. Collier now understands and has admitted that his involvement in the reimbursements violated the false statement statute as interpreted and applied in the District of Columbia Circuit in the campaign contributions context, *U.S. v. Hsia*, 176 F.3d 517, 522 (D.C. Cir. 1999), he did not know at the time that such reimbursements were illegal.  He had no intent to violate the law and every reason to expect that he could rely upon the two respected political consultants who had been engaged for guidance.

Mr. Collier has admitted that the motive for making conduit contributions was to avoid having it known that the CIN was supporting candidates for political office and to avoid contribution limits.  (*See*, Factual Basis for Pleas, ¶17.)  Nonetheless, he did not know that the Federal Election Act made such conduct a crime and did not intentionally violate that Act.  Rather, he thought that the actions he took were legal.  This is demonstrated by several undisputed facts.

First, no effort was made at any time to hide the contributions or the reimbursement of the individuals who made them.  Each year's "Catawba Indian Nation Annual Economic and

Development Plan" discussed the political activities associated with the "Advanced Gaming" efforts, and the accompanying Annual Budgets contained a line item for those efforts.[2] Moreover, the contract with the Bally's affiliate expressly set forth its intent to pay for past and future "efforts to obtain Legislative Approval."[3]  And, the Closing Statement itemizing "Checks Made Payable by SDG/Bally at Closing" expressly includes this line item:  "Reimburse SPM Columbia -- Friends of [U.S. Senator]."[4]

Second, consistently with Mr. Collier's insistence that the CIN always be provided with complete, timely, accurate and understandable financial information, the reimbursements were unambiguously recorded in straight-forward, plain-English terms in the general ledgers and other accounting records of the CIN's Economic Development program.  Those records contain such notations as "[name of individual] -- political contribution reimbursement" and "[name of company] -- reimbursement of checks written to [named individuals who had made political contributions]."  We respectfully submit that no one who actually had knowledge that he was violating the federal campaign contribution act and intended to do so would take such pains to assure that that knowingly illegal reimbursements were recorded on the CIN's books and records.[5]  Indeed, these books and records are periodically reviewed by federal officials, as Mr. Collier and Mr. Price well knew from their years of providing accounting, financial, economic development and other services to the CIN.

Third, as reflected in the CIN Economic Development General Ledger,[6] a number of the reimbursements for contributions to candidates for federal office were made to one of the

---

[2]   The "Catawba Indian Nation 2002 Annual Economic and Development Plan and Budget" is as Appendix B.

[3]   The pertinent provision in the contract is attached as Appendix C.

[4]   The Closing Statement, Appendix D, has been filed under seal.

[5]   The CIN Economic Development General Ledger for 2003, the year when the majority of the conduit contributions were made, Appendix E, has been filed under seal.

[6]   *Id.*

political consultants mentioned above, the son of the former governor who was employed by Mr. Collier's company to lead the political efforts. This individual clearly knew that he was being reimbursed for his political contributions to federal candidates. If this experienced political operative (who actually made more reimbursed contributions than Mr. Collier) knew that the reimbursements were illegal, he clearly misled Mr. Collier and abused his trust by recommending contributions, accepting reimbursement for his (and his wife's) contributions, and remaining silent when he could have prevented the illegal activity. If somehow he did not know that the reimbursements were illegal, that lack of knowledge and intent on the part of such a politically sophisticated individual re-affirms the absence of any guilty knowledge or specific intent on Mr. Collier's part, as the Government evidently has concluded. (Our requests for interviews were rejected by both this individual and by the other primary political adviser (who arranged and was present at the meeting in January 2003 when ten of the checks were turned over to a candidate for federal office. *See*, Factual Basis for Plea, ¶18).)

In addition to the complete absence of any effort to hide or disguise the reimbursements, the full recordation of these reimbursements, and the guidance (or misguidance) of the political consultants -- as well as the principled and unblemished life which Mr. Collier has led for 64 years (as discussed in earlier sections of this memorandum) -- there is still other important evidence establishing beyond question that Mr. Collier would not and did not knowingly or intentionally contravene federal election laws or any other statutory prohibitions. Mr. Quantz observes that "Mr. Collier's personal integrity was beyond reproach and would not be compromised." Dr. Sussman reports that "his character and integrity are impeccable." Mr. Young describes Mr. Collier as "a man of such character and principle" and "a man with integrity." Mr. Smith, a member of the Honor Council in law school, a retired Captain in the Judge Advocate General Corps, President of the USC Law School Partnership Board, Chairman of the USC Education Foundation Board (which manages the University's endowment), and

former Chairman of the South Carolina Education Lottery Commission, confirms that Mr. Collier is "true to his word, reliable and honest." Professor Swanson attests, "I cannot imagine that Terry would ever KNOWINGLY commit a criminal act." (emphasis in original) Mr. Dial states, "I know that he would not break the law consciously, intentionally or for any gain," and, similarly, Mr. Kitchens emphasizes, "I know that Terry would never have knowingly done anything against the law." The observation of Mr. Kneece, another attorney, is particularly perceptive: "When Terry's business dealings took him into the political world, I believe it may have been a world for which he was ill-prepared. I don't know the details of his case, but I do know that the world of politics is sometimes complex and the expertise needed to navigate these sometimes treacherous waters is extensive. I don't believe Terry was experienced enough to conduct this type of business, even with the help of so many advisors. Nevertheless, he failed to comply with federal law and has accepted responsibility. I do not believe he had criminal intentions as he conducted his business, only perhaps serious misjudgments and naivety."

Finally, the Court should note that conduit contributions were also made by Mr. Michael Schraibman, a long-time business colleague and executive in SPM who will speak to the Court at the sentencing, and by Mr. Collier's two adult sons. In light of his devotion to, and the standards that he instilled in, his family members as discussed earlier in this memorandum, it seems beyond dispute that Mr. Collier would never have involved his sons in any conduct that he knew to be illegal. As Mrs. Collier cogently observes, "It is inconceivable that this man would endanger his family and friends in any way by consciously allowing them to participate in criminal behavior."

In sum, Mr. Collier has forthrightly admitted that he has violated 18 U.S.C. §§ 1001 and 2, as interpreted and applied by the United States Court of Appeals for the District of Columbia Circuit. But it is equally clear that he did not act with the specific intent of violating §1001 (or 2 U.S.C. §§ 441f and 437g(d)) and that he did not know at the time that the reimbursements he

helped arrange violated § 1001, as interpreted in this Circuit. We respectfully submit that there is overwhelming evidence -- from numerous, mutually reinforcing sources -- demonstrating beyond any reasonable question that, in committing the violation of 18 U.S.C. §§ 2 and 1001 to which he has plead guilty, Mr. Collier did not knowingly or willfully violate any federal law, including the Federal Election Campaign Act.

**VIII.   ACCEPTANCE OF RESPONSIBILITY**

The Government and the Probation Officer agree that Mr. Collier has "demonstrated an acceptance of responsibility for the offense. . . ."(Presentence Investigation Report, ¶37; *see also, id.*, ¶27)  (This subject is discussed further in Section IX.B.1, *infra* at 23-25.)

**IX.   DETERMINING THE APPROPRIATE SENTENCE IN THIS MATTER**

**A.     Sentencing Guidelines Analysis**

Following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), " . . . the Guidelines should be the starting point and the initial benchmark" of any sentencing determination. *Gall v. United States*, 522 U.S. ___, ___ (2007), slip. op. at 11.

Under the Government's analysis (Plea Agreement, at 5-6), which is adopted in the Presentence Report (at 8), Mr. Collier's Base Offense Level is 8, as provided for in U.S.S.G. §2C1.8(a).  The Government asserts that §2C1.8(a), pertaining to "Making . . . a Contribution . . . in Violation of the Federal Election Campaign Act," rather than §2B1.1(a), pertaining to ". . . Deceit," is applicable pursuant to the cross-reference in U.S.S.G. §2B1.1(c)(3).  The Base Offense Level is increased by 2 levels under U.S.S.G. §2C1.8(b)(4) because the number of illegal transactions exceeds 30.  The Offense Level also is increased 6 levels under U.S.S.G. § 2B1.1(b)(1)(D) (the "Loss" Table) because the total amount of the contributions is between $30,000 and $70,000.  The Offense Level is decreased by 3 levels under U.S.S.G. § 3E1.1(b) because of Mr. Collier's acceptance of responsibility.  Thus, under this asserted calculation, the

A/72381379.1

Total Offense Level would be 13.[2]

There is something fundamentally unfair about the Government's approach. As discussed above, the Government has not attempted to, and indeed cannot, prosecute Mr. Collier under the federal election laws (the statute directly applicable to conduit contributions), because those laws contain stringent knowledge and intent requirements. Rather, it has prosecuted him under the less demanding 18 U.S.C. §§ 2 and 1001. Nonetheless, it now seeks to <u>sentence</u> him under the Guidelines relating to election law violations it could not prove, presumably because those Guidelines allow a stiffer sentence.

The Government's attempted use of the reference provision in § 2B1.1(c)(3) would bring into play § 2C1.8(b)(1), which, to determine the increase in Offense Level depending upon "the value of the illegal transactions" involved, <u>refers back</u> to the "Loss" table in § 2B1.1(b). Thus the Government -- by seeking sentencing under the Guidelines for violation of the Federal Election Campaign Act (U.S.S.G § 2C1.8) rather than the Guideline for § 1000 to which Mr. Collier pled (U.S.S.G § 2B1.1) -- is attempting to use the 2B1.1 "Loss" table (which normally applies as written to a §1001 violation only when there is a "loss") without having to show any loss. Although the Government cannot show any loss (as the Probation Report makes clear, in paragraphs 25 and 100), its attempt in this regard would add <u>6 Offense Levels</u>. This is simply not justified in the circumstances at bar. It is also difficult to believe that the Sentencing Commission, in drafting the Guidelines, intended that there be an increase, by the use of the Guidelines' reference mechanism, for a §1001 violation when there is no loss. We thus believe that a 6-level increase is inapposite in this case.

Moreover, the Government's calculation has multiple flaws. By the correct calculation, the Total Offense Level is 4, as discussed in subsection 1, *infra*, or at worse, 6, as discussed in subsection 2, *infra*. And, even if the Government's basic approach were to be adopted, the

---

[2]    The ensuing discussion, through the conclusion of this Memorandum, addresses not only the foregoing contention but also the observations in the Addendum to the Presentence Report (at 22-23).

circumstances warrant a significant downward departure, as discussed in subsection 3 and section B, *infra*.

1. The correct Sentencing Guidelines analysis is the following. U.S.S.G. § 2B1.1(c)(3) provides that another Guideline (such as U.S.S.G. §2C1.8) may be applied by reference only if "the conduct set forth in the count of conviction establishes an offense specifically covered by another Guideline … ." A cross-reference thus is permitted only when <u>all</u> the elements of another offense covered by another Guideline are encompassed by the count of conviction. *See, U.S. v. Bah*, 439 F.3d 423, 427 (8th Cir. 2006). Conviction of a violation of the Federal Election Campaign Act, 2 U.S.C. § 441f and § 437g(d), requires proof, *inter alia*, that the offense was committed knowingly and willfully -- specifically, that the defendant knew of and intended to violate the statutory proscription against conduit contributions. H.R. Rep. No. 94-917 (1976), at 3-4 ("Criminal penalties are reserved for knowing and willful violations" which are "committed with a specific wrongful intent" and with "a knowledge of all the relevant facts and a recognition that the action is prohibited by law.")

On the other hand, conviction of a violation of 18 U.S.C. §§ 2 and 1001 in the D.C. Circuit does not require such stringent proof. The only requirement under §1001 is that the defendant intended to take the actions which he took. *U.S. v. Hsia*, 176 F.3d 517, 522 (D.C. Cir. 1999) ("We believe that the government need not prove that [a defendant] knew her acts to be unlawful; the question whether she could in fact have had such knowledge is therefore irrelevant.") Consequently, in this Circuit, conviction under 18 U.S.C. §§ 2 and 1001 does not establish an offense under 2 U.S.C. §§ 441f and 437g(d). Moreover, nothing in the stipulated Factual Basis or the Information to which Mr. Collier pled establishes the elements of a criminal violation of Federal Election Campaign Act. It follows that U.S.S.G § 2B1.1(c)(3)'s cross-reference provision is inapposite in this case and cannot lead to the application of U.S.S.G. § 2C1.8 in the Guidelines calculation.

A/72381379.1

It also would be erroneous to conclude, because the contributions at issue were between $30,000 and $70,000, that there was a "loss" of that amount that implicates Guideline § 2B1.1(b)(1)(D). In fact, there is no "loss" within the meaning of U.S.S.G. § 2B1.1(b) because, as discussed above, the political contributions at issue were budgeted for in the Catawba Indian Nation's Annual Economic and Development Plans and Budgets and were made with the authorization of, and in furtherance of the interests of the CIN. The contributions also were accurately recorded in the CIN's books and records. (And, as noted in the Presentence Report, ¶¶ 25, 100, the various campaign organizations also did not incur any monetary loss.)

Based on the foregoing, we believe that the following is the correct Sentencing Guidelines analysis:

| | |
|---|---|
| Base Offense Level (for violation of 18 U.S.C. §§ 1000 and 2 -- <u>See</u> U.S.S.G. § 2B1.1) | 6 |
| Acceptance of Responsibility -- <u>See</u> U.S.S.G. § 3E1.1(a) | -2 |
| Total Offense Level | 4 |

2. Even if, *arguendo*, § 2C1.8 (a) could be applied by reference pursuant to § 2B1.1(c)(3), the two-level upward adjustment under § 2C1.8(b)(4) for 30 or more illegal transactions would not be applicable. We recognize, of course, that U.S.S.G. § 1B1.3(a) provides that "<u>unless otherwise specified</u>," offense level and adjustment determinations "shall be determined on the basis of ... all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured or willfully caused by the defendant" and " ... all reasonably foreseeable acts and omission of others in furtherance of the jointly undertaken criminal activity." (emphasis supplied) However, U.S.S.G. § 2C1.8(b)(4) provides for a two-level increase "<u>[i]f the defendant</u> engaged in 30 or more illegal transactions." (emphasis supplied) The introductory section of the 2003 Guidelines explains that "[t]he use of 'the defendant' in subsection (b)(4) means that the Commission has 'otherwise specified' within the meaning of

§ 1B1.3(a).  Thus <u>this enhancement could not be applied on the basis of illegal transactions</u> <u>engaged in by a codefendant for whose conduct the defendant would otherwise be accountable</u> <u>under U.S.S.G. § 1B1.3(a)(1)(b)</u>."  Hutchison, "Highlights of the 2003 Amendments," Federal Sentencing Guidelines Manual (2003 ed.), at XIX, n. 49 (emphasis supplied).

The authors of the principal treatise on the Sentencing Guidelines reach the same conclusion:  "The Commission does 'otherwise specify' whenever it uses the term 'defendant' in a chapter two or three guideline provision ... .  <u>The use of 'defendant,' therefore, otherwise</u> <u>specifies and precludes holding a defendant accountable for the conduct of others</u>."  Hutchison, Hoffman, Young and Popko, FEDERAL SENTENCING LAW AND PRACTICE, (2007 ed.), at 74 (emphasis supplied).

In an analogous context, the Fourth Circuit concluded -- with respect to the abuse of trust enhancement in U.S.S.G. § 3B1.3 "if the defendant abused a position of public or private trust" -- that "[s]uch **defendant**-specific language invites a finding that the **defendant** being sentenced abused a position of trust before the enhancement may be applied."  *U.S. v. Moore*, 29 F.3d 175, 178 (4th Cir. 1994) (emphasis in original).

Consequently, even if § 2C1.8 were applicable by reference, the Total Offense Level would  be 6, not 13 as currently calculated, because, as just explained, there could be no enhancement for the number of illegal transactions and because there should be no 6-level increase by use of the "Loss" table.[8]  The calculation would be as follows:

| | |
|---|---|
| Base Offense Level (using U.S.S.G. § 2C1.8(a)) | 8 |
| Acceptance of Responsibility -- (<u>See</u> U.S.S.G § 3E1.1(a)) | -2 |
| Total Offense Level | 6 |

---

[8] As discussed above, we do not believe that the Sentencing Commission intended an increase, by use of the reference mechanism, for a §1001 offense where there was no loss.  Thus we think that the 6-level increase proposed by the Government is not available, relying as it does on an aberrant, unintended application of the cross-reference provisions.

3.  If the Court rejects our Guidelines analysis as set forth in Section IX.A.1, *supra* at 19-20, or our alternative analysis as set forth in Section IX.A.2, *supra* at 20-21, and instead applies § 2C1.8 in accordance with the Government's contention, the Court should depart downward under U.S.S.G. § 5K2.0 because there exist mitigating circumstances of a kind and a degree not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines.  The Supreme Court addressed the analytical framework governing departures under § 5K2.0 for atypical cases -- *i.e.* -- those falling outside the "heartland" of the typical case that the Guidelines address -- in *United States v. Koon,* 518 U.S. 81, 95-96 (1996).  Applying the *Koons* criteria here, Mr. Collier's conduct does not squarely fall within the parameters of § 2C1.8. because the level of knowledge and criminal intent necessary to support a  conviction under the Federal Election Campaign Act is lacking. The absence of these critical factors is not addressed in §2C1.8 or in the departure provisions of U.S.S.G. §§5K2.1-24, and thus this is an "atypical" case that does not fall within the "heartland" of cases carved out by the purportedly applicable Guideline, U.S.S.G. § 2C1.8.

**B.**    **Sentencing Proposal and Analysis Under 18 U.S.C. §3553**

We believe that we have demonstrated above that the Total Offense Level under the Sentencing Guidelines is 4.  However, even if the Court disagrees with our Guidelines analysis, ". . . [i]n accord with 18 U.S.C. §3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," *Kimbrough v. United States*, 552 U.S. ___ (2007), slip op. at 1, and  ". . . §3553(a)(3) directs the judge to consider sentences other than imprisonment." *Gall v. United States*, 552 U.S. ___, ___ slip. op. at 21 (2007).  "In so doing [*i.e.*, considering the §3553(a) factors], he may not presume that the Guidelines range is reasonable.  He must make an individualized assessment based on the facts presented." *Gall,* slip op. at 11-12.

Under these principles, we believe that there are ample grounds in light of the specific,

A/72381379.1

individualized circumstances of this case for a different sentence from that which would result from the Government's Guidelines calculation -- "'a sentence sufficient, but not greater than necessary to accomplish the goals of sentencing'" set forth in 18 U.S.C. §3553(a). *Kimbrough*, slip op. at 12, quoting 18 U.S.C. §3553(a). Specifically, we propose that Mr. Collier be fined and sentenced to a term of probation , in such amount and of such length as the Court may determine to be appropriate, together with the condition that he devote a specified number of hours per year for a specified number of years to community service. Mr. Collier previously has counseled sentenced offenders who are transitioning back into the community in the handling of their personal financial affairs and he thus could again provide such much needed assistance in the battle against recidivism. Mr. Collier also has formed an alliance with the Ronald McDonald House foundation to provide important respite opportunities to parents and families of critically ill children and he could be directed to continue in this service. Fashioning a non-custodial term of imprisonment to allow and require Mr. Collier to continue the charitable work that he has done, coupled with the sting of a fine and the lifetime shame of a felony conviction, and other standard conditions of probation as the law requires and the Court deems appropriate, would be in the best interests of justice.

For the reasons stated below, this proposal fully addresses the factors specified in sub-section (1) of 18 U.S.C. §3553(a) and fully satisfies the purposes set forth in sub-section (2) of that provision.

### 1.    18 U.S.C. §3553(a)(1) -- *History and Characteristics of the Defendant*

The criminal conduct by Mr. Collier is indisputably an aberrant deviation from his otherwise law-abiding life and contrary to his personal reputation and exemplary conduct over more than half a century. Moreover, as previously noted, the Government and the Probation Officer agree that Mr. Collier has "demonstrated an acceptance of responsibility for the offense. . . ."(Presentence Investigation Report, ¶37; *see also, id.*, ¶27) We think, however, that there is

additional information in this regard which should be considered in the sentencing determination.

It is absolutely clear that Mr. Collier is deeply, genuinely (and not just strategically) remorseful for the offense leading to this prosecution. Secretary Riley has concluded that Mr. Collier "has taken responsibility for the offense ...." Other attorneys such as Mr. Kneece and Mr. Rodgers, as well as Mr. Avant, Mr. Moore and Mr. Arnold Scraibman, concur. Mr. Dial emphasizes that Mr. Collier is not only "extremely remorseful [but also] fully cognizant of the terrible mistake he has made."[9]

Mr. Collier's mistake and the ensuing proceedings have clearly taken their toll. Mr. Schraibman has observed "[t]he mental and emotional distress he is going through due to the public acknowledgement" and has seen that this "has been punishment in itself." Mr. Scraibman has also written that the media coverage arising out of, and other adverse reaction to, this case has brought the growth of SPM Resorts to a standstill. Professor Swanson remarks in her letter to the Court about "the pain of public humiliation . . .the rejection . . . the self-doubt created, the confidence destroyed, the sleepless nights and the related ongoing emotional pain endured by this couple . . . [and] the excruciating stress . . . ." Mr. Quantz, too, has seen that "[t]his legal proceeding has been devastating to both Mr. Collier and his family." Mr. Kitchens reports, "This thing has about killed him. He is so embarrassed that he rarely comes to Columbia and he looks like he has aged ten years. I am sincerely concerned about his health and I told him this just last week. . . . He has already paid and will continue to pay a heavy price for what he unwittingly did." Mr. Rodgers concurs as to "the effect the current criminal process has had on Terry. It is obvious that Terry has been extremely embarrassed by his error in judgment resulting in the

---

[9]    We note that, in the Addendum to the Presentence Report, when discussing the different issue of criminal intent and knowledge, the Probation Officer makes the odd observation that ". . . acceptance is as to the conduct, not just the wording of the charge. Based on the aforementioned, the Court may consider that §3E1.1 is not appropriate in this case." (Presentence Report, at 22-23) We respectfully suggest that the Probation Officer has misunderstood our position and is confusing apples and oranges. We have never relied on any "wording vs. conduct" distinction, and we believe that the evidence available to the Court overwhelmingly demonstrates that, from the very beginning of the Government's investigation, Mr. Collier has sincerely accepted responsibility for, and feels the deepest possible remorse over, the conduct leading to his guilty plea.

A/72381379.1

criminal charges against him and his recent guilty please. . . . [H]aving to address these criminal charges has been one of the most difficult experiences of Terry's life. . . . Terry recognized he had committed a very serious mistake and the only way to resolve the situation was to move through the daunting criminal process with as much integrity and dignity as possible."

Finally, Mrs. Collier, concludes, "He has admitted guilt to this action, and as a result has suffered irreparable damage to his hard-earned career and good name. I cannot remember a night of peaceful sleep for either of us in the past two years. We are both very ashamed and know that our lives are changed forever." She adds, clearly speaking on Mr. Collier's behalf as well as her own, "We pray that this action has not caused harm to anyone."

Thus, it is incontestable that Mr. Collier sincerely regrets his actions and is truly remorseful about them. This is so for many reasons but especially because of the impact that his actions have had on his family and his business associates and may have on the economic development prospects of the Catawba Indian Nation, to which he remains deeply committed. In sum, we respectfully suggest that these considerations, together with those discussed in Sections II-VI, *supra*, demonstrate beyond question that "the history and characteristics of the defendant," 18 U.S.C. §3553(a)(1), weigh significantly in favor of a sentence other than the incarceration that would result from the Government's Guidelines calculation.

2.      18 U.S.C. §3553(a)(1) -- Nature and Circumstances of the Offense

The "nature and circumstances of the offense" also counsel a sentence other than incarceration. In Section VII, *supra*, we have reviewed at some length the important issue of knowledge and intent in this case, and have shown that Mr. Collier did not undertake the political contributions with the purpose of violating laws relating to the political process. Mr. Collier was naïve and "ill-prepared" for the "treacherous waters" of the political world, in the words of Mr. Kneece (*supra*, at 16). There is no evidence that he knowingly and intentionally schemed to evade statutory proscriptions. This factor, also, materially differentiates this case from the

A/72381379.1

normal circumstances involved in the typical conduit contributions prosecution.

    3.    *18 U.S.C. §3553(a)(2)(A) --The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*

The sentence we have proposed would encompass substantial, meaningful punishment. It would require a significant amount of time devoted to community service. Such service will serve as a constant reminder to Mr. Collier, his family, his personal and professional associates, and his community that he is a convicted felon. Additionally, the Supreme Court recently has emphasized that "[o]ffenders on probation are [also] subject to several standard conditions that [further] substantially restrict their liberty." *Gall*, slip op. at 9. We thus respectfully suggest that the sentence that we have proposed will not only constitute substantial punishment for Mr. Collier but will also be, for years to come -- as this man in his mid- and late sixties continues to discharge his obligations -- a forceful, tangible reminder to the community of the seriousness of the offense and the importance of the legal requirements that Mr. Collier contravened.[10]

    4.    *18 U.S.C. §3553(a)(2)(B) -- The need for the sentence imposed to afford adequate deterrence to criminal conduct*

The immediately preceding observations address this statutory consideration as well.

    5.    *18 U.S.C. §3553 (a)(2)(C) -- The need for the sentence imposed to protect the public from further crimes of the defendant*

We respectfully submit that there is no realistic possibility that Mr. Collier will ever again be involved in any campaign contribution or other criminal violation.

    6.    *18 U.S.C. §3553(a)(2)(D) -- The need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner*

These factors are not pertinent in the sentencing of this particular 64 year-old defendant.[11]

---

[10]    For these same reasons, the proposed sentence would "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §3553(a)(6). Moreover, under the analysis now required by *Gall*, our sentencing proposal would be considered a "minor departure" which surely is justified by the circumstances of this case. *Gall*, 552 U.S. at ___, slip op. at 12.

[11]    There also is no "need to provide restitution to any victims of the offense," 18 U.S.C. §3553(a)(7), for the reasons discussed in Sections VII and IX.A, *supra*, and as confirmed by the Presentence Report, ¶¶ 25, 100.

A/72381379.1

## X.  Conclusion

Not all crimes deserve incarceration.  Mr. Collier's crime is one that does not.  Rightly construed, the Guidelines do not demand incarceration.  Moreover, Mr. Collier's lack of intent to violate the federal election laws, his basic integrity (as documented by a multitude of voices) and his years of meaningful service to his community counsel another remedy, whether the situation is analyzed in terms of a Guidelines departure or in terms of the various factors set forth in 18 U.S.C. § 3553.  Probation with a fine and significant community service, we respectfully submit, is the correct result in this matter.

Respectfully submitted,

_____/s/_____
James Hamilton (108928)
Warren Anthony Fitch (089920)
Bingham McCutchen LLP
2020 K Street N.W.
Washington, DC 20006
Tel: (202) 373-6000
Fax: (202) 373-6001
james.hamilton@bingham.com
tony.fitch@bingham.com

James M. Griffin
Suite 2B
1116 Blanding Street
Columbia, SC 29201
Tel: (803) 704(0800
Fax: (803) 704-0805
jmg@jimgriffinlaw.com

Counsel for Defendant
David Therrell Collier

<u>CERTIFICATE OF SERVICE</u>

I certify that on the 24th day of January, 2008, I caused defendant David Therrell Colliers

Memorandum in Aid of Sentencing to be filed through the ECF system and to be served by hand

upon the office of:

> Eileen Gleason, AUSA
> John Pearson, AUSA
> 12th Floor
> 1400 New York Avenue, N.W.
> Washington, DC 20530

> <u>/s/ Warren Anthony Fitch</u>
> Warren Anthony Fitch

# APPENDIX A

*October 4, 2007*

*The Honorable Royce C. Lamberth*
*U.S. District Court for The District of Columbia*
*333 Constitution Avenue, NW*
*Washington, D.C. 20001*

*Judge Royce Lamberth:*

My name is Dewey L. Adams former Tribal Council/Executive Committee
Member of the Catawba Indian Nation, located in Rock Hill, S.C.

I met Mr. Terry Collier in late fall of 1997. He and a team of consultants
from the Columbia area met with our Tribal Council to discuss the
management of our then Bingo Facilities located in Rock Hill, S.C. From
day one I feel he won over the Council with his concern for fairness and his
approach to setting up sound business format and a management team that
would be held accountable to the Tribal Council at all times He offered to
train our folks, set-up financial record keeping, oversee the daily operations,
and even offered up front to spend his own personal money to make this
happen. Terry and his team met with our Council on an average of every 8
weeks to review the status of our operations.

We had a difficult task from the start; the State Legislators in S.C. (outlawed
all Video Type games, then Introduced the State Lottery) Class !!! Gaming.
Then the Department of Revenue (changed the tax laws and how we had to
operate our games) all changes from the original Settlement Agreement
without approval of the Tribe eventually bankrupting our Bingo Gaming
operations.

Mr. Collier seeing this unfolding in our operations began to meet with our
Council on ways that we might approach our Legislators, Congressman and
talk about some type of reprieve. Mr. Collier always seemed to put our
interest upfront. He believed we had certain right the State of S.C. always
wants to overlook.

Mr. Collier and his management team helped us set-up an Economic Development Board to look at other economic ventures for the Tribe. We met quarterly, looking at several projects over the years; unfortunately the language within our Settlemement Agreement restricted us in some ways that even local government couldn't understand. Incentives that we should have had were handcuffing us in some ventures. Our own members fighting us, simply because of confusion that resulted from our Bingo not making increased profits as projected; until these laws were changed.

The management team began to meet with both Department of Revenue over our concerns and meeting with local State Legislators and U.S. Congressman alike. Their message was simply making them aware of our concern of unfairness and wrongful doing on their part.

I believe if you look into or investigate Mr. Colliers past you'll find him to be very credible and honorable person in his hometown, local community, and the State. When the Tribe had a background check done that's what was revealed to us.

Mr. Collier loves his wife, and children. He has always supported their carriers. He always loved talking about his family and was proud of all their accomplishments. His company is very successful and holds quite a great reputation throughout the Southeast.

I thank you for allowing me to share some of my insights toward Mr. Collier, and are willing to answer any questions you might have of me in the future. If I can be of further help don't hesitate to contact me Personally at 803 –327 –9040 (Res.) or 803 – 517 –7488 (work cell).

Respectfully:

Dewey L. Adams

*H. DAN AVANT*
*63 TRADD STREET*
*CHARLESTON, SOUTH CAROLINA 29401*

September 19, 2007

The Honorable Royce C. Lamberth
United States District Court for the
    District of Columbia
333 Constitution Avenue, NW
Washington, D. C. 20001

Dear Sir:

My name is Dan Avant, and I am writing, of course, to describe my relationship with my long-time friend, Terry Collier. As a brief introduction, I am presently Chief Executive Officer of NAI Avant and past president of Edens & Avant, both commercial real estate companies located in Columbia, South Carolina. I am a graduate of Wofford College and served on its Board of Trustees for eight years. In addition, I have served on the Board of Visitors of the Medical University of South Carolina and the Board of the South Carolina Foundation of Independent Colleges. I also have been involved in various community activities, having served in leadership roles over the past thirty-plus years.

My business has been located in Columbia, South Carolina since 1967 and I have known Terry and been a friend of his family and enjoyed a personal friendship with him during these many years. As most people in life and business, we both have experienced our ups and downs.

Terry and I participated in a partnership together involving a development of a condominium project located on Edisto Island in 1985. The project did not go as planned, and we both suffered financial difficulties as a result. However, Terry lived up to his obligations to the partnership under these difficult circumstances; and, at great personal sacrifice. These are the kind of experiences that bring out the true character of a person and Terry demonstrated his by meeting all of his obligations and commitments to the point of possibly having to declare personal bankruptcy. Fortunately, he was able to overcome this setback, although it took several difficult years and many sacrifices.

It was during this same period of time that Terry's marriage failed and he was forced with providing for his ex-wife and three children while trying to rebuild his real estate business. Again, Terry demonstrated his strong character by meeting his obligations and commitments to his family, while successfully building his real estate company.

For the many years that I have known Terry, both professionally and socially, his character and ethics have been above reproach. He has been respected and admired by many of my associates over the years.

The Honorable Royce C. Lamberth
September 19, 2007
Page Two of Two

I know Terry is extremely remorseful for the bad judgment exercised in this unfortunate incident. I have complete confidence this behavior will never be repeated or condoned by him again.

It is for the above reasons that I would hope the Court will view this as an isolated incident, never to be repeated, therefore, grant him mercy.

Respectfully submitted,

H. Dan Avant

# BERRY, QUACKENBUSH & STUART, P.A.
## Attorneys and Counselors At Law

**THE NBSC BUILDING**
1122 LADY STREET, 5TH FLOOR
POST OFFICE BOX 394 (ZIP 29202-0394)
**COLUMBIA, SOUTH CAROLINA 29201**

JOE E. BERRY, JR
MARK D. BOWER

TELEPHONE
(803) 779-2650

FAX NUMBER
(803) 255-0179

September 28, 2007

The Honorable Royce C. Lamberth
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

      Re:    Terry Collier

Dear Judge Lambert,

      Mr. Terry Collier has been a friend of mine and of my family in excess of thirty five years. As you can see, I am an Attorney that has practiced our profession for over 52 years. Although I have never represented Terry as his Attorney, I have been close to him as my friend and neighbor. My daughter babysat for the Collier's on many occasions. And we were very fortunate for them to leave their then young daughter with us over the weekend on numerous occasions. I tell you this to indicate the closeness of our families.

      Terry is a caring compassionate and loving person. Prior to my daughter reaching 16 years of age, I received a telephone call from Terry asking if they could have a "coming out birthday party" for her at the Country Club. I was pleased that they had such feelings for her but troubled that they thought of doing this before we thought of doing the 16th birthday party. We agreed only if we could pay for it; to which he objected since they sincerely wanted to honor our daughter. We compromised and split the expenses. This occasion has never been forgotten by my daughter or our family.

      Judge, Terry Collier has led an honorable and ethical life with a strong commitment to his family, his friends, his employees and all those with whom he has come in contact. Terry has been actively involved in our community sharing with us his time, talent and resources.

      Although we both have moved from our old neighborhood he now lives across the street from my home on Old Mill Circle and we still enjoy socializing with them.

      It is my unqualified opinion that Terry Collier is an honest, loving, compassionate, caring and ethical person with an enthusiastic work ethic. I feel so strongly about his Character that I would trust him with all that I own. I would not say that about many of my friends.

My wife has known Terry for sixteen years and joins me in the content of this letter.

If you need anything further please do not hesitate to contact me.

Sincerely,

Joe E. Berry, Jr.

I concur with my husbands comments about our friend Terry Collier.

Charlotte L. Berry

09/27/2007  20:19    3663076              TIRETOWNAUTO                    PAGE  01

# CARSON T. BLUE

1005 Deas Street
Rock Hill, South Carolina 29732
(803) 366-2930

September 28, 2007


The Honorable Royce C. Lamberth
United States District Court for the District of Columbia
333 Constitution Avenue NW
Washington, DC 20001

Dear Sir,

In the twenty plus years that I have known & worked with Terry Collier I have been impressed with his
dedication to any endeavor he as been involved with.

Terry demonstrates a giving and generous nature. I have always been impressed with
his positive attitude & dedication. As A former Committee member of the Catawba Indian Nation I had the
opportunity to work with Terry on many endeavors involving Tribal Economic Development.

Terry is dedicated to his wife & son whom he has spoken of often. His family is the most important thing in
his life.

I hope that you will give serious consideration when making your decision concerning his countenancing in
November. I feel that he has so much to offer to his family & community

Please feel free to contact me if you have any questions about this letter.

Sincerely,

Carson T. Blue

October 23, 2007

The Honorable Royce C. Lamberth
United States District Court for the
 District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C.  20001

Dear Judge Lamberth,

My name is Gilbert Blue. I was Chief of the Catawba Indian Nation for 34 years until voluntarily resigning my office in March 2007. I am writing this letter on behalf of Terry Collier, who for years has been a very good friend and supporter of the Catawba Indian Nation.

I was first introduced to Terry Collier in the mid-1990s by Bobby Price, who had already worked with us for several years (largely without charge) in the successful effort to regain our federal and state recognition.  Following the success of our re-recognition efforts, which included the right to conduct bingo games in South Carolina, we met Terry, through Bobby, in the course of looking at various potential bingo sites around the State.

As we worked with Terry, we became very impressed with his management ability and invited him to make us a proposal to manage the Tribe's bingo operations. The Executive Committee evaluated Terry's proposal, along with others, and selected his organization.

Terry retained a professional manager who had significant experience operating bingo games to manage and direct the Catawba bingo operations. Unfortunately, there were persons within the Tribe who lacked any experience with operating this type of bingo but still insisted on being involved with the management. This led to some internal difficulties and prevented the bingo operations from being as profitable as they could be.

Fortunately, Terry's organization continued to provide us with detailed financial reports during this period, and these reports left no doubt that the bingo operations under the new management were not being properly conducted.  Eventually, the Executive Committee faced up to the mistake that had been made and returned the management of the operations to Terry's company.  Terry and Bobby re-established a large and very sophisticated management system, and we saw a rapid return to profitability which lasted for several years.  This money was used to benefit the Tribe in many ways.

The bingo operations under Terry's leadership were conducted in accordance with a detailed Internal Controls Manual which Terry, Bobby and others developed.  We received detailed reports accounting for every dollar brought in and every dollar spent, and Terry and Bobby put in a great deal of time explaining the reports and budgets to us. There was no doubt that everything with Terry and his associates was above-board. For a few years, it seemed that at long last the Tribe had turned the corner financially, and Terry insisted that we take advantage of

The Honorable Royce C. Lamberth
October 23, 2007
Page 2 of 2

these great results by beginning a comprehensive economic development planning program, which he and his colleagues have been heavily involved in ever since.

Unfortunately, the State of South Carolina adopted a State-run lottery in 2001. The lottery was financially devastating to our bingo operations. This fact was not readily apparent to us, although Terry advised us that our current operations would quickly begin to lose money and that we needed to begin immediately to seek government approval for a different type of bingo game. The Executive Committee eventually came to realize that we needed to follow Terry's advice that we had to seek authority for an electronic type of bingo game that would be popular and therefore could be profitable despite the existence of the lottery.

From that point on, Terry worked very hard with the Tribe's Executive Committee to obtain legal approval for the Tribe to operate electronic bingo. Terry spent a great deal of time negotiating a contract with a company affiliated with Bally's that provided badly needed money not only for the Tribe's gaming authorization efforts but also for the Tribe's basic day-to-day operations. Without those funds, the Tribe would probably have been forced to suspend a significant portion of its basic governmental functions. I believe the Tribe was reimbursed through this contract for all monies spent from its Economic Development fund for the authorization efforts.

During this same period, on two different occasions Terry personally took out a large loan from his bank and then loaned this money to the Tribe, without collateral and at the same interest rate he was paying his bank -- once to pay outstanding property taxes and once to cover Tribal operating expenses. Terry's companies also developed operating budgets for the Tribe for several years at no cost to us and have always allowed the Tribe to use his companies' various facilities whenever needed. Terry also advanced funds to cover the fees of attorneys who represented the Tribe in litigation seeking the necessary authorizations. In short, Terry has continued to stand beside us throughout this difficult period.

As you can see Judge Lamberth, the Catawba Indian Nation has been through a lot in the last 15 years. We have had more than our fair share of disappointments. But, I want you to know that through it all, Terry Collier has been a trusted and invaluable advisor and a true friend to us. Please consider Terry's contributions and efforts, and also those of Bobby, on our behalf when you make your decision.

Thank you.

Respectfully,

*Chief Gilbert Blue*

Chief Gilbert Blue

# CARNEVALE ASSOCIATES

975 PITT STREET
MOUNT PLEASANT, SOUTH CAROLINA 29464
843-849-7389   FAX 843-856-1492

9-27-07

The Honorable Royce C. Lamberth
United States District Court for the
        District of Columbia
333 Constitution Avenue, NW
Washington,D.C.  20001

Dear Judge Lamberth:

I am Robert "Corky" Carnevale and have been a friend and business associate of
Mr. Terry Collier for over 35 years.

During my friendship with Mr. Collier I have watched him raise a wonderful family
and grow a very successful business. He approached both tasks with tremendous integrity
and hard work. The results of these efforts are self evident and to be commended.

As the former Chairman of the Board of South Carolina Special Olympics, it is hard
for me to express how much Mr. Collier has meant to our organization. Over the past ten
(10) years he has helped us raise over $25,000 for use by our athletes in South Carolina.
His generosity to our programs is something our staff and athletes look forward to each
year and is evidenced by the improvements to the basketball, bowling, sailing and tennis
programs these athletes enjoy.

Mr. Collier has most recently been very helpful in supporting the organization of
the College Transition Connection which is a program for Postsecondary Education for
Individuals with Intellectual Disabilities. This organization, in conjunction with the
National Down Syndrome Society, has created a college experience at the University of
South Carolina and at Clemson University for these individuals who, beforehand, had no
such opportunities.

I close by saying I know Mr. Collier to be a person who has "made a difference"
and a person who I will look to for support in the future. Thankyou for your consideration
towards Mr. Collier.

Sincerely;

Robert Carnevale

September 6, 2007

Dr. David B. Chvatal, DMD
743 Mallory Hill Drive
The Villages, FL 32162

The Honorable Royce C. Lamberth
United States District Court for the
    District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Lamberth:

My name is Dr. David B. Chvatal, and I am writing to you on behalf of Mr. Terry Collier. I have a Bachelor of Science degree from St. Bonaventure University and a Doctor of Dental Medicine degree from Fairleigh Dickinson University School of Dental Medicine. I practiced dentistry for 31 years before retiring in June 2005. I have been on the Board of Trustees of The Ocean Club on Smuggler's Beach Timeshare Association for 13 years and have Vice Chairman and Chairman numerous times.

My association with Mr. Collier stems from our Board of Trustees and dates back to 1998. We interviewed then SPM Defender as a management company, and Mr. Collier was kind enough to allow us to visit Myrtle Beach, South Carolina to view his company operations and support team first hand. Mr. Collier was very open, honest and specific as to the services his company could provide to our board. He included information on the kinds of reports, accounting, budgeting, billing and collections, and financials, he could provide and the costs associated with each area. In the nine years that SPM has been our management company, everything he said would occur has occurred, and he has provided these services with complete transparency.

While we were in Myrtle Beach, Mr. Collier took us around to view some of the properties he owns and manages. What struck me the most was the relationship he has with his employees, regardless of their position. From the general manager of a resort to the woman in charge of the laundry, all were happy to see him, and the smiles, hugs and handshakes were sincere, warm and genuine. He treats his employees as a part of his family.

It is my opinion that Mr. Collier is a man of high moral character, integrity and honesty and is well respected by his peers in the timeshare industry. He is a man who respects all people, and I am proud to call him my friend.

Sincerely

Dr. David B. Chvatal, DMD



2536 Broad Street
Camden, SC 29020

1065 Highway 1 South
Lugoff, SC 29078

400 South Mill Street
Manning SC 29102

404 Rutledge Street
Camden SC 29020

336 South Main
Bishopville, SC 29010

100 Pontiac Bus. Center Dr.
Pontiac, SC 29045

407 Hwy 321 By Pass South
Winnsboro, SC 29182

1310 White Pond Road
Elgin SC 29045

**LAUNDRY & CLEANERS, Inc.**

**Main Plant**
Phone (803) 432-1444
Camden, South Carolina 29020

September 14, 2007

The Honorable Royce C. Lamberth
United States Disctrict Court for the District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

Re:Terry Collier

Dear Judge Lambreth,

I am writing on behalf of my life long friend Terry Collier.  My name is Harvey Clarke and I am 62 years old and a life long resident of Camden, South Carolina.  I am the owner of City Laundry & Cleaners, Inc. which was started in 1925 and taken over by my father to become our family business in 1940.  Following his untimely death when I was 15 months old, my mother took over the business.  I worked since the time I can remember in the industry and fully took over and have been growing this company for the last 40 years.  We now have 8 stores and can be found in 5 counties employing 40 people.

I have served my community through terms on the City Council and being an active member of Rotary Club.  I have three children who all finished college and now one has joined the family business, one is lobbyist in Washington and one is a banker in Charlotte.

Terry Collier and I met while in college in 1963.  There are so many common denominators between the two of us that we could have been brothers.  As for Terry as a father, he has raised three successful children who have all brought great happiness to him.  As we were both working to raise our children into successful adults you would always know where to find Terry, with his children.  Whatever the activity or sport he was there supporting and participating with them.

Terry has a sense of devotion that is amazing.  As his mother aged I watched him do whatever it took to take daily care of his mother.  It did not matter whether it was emotional, physical or financial needs that needed to be met, they were all taken care

of for her. His mother was always so proud of him because of all he accomplished in such an honest fashion.

As a husband to his lovely wife Linda, he has been steadfast in his commitment to a long term and growing relationship with her. I personally think there influence separately and together on those around them is always positive.

As a businessman Terry has always been honest. Everything that he has worked on has been a success. He is straight forward with out any gray area. You know exactly where you stand with this man.

Terry as you can see is truly a kind, honest devoted man not only to his family but to those around him. I do hope that you will see the man that I have seen for all of his wonderful traits. Each of us are better for knowing Terry and are thankful for the many ways he has touched our lives.

Sincerely,

Harvey Clarke

Harvey Clarke
Owner, City Laundry & Cleaners

ROBERTSON
&
COLLIER, LLC
ATTORNEYS AT LAW

Meredith M. Robertson
David T. Collier, Jr.*

1122 Barnwell Street
Suite B
Columbia, SC 29201
Telephone: 803-771-0834
Facsimile: 803-771-0894

September 4, 2007

The Honorable Royce C. Lamberth
United States District Court for the District of Columbia
333 Constitution Avenue
Washington, DC 20001

Re:    Terry Collier

Dear Judge Lamberth:

My name is David Collier and I am Terry Collier's oldest son. I am an
attorney practicing in the areas of real estate and estate planning in
Columbia, South Carolina. I have undergraduate and law degrees from the
University of South Carolina and an LL.M. degree from the University of
Tulsa. Certainly, I would have never achieved such personal and
professional success without the support of my Father, Terry Collier.

When I was younger, I took notice by the way people interacted with my
father. It seemed that he was one of those special people that everyone
wanted to be around. Back then I probably attributed that to the fact that
was a really nice person that was fun to be close to. But as I grew older I
began to realize that it was more than just that. People actually seemed to
gravitate toward my Dad. Later on I realized that his magnetism was due
to him being a source of stability for so many people in his life. He was,
and still is, the type of person that's always willing to help a friend or
family member in need. He's not afraid to stand with someone and help
him or her face his or her problems.

In the past my Dad has given me not only support, but gave advice through
setting examples for me and everyone else close to him. Growing up, my
father generally worked several hours away from home. I would often call
him during the work day, and he would always take the call giving me all
the time I needed to discuss school, football practice, relationships, etc.
Several years later I discovered that my Dad had a policy in his office that
anytime time one of his children called he was going to take the call. I've

* LL.M. in American Indian and
Indigenous Law

The Honorable Royce C. Lamberth
September 4, 2007
Page 2

heard stories of him leaving important meetings (some with serious business implications) just to have a routine conversation with me, my brother or my sister. Even though he may have been in another town, I always felt like he was right there for me. My father's commitment to me, my brother and my sister is something that I will always cherish, and something that I aspire to one day achieve.

My Father is a good man, a man who understands the importance of placing the needs others ahead of his own. I'm certain that this Honorable Court will receive many additional letters of support for my father – more than likely from those that he has similarly supported in their times of need.

Sincerely,

David T. Collier, Jr.

Jay Collier
5614 Katy Hill Rd.
Wadmalaw Island, SC 29487


August 21, 2007


The Honorable Royce C. Lamberth
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington D.C. 2001


Dear Judge Royce C. Lamberth,

    My name is Jay Collier, I am the middle child and youngest son of Terry Collier. I currently reside with my beautiful wife Kaita and wonderful baby boy Sheldon in Charleston, South Carolina. We live a relatively simple and peaceful existence out side of town on Wadmalaw Island. I am employed by Bohicket Boats as an Ecotour Guide and Charter Boat Captain. We have a great fondness for nature and the South Carolina coast which I can attribute in great part to my dad, Terry Collier.

    To fully understand my relationship with my dad and my impression of his character, I'll have to go way back to my little league baseball days. First of all, my dad is probably the hardest working person I have ever known. His work ambitions and goals were always very lofty and he has accomplished a great deal through good old fashioned hard work with early mornings and late nights at the office. Somehow throughout all of that work, his commitment to my brother, sister and I was equally as strong. Although he often worked two hours away from home, I could always call him up and he would stop whatever he was doing, hop in his car and be there for me. He was assistant coach on my little league baseball team, and would drive two hours every couple of days just for practice and he never missed a game.

    Our favorite pastime has always been spending time together on a boat, fishing and cruising the waterways of coastal South Carolina. Out on the water is where my dad and I have truly bonded, and those experiences are priceless to me and have shaped the person that I am today. He taught me an appreciation of nature that remains a huge part of my life and work today. During our time on the water my dad instilled in me many of life's lessons. One of the most valued lessons has been to treat all people like I would want to be treated myself.

    My dad has always treated his coworkers and employees with the utmost respect. The folks that work for and with my dad have been like an extended family to us. My dad has truly made a point to get to know the individuals he works with; no matter if it is the maintenance man or the vice president of the company, he treats them like family. I

have known some of his employees my entire life and they have let me know that they appreciate the way they are treated, which is often uncommon in an employee, employer relationship.

Recently my wife and I were blessed with a baby boy. My dad listened outside the hospital room door as my son was being born, and cannot get enough of being a grandfather. He has been very distraught about bringing the stress of this case to our family during such an important and fun time. During all of this I have learned that the importance of family to my dad continues to be number one.

Sincerely,

Jay Collier

September 5, 2007

The Honorable Royce C. Lamberth
United States District Court for the
District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

Dear Judge Lamberth:

My name is Linda H. Collier and I am the second wife of Terry Collier. We met in 1985 and married in January 1993. I graduated from Winthrop University in 1972 with a B.S. in Education, and received a Master's Degree (1973) and Ph.D. (1977) from the University of South Carolina. I spent thirty years in a very rewarding career as a teacher, Assistant Principal, and finally 25 years as a professor at Columbia College in Columbia, South Carolina, and retired in 2004. During my academic career, I received such awards as Columbia College's "Faculty Member of the Year" in 1998, and was selected as one of the top five professors of four year colleges and universities in South Carolina in 1999. I share this information in hopes of establishing my strong work ethic and character.

I believe it is this strong and honest work ethic that Terry and I have always shared that brought us together as a couple. I have always admired Terry's ability to think globally, but always remain a hands-on and very employee-centered leader of his companies. I have witnessed the respect earned and friendships formed in all of his business ventures. Terry has that unique gift of seeing equal value in all his employees, whether maintenance staff or vice-president. This type of leadership has enabled him to create a successful and respected business over the past 40 years.

In describing Terry's character, the words greedy, devious, or deceptive are the exact opposite of any way a person would describe him. In fact, he is one of the most generous persons I know. He is always putting the needs of others above his own, especially those needs of his family and friends. I have lovingly often called him an "enabler".

It is very difficult for me to understand how this same man, as CEO of New River Development, LLC, committed acts which led him to plead guilty in Federal Court to one count of causing a false statement to be made to the Federal Election Commission. However, I do admire him for admitting his guilt and would never expect him to blame others. It is my firm belief that this was a mistake in judgment, after ten years of working tirelessly for the Catawba Indian Nation and meeting obstacles of unbelievable proportions. Terry believed in his fight for the Catawba Indians to have a means of being productive citizens. I shared in his joy when Catawba Indian Bingo opened and watched as the passing of the lottery bill in South Carolina slowly destroyed this source of income for the Catawbas. He then spent many years researching and developing plans for a Class II Bingo facility as a means of support for the Catawba Indian

The Honorable Royce C. Lamberth
September 5, 2007
Page two of two

Tribe. He even cared enough to send his oldest son David to graduate school in American Indian Law.

I know that over the years Terry personally loaned money to the Catawba Indian Nation when they couldn't make payroll. He also did such things as buying Christmas presents for the children on the reservation. These are acts of an involved and caring person, not a person who set out to engage in criminal behavior.

In closing, I respectfully request that you consider the positive way Terry has conducted his business and personal life over the past 64 years. It is my heartfelt belief that this criminal action is a result of his commitment to helping those he works with and a careless and obviously very grave oversight in not fully understanding campaign finance laws. It is inconceivable that this man would endanger his family and friends in any way by consciously allowing them to participate in criminal behavior. He has admitted guilt to this action, and as a result has suffered irreparable damage to his hard-earned career and good name. I cannot remember a night of peaceful sleep for either of us in the past two years. We are both very ashamed and know that our lives are changed forever. We pray that this action has not caused harm to anyone.

Thank you for your fair and thoughtful deliberation.

Sincerely,

Linda H. Collier

Linda H. Collier

9/20/07

My name is Maggie Collier. I am the only daughter and youngest child of Terry Collier.   I live in NYC and work as an event promoter and professional singer.

My father grew up in a small town in South Carolina. His father owned a liquor store and from my understanding they lived on simple means. Two things that were instilled in him throughout his adolescence were the value of hard work and good manners. When my two brothers and I were born, my father was determined to provide us with the best things life had to offer.   Starting from the bottom up, he began a small company that required him to work long hours and often times work out of town. Despite all of that time consuming work, he still managed to be present at our baseball games, piano recitals and even performed in some of the plays with us at our local community theatre. One thing that was repeatedly said to me throughout my childhood from other parents was how my father was one of the nicest people they'd ever met. My father stressed to us often the importance of being a kind person. I think it has become my most powerful tool in life.   Throughout my life i've looked up to him as the hardest working, sweetest, most honest, charming and caring person I've ever met. I've always been amazed at how one person could posses that many wonderful virtues.   He has helped my brothers and me become well rounded individuals by exposing us to art and music and sports and different cultures. He is a tolerant and fair man who understands others and is empathetic to every situation around him. My father is a role model to me and to everyone else who has had the great fortune of knowing him.

For over two years we, as a family, have had to endure a lot of pressure and sadness regarding this case.   Despite that fact, my father has refused to allow it to take precedence over any situation that might be occurring in mine or my brothers lives.   He is a soldier when it comes to putting his children and loved ones first.   I have always worried about the pressures of all his hard work over the years affecting his health as he gets older. I began to relax more and more as his retirement approached with the comfort of knowing that he could finally rest and enjoy life with his devoted wife in his golden years.   If anyone deserves to relax and spend much needed time with his wife, children and new grandson, it's my dad.   I am so hoping he has that opportunity very soon.

I would like to thank you for taking the time to read this, Judge Lamberth.

Sincerely,

Maggie Collier

One LeConte Court
Columbia, South Carolina 29205
September 11, 2007

The Honorable Royce C. Lamberth
United States District Court for the
    District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

Re: Letter of Reference for Mr. Terry Collier

Dear Judge Lamberth:

My name is Kenneth W. Collins, Sr., and I am a native of Greenville, South Carolina. I attended Gardner Webb College and the University of South Carolina. I served actively in the United States Navy from 1965 until 1967. While on active duty, I was assigned to the Staff, Commander Patrol Force Seventh Fleet in Southeast Asia. Following active duty, I served four years in the United States Naval Reserve and was honorably discharged in 1971. In 1967, I accepted a full time position in Columbia, South Carolina, with Commercial Equipment Corporation. In 1973, I accepted a position as an area manager with United Virginia Mortgage Corporation/Crestar Mortgage Corporation. In 1984, I left United Virginia as a region manager (3 states) to join Terry Collier in the Collier Company which later became SPM Resorts. I served SPM Resorts as Senior Vice President until early 2007 when I semi-retired. I am presently a real estate broker in South Carolina, Florida, and Tennessee; and I have served as a board member of the Community Association Institute. I was a member of the Columbia Sertoma Club and the Rotary Club in Myrtle Beach. I have been and am presently an active member of Shandon United Methodist Church where I have served on the Administrative Board and as president of the Joy Sunday School Class. I have been married to Dr. Mary A. Collins of Augusta, Georgia, for 36 years; and we have resided on LeConte Court for 29 years. We have two children – Wilson (31) and Sarah (29).

I have known Terry Collier for over 27 years. We have been friends, business partners and together Little League Baseball coaches. Before starting his own company, Terry worked as an Air Traffic Controller in the National Guard, with South Carolina National Bank, and with a commercial real estate firm.

In the early years of our business relationship, it was just the two of us with children of similar ages, attending the same schools and church. Terry's commitment to his children helped me with my commitment to my family in that we made the job allow for time with our children and their activities. Many times we would leave Columbia for out-of-town

meetings before 6 am. This would allow time for the meeting as well as allow us to be back in Columbia in time to pick up the children from school, attend athletic functions, school plays, dance recitals and/or music recitals; and yes, coach little league baseball. There were times when we could not actually afford it, but we did. We rented a small plane so that we could have the time for business and the many activities that involved our children. Once we flew from a meeting in Nashville, Tennessee, so that we could watch our children perform in a school play. In this particular play, the sky was falling and our children were ducks and trees. We were thrilled to be able to be in that audience that night!

Terry is a caring person who has always been genuinely interested in the well-being of not only his family but also his many friends, business acquaintances, and employees. Over the years, Terry has made sure that some of his less fortunate family members were able to take and enjoy a vacation. Terry has always taken time for each of his employees and has gotten to know each of them on a personal basis. Remarkably, Terry knows and remembers his employees' children's names and never fails to ask about them. I have tried, but I have never quite developed the communication Terry has with the employees.

Terry has cared about his church, Shandon United Methodist. When the church asked members several years ago for financial assistance with the restoration of the church's bell tower and its bells, Terry knew he could help, and he did!

I feel extremely fortunate to have known and worked with Terry Collier. He is, indeed, a caring and generous individual. I am honored to be able to say we have been and are friends.

Sincerely,

Kenneth W. Collins, Sr.

69 Pitt ST
Charleston, SC 2903

September 27, 2007

The Honorable Royce C. Lamberth
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Lamberth,

I am writing on behalf of our family to share with you our long-term relationship with David Therrell Collier. I met Terry in November 1984 through a mutual friend and have enjoyed a very close relationship with him since that time. Terry introduced me to my husband, Leigh, who has been a lifelong friend of Terry's, growing up together in rural Dorchester County in the 1950s.

My name is Hope Geer Colyer and have lived in Charleston, South Carolina all of my life, with the exception of my college life and first few years of marriage. I graduated from the University of North Carolina at Chapel Hill with a degree in Zoology in 1982 (with honors). In 1995, I completed a Masters in Health Administration from the Medical University of South Carolina (MUSC) with honors. I have worked at MUSC, a 600+ bed academic medical center in Charleston, in Hospital Marketing since 1993 and currently serve as the Director of Referral Services for the Medical Center. My position has provided me the opportunity to serve in leadership positions for MUSC at the request of hospital and clinical leadership.

My husband is Leigh Colyer, III, is a graduate of the University of South Carolina with a Civil Engineering degree. His professional credentials include unlimited general contractor's license, residential homebuilder's license, South Carolina real estate broker and member of the Urban Land Institute. Leigh's career includes working for development, real estate and building companies based in South Carolina with projects in other located throughout the southeast.

My husband, Leigh, and I have been married for twenty years and have three boys, ages 11, 14 and 17. We are members of St. Philips Church, where my husband serves as an usher and son Ben serves as an acolyte. Our boys are active junior tournament tennis players.

During our two and one-half year courtship, Leigh and I had several occasions to spend time together with Terry in a family environment. Terry's three children, David, Jay and Maggie, are close in age to Leigh's two children, Traci and Angie. These were special times for all of the children and for Terry and Leigh to be together as family friends with all of the children. Terry's commitment to his children has always been exemplary. My parent's divorced when I was 14 years old so I am observant of how divorced parents, especially fathers, choose to spend time with their children. Terry has always made his children a priority and still does. His calendar has always been set according to his

scheduled time with the children or events that they were involved in and they continue to be his priority.

We were honored to have Terry as our best man in our wedding in 1987, and when our first child, Leigh Colyer IV, was born, Terry accepted the responsibility of being Leigh's godfather.  When our son Rivers was born, we, again asked Terry to be a godfather, based on the love and support that he had shown to Leigh.  Terry enthusiastically accepted being Rivers' godfather.  Several years later, our third son, Ben was born.  And, although, Terry is not Ben's godfather in the Episcopal Church, Terry vows that he is all three of the boys' godfather.

On several occasions, Terry wrote to our son Leigh as a time capsule of the recent year.  I have enclosed several copies of these letters, which I keep in a secure safe to ensure Leigh has these for reflection in later years.  These letters exemplify the special person that Terry has always been.

Every Christmas, with few exceptions, Terry has come to Charleston to spend time with our boys.  This is a tradition that the boys cherish because Terry makes it such a special time.  He is more than generous to Leigh, Rivers and Ben but it is the camaraderie, the friendship, the laughter and the love that is exchanged among all of us that makes this time so very memorable.  I wish he were living closer to Charleston so we could share these special times more often.

As noted previously, all of the boys play junior tennis and, when they have had tournaments in Columbia or Myrtle Beach area, Terry enthusiastically shows up for their matches.  Often, these matches are played in rather uncomfortable weather conditions but Terry stays to cheer them on (or encourage them, as often is the real need).

The boys have spent time with Terry in Ft. Lauderdale over the past two years.  Leigh has an office in Ft. Lauderdale and has taken the boys to fish on a couple of occasions.  Terry is always ready to jump on the boat to go share the fishing experience with the boys.  These experiences in Florida have been just as special as the times together at Christmas.  Terry always exhibits a positive, nurturing attitude towards our children and this is heart-warming to me and Leigh.  He has always been the perfect godfather for our boys. Included herein are personal letters from Leigh IV and Rivers that they want to send in support of their godfather.

Leigh and I submit this letter of reference for Terry to assist the court in its resolution of Terry's current situation.

Sincerely,

Hope G. Colyer

Hope and Leigh Colyer


Enclosures:   Letters from Terry Collier
              Personal letters of support from Leigh and Rivers

DAVID THERRELL COLLIER

May 17, 1990

Dear Leigh & Hope,

This is such a special time for yall & I feel honored to be included. We're all going to have fun watching Leigh, II grow up.

I look forward to sharing your friendship for many-many moons.

Terry
The Godfather

DAVID THERRELL COLLIER    12/25/90

Dear Leigh,

It has been an interesting year, 1990, the first year in which you made appearance. Your Mom & Dad were living in Hilton Head — playing lots of tennis, some fishing & hunting. Most of the 2nd half of '90 was spent celebrating your birth & introducing you for the first time to family & close friends. These are the people who will be important to you for the rest of your life — you'll be re-introduced from time to time through the years as your memory gets better & theirs begin to fade.

While living in Hilton Head, your father was a pioneer developer of housing on Dafuski Island where the only access is by water. Can you imagine how difficult it was to ferry materials, men & supplies? Also while there, your Mother & Father developed the "Old Oyster Factory" restaurant which they sold just prior to their return to the Holy City.

DAVID THERRELL COLLIER

All said & done, the USA is just the best place in the world in which to invest one's life. Add to this, your particular fortune of having been blessed with great family members with deep roots in the Lowcountry of South Carolina, things so far could not have worked out much better for my Godchild.

May God bless & keep you

Your Godfather

January 1, 1994

Leigh Colyer, IV
171 Church Street, Suite 300
Charleston, SC

Dear Leigh:

Now something has changed — remember when I wrote about you moving Shrimp over — well, now you have to share the spot light — Your brother, Mr. John Rivers Hope Colyer, was presented by your Mom on January 5, 1993. He weighed in at 8 pounds 14 ounces. I am proud to be Godfather to Rivers also, so henceforth, this letter will be to both of you.

Rivers, for your part, the birthing and christening were fine affairs. You put your vocal chords on display during the christening, after which your Grandfather and Grandmother Moore entertained family and friends at their home.

This has been a great year for hunting and fishing in our area of the country. Leigh, you were introduced to dove hunting and are now hooked. Your Father belongs to a hunt club in the Sumerton area and you've been lucky enough to accompany him on a few shoots.

To my knowledge, you hold the record for the youngest ever to have made way to the gulf stream. Just barley three, you , your Father, Roger Crook (Walterboro), Jay Collier, and I made the trip and if my memory serves me correctly, caught a few Kings. For your part, you were absolutely no trouble and a serious fisherman.

Your Dad's home building and construction business continues to grow and the future indeed does look bright for our economy in that respect. His company's particular expertise lies in the area of custom building homes for those in the upper income bracket. Your Mom continues to prove to be an asset to the Medical University of South Carolina and surely will be a senior executive with in that facility in the not to distance future. Your Mom has much drive and strength which will be an asset to your family as the years go on.

My own business continues well with expertise in the area of real estate management and investment. I've added several new people this year and if I don't mess up, growth seems sure.

My children are doing well, David's at Seewanee, Jay and Maggie remain at Hammond. Maggie hopes to attend The Asheville School in the fall of this year, she will be a sophomore. Incidently, Jay has had a terrific year deer hunting down around St. George.

Guess what - I'm getting married on January 5, 1994. Linda Herlong (whom I have dated for the past several years) and I will be betrothed at Shandon Methodist Church in Columbia. Following the service, we will have a dinner for 60 or 70 members of family and friends at Forest Lake Club. Of course, your Mother and Father will be in attendance. After dinner some will join me and Linda (she's a professor at Columbia College where she has taught for 16 years, she grew up in Clio, South Carolina) at our new residence, 103 Catesby Circle in Greg Park just off Forest Drive.

Your step sister Tracy married this year - a very fine young man, Mike Thorvalson, they're living in Charleston and doing well and seem very happy. Step sister Angie was elevated to the Honors Program where she is a sophomore at the University of South Carolina. It is indeed an academic honor to be in this program and assures her of more opportunities than the typical graduate.

It's been a year of much news in sports. Toronto Blue Jays won the world series and for the third year in a row the Braves came really close. But there's hope, the Braves look real good. My old friend and friend of your Dad's, Bobby Cremmins, who played basketball at USC during the Frank McGuire era, accepted a job as head basket ball coach at USC which made all of us very happy. However, the next day Bobby reconsidered and announced that he would remain as head coach at Georgia Tech. USC got Eddie Folger from Vanderfelt as Bobby's replacement. Folger's a real class guy with a good record. I'll bet the "chicken curse" will get him. We switched football coaches again, outgoing - Sparkey Woods, incoming - Brad Scott (from Florida State where he was an assistant). Clemson also swapped. They got rid of Ken Hatfield (who wasn't country enough for them) and hired a former assistant to Danny Ford, Tommy West.

A.M. radio which almost disappeared from sound has been revived, mostly to the credit of Rush Limbaugh who offers a conservative twist to the generally very liberal press offerings heretofore. It's been refreshing to see someone take on the major newspapers and networks with so much success.

Rush is really on President Clinton's case, whom he accuses of moving us toward a more socialistic form of government. I believe he's right. The idea of government taking care of everybody just won't work for long. Incentive for the individual to attain goals must remain — excuse me for expressing my views, I'll try to contain this to events.

South Carolina is going to have to do something to replace lost economic opportunities which were dashed when our major banks sold out to major North Carolina banks. Most large financial decisions are made out of this state and that's not good for dear old South Carolina. We are really in need of statesman and business leaders dedicated to our state.

That's it this year boys. Honor your Mother and Father, obey the Ten Commandments, say your prayers every night and thank God for the opportunity of growing up in South Carolina.

I love you, your Godfather,

Terry Collier

Hi. I'm Rivers Colyer, I am 14 years old, and I live in Charleston, SC. Terry is my brother's godfather and he has always been a very close friend to my dad. Terry is a man of high character that has had a great influence on my life. I have always thought of him as a father figure. A man I could look up to. A man that I could talk to for guidance in everyday life. I don't know where I would be today if Terry had not been a part of my life.

Rivers
9/27/07

September 26, 2007

Terry is my godfather who I love and support with all my heart. He has always been there for me no matter what the circumstances. Terry is the most ethical and caring person I have ever encountered in my life. Terry is a respected member of all the communities that he makes himself a part of. The morals that Terry has are of the highest standards and although he made a mistake he was willing to stand up and admit to what he did with no hesitation. Terry has earned the respect of everyone that he has ever encountered in his life and I feel honored to be his godson. I wish that I could shape myself to have the character and respect that Terry has because he is a role model that we should all look up to. If there were more people like Terry in this world than we would be much better off. I love Terry with all my heart and know that he feels the same way for me and my family.

Sincerely,

Leigh Colyer IV



September 28, 2007

The Honorable Royce C. Lamberth
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

Re: Terry Collier

Dear Judge Lamberth,

My name is Bobby Cremins and I am the former basketball coach at Appalachian State University and Georgia Tech. Presently I am the Head Coach of Men's Basketball at the College of Charleston.

I have known Terry Collier since 1971 and have had close contact with him since that time.

He has raised a wonderful family and I have admired his hard work and dedication in developing a successful business.

Mr. Collier has always been there for me over the years when I have called on him for help or support.

I would like to repay some of that help by asking you to consider Mr. Collier's contributions to society as you dispose of his situation.

Thanking you in advance, I remain

Sincerely,

*Bobby Cremins*

Robert J. (Bobby) Cremins

**College of Charleston Department of Athletics**
66 George Street   Charleston, SC 29424
(843)953-5556   Fax: (843)953-8296   www.cofcsports.com



September 28, 2007

The Honorable Royce C. Lamberth
United States District Court for the
District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

Dear Judge Lamberth:                    RE:  David Therrell Collier (Terry Collier)

We are brothers in business in Columbia, S.C. for 26 years.  We manufacture and market medical equipment for people with psoriasis, vitiligo and other related skin diseases for use in physician's office and at home when prescribed by a physician.

We were raised in the small town of St. George; SC and attended grade and high school along with our life long friend Terry Collier. We have remained friends through the years and all of us always remember our roots and the values that were instilled in us during our upbringing in Church and school in this small country town.  All of us, along with Terry, now have families and have tried to raise them in the good old timey way. Terry is a dedicated husband and father of 3 children. He puts his family first in all that he does. Business is important to him but it does not outweigh the love for family.

Terry has been a very successful businessman; community leader and a long time advocate in helping others who need food, clothing and medical needs.  His untiring effort in helping others has been recognized in this community and in the State of South Carolina. Terry has always been there for us when we needed advice or new directions or Counseling in our business. His business background in banking earlier in his career was of great value to us.  He is always there when we need him and cheerful and gracious in advising.

The Court has Terry's future in its hand.  Our prayer is that he will be able to be the citizen and gentleman tomorrow that he was yesterday; that this situation will only make him a greater person.

Respectfully,

Charles R. Crook                    Clyde D. Crook



BANK OF
# WALTERBORO

The Honorable Royce C. Lamberth
United States District Court for the
    District of Columbia
333 Constitution Avenue, NW
Washington, D.C.  20001

W. Roger Crook
*President*

September 24, 2007

Dear Judge Lamberth,

    My name is Roger Crook, and it is with a sincere belief in the goodness of his nature and character that I eagerly write this letter to this honorable court on behalf of my lifelong friend, Terry Collier.

    I have been in the banking business for 42 years, and have served as President and CEO of the Bank of Walterboro in Walterboro, S.C. since 1989.  Honors include having been named South Carolina Banker of the Year, and having served as President of the Independent Banks of South Carolina.

    I have served as chairman of a number of local boards including the Walterboro-Colleton County Chamber of Commerce, the Colleton County Development and Resource Board, and the Bethel United Methodist Church Finance Committee.  I currently am serving on the board of the Colleton Regional Medical Center.

    My wife and I have been married for 40 years, and we have one son, who is a friend of Terry's children.

    I have known Terry since we were young children growing up in the small town of St. George, S.C.  We have remained close friends ever since, and have always maintained a deep interest in each others's families, lives and careers.  And for that reason, I believe I am in a most credible position to offer the statements that follow.

    Terry, as I did, grow up in a family of modest means, but it was a family that valued honesty, trustworthiness, hard work and integrity.  To my knowledge, Terry has always conducted his business and financial dealings honestly and according to terms.  Determined early on to become successful, Terry, through a more than 30-year business partnership and other steadfast long-term relationships, has earned an uncommon measure of financial and social success and has become known and admired throughout the state of South Carolina.  But he has never forgotten that he came from the tiny town of St. George, and has always kept in connection with the town and its people.

Consequently, he has always been well regarded and respected by the people who knew him as a child of that community. And I'm certain that will continue to be the case. In fact, I had a clear indication of that recently from a man who knew Terry years ago.

A former high school classmate of Terry, who is a retired farmer in the St. George area, called me after reading in the newspaper about Terry. He asked me if David Therrell Collier was the Terry Collier he knew. When I answered that it was, he asked if there was anything he could do to help Terry.

While I admire Terry's success in business, it is his good-heartedness and loyalty toward family, friends and associates that I cherish most in him. His mother was an invalid toward the end of her life, and I will never forget the tender manfulness he displayed when I would see him gently lift her from her wheelchair into the car.

In conversations we've had over the years about raising our children, it has always struck me how he has related to and supported his two sons and daughter, despite a divorce from their mother many years ago. He has told me that it was always important for him to be sure to treat each child according to his or her individual personality and needs. Following the divorce, as busy as he was with his career, he nevertheless would not pass up a recreational time with the children, and he never wavered from the scheduled visitations. For Terry, it's always been "family first."

And when my own son recently switched careers, Terry, on his own, drove to Charleston to sit down with him and offer him advice.

Advising young people and taking an interest in their lives is something Terry has always done. And when he hears that they have done well or that something has gone well for them, he always responds with an earnest and hearty "Good for you!"

Terry Collier is a valuable man. He has been valuable to his family, business associates and friends. And he has been valuable to his community and to South Carolina.

Knowing Terry as I do, I know he has a keen conscience, and will feel remorse hereafter for the acts that presently have him before this court. But I also know that he will continue to be the good, helpful, generous father, friend and citizen he has always been.

Respectfully yours,

Roger Crook

# Dial, Dunlap
# &Edwards, LLC

### COMMERCIAL REAL ESTATE

September 17, 2007

The Honorable Royce C. Lamberth
United States District Court for the
District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

Your Honor:

My name is Robin H. Dial and I was born and raised here in Columbia, SC. After my undergraduate degree from UNC – Chapel Hill and graduate school at the University of Florida, I returned to Columbia and began a life long career in commercial real estate sales and development. Over the many years I have been on the board of directors of various groups such as Historic Columbia, Town Theater, Columbia Museum of Art, Friends of USC School of Music, and three different National Banks. Since the early 1970's I have known and had a friendship with Terry Collier.

I understand that in your hands rest the enormous decision of Terry's fate as to his recent pleading. Over 35 years (or more) I have known Terry to be a caring and loving father to his three children. By example, when Terry's business ventures took him to Myrtle Beach, SC, he purchased a van with video player in order to be able to transport the young children back and forth and although the drive was long, he never missed an opportunity to spend time with the children. As they have grown up and gone through the complicated phases of adolescence and young adults, I have seen Terry encourage or discipline or support or advise or just listen – as circumstances required – for each child/young adult.

Terry and I talk about our different fields of real estate and I know that for many years he has made a prolonged and active effort to find and promote minority workers into positions of greater management and responsibility within his company. Since he has a business with extensive people/management issues, I would have expected that over the years that he might have become a little callous regarding employees – but just the opposite: he shows a remarkable interest in his workers and their opportunity to advance themselves and their lives.

Finally, over the past 10+ years Terry has discussed with me his involvement in business with the Catawba Indians and his worries about difficulties in communicating with the tribe and their business matters. We discussed their (the Tribe's) approach to business as being different from ours and the various steps that Terry took to protect and inform them

regarding their business and possible economic shifts. I believe that when political contributions were being made, this was done openly – not secretively or as part of any conspiracy. Although Terry crossed the line as set forth in his pleading, I know that he would not break the law consciously, intentionally, or for any gain. I know that he is extremely remorseful and fully cognizant of the terrible mistake that he made. I hope that you will be merciful in your decision. This matter will be with Terry in his heart and his head for the rest of his life.

I hope that you will find it appropriate to consider a suspended sentence in the case of Terry Collier.

Sincereiy,

Robin H. Dial



OFFICE LOCATIONS
Columbia, SC (803) 252-4901
Hilton Head Island, SC (843) 785-9901
Myrtle Beach, SC (843) 238-5000
Orlando, FL (407) 650-3999

September 15, 2007

The Honorable Royce C. Lamberth
United States District Court for the
  District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

Dear Judge Lamberth:

My name is Patricia (Trish) Docherty. I am the Regional Vice President of Operations for SPM Resorts, Inc., in the Florida Region. I have been employed with SPM Resorts, Inc. since 2001. I am married with twin daughters that are 7 years old and live in Orlando, Florida.

I have known Mr. Terry Collier professionally since I joined SPM Resorts, Inc. in 2001. He welcomed me just as he does with all employees with warmth and a genuine caring nature. Through the years I have had many occasions to be in the company of Terry Collier either at work related seminars or company functions. Each time Terry would treat me as one of the family, knowing fully what family meant to him meant a lot to me. When Terry Collier would visit any of the properties that I oversee in my region he would take time to walk around the property and often times you would see him stopping to talk to the employees and even assisting them with some of their tasks. He always considered himself one of the team and not above anything.

I have worked for other companies in the hospitality industry over the years but none of them compare to SPM Resorts, Inc. when it comes to feeling like a member of the family and an important asset to the company. Terry instills that philosophy and it has not changed over the years.

I am proud to be a member of SPM Resorts, Inc. and to know Terry Collier as a professional in the industry.

Sincerely,

*Trish Docherty*

Trish Docherty
Regional VP of Operations
SPM Resorts, Inc.

The Honorable Royce C. Lamberth
United States District Court for the
        District of Columbia
333 Constitution Avenue, NW
Washington, D. C. 2001

August 30, 2007

Dear Sir:

It is with pleasure that I introduce myself to you as a friend of Terry
Collier. I am a graduate of the University of South Caroline with a B.S.
degree in Pharmacy. I have been engaged in the retail apparel business for
the past 42 years in the Charleston, South Caroline area.

I have known Terry since our college years but have really gotten to know
him more closely over the past 30 years. My wife and I have shared some of
his family pleasures such as weddings, and most recently the birth of his
grandson. Terry, too, has been a part of our family's special events.

Terry has raised a wonderful family: one son who is a lawyer, another son,
who is a fishing guide, and a daughter who has done some acting. Maggie had
a part in the famous movie, "Prince of Tides".

Terry has always been a hard worker. He has had his ups and downs in the
real estate industry; with his perseverance, he has become a success in the
Time Share Industry. Terry's firm has become one of the largest Time
Share Management firms on the eastern seaboard. I have met several of his
associates, and they all feel that Terry has given them a wonderful
opportunity. It was only last year that I read an article in a magazine about
Terry's company, SPM. The article discussed the company's stability and its
financial accountability.

-2-

I know that Terry has served his country in the Air National Guard and was honorably discharged.

Terry has also served on the board of the DeBordieu Colony Association, a home owners association in Pawleys Island, South Carolina. I am also a resident there and know that he has performed an exceptional job and has always been respected for his knowledge of the real estate market, budgets, and community wellness.

This man I am writing about is my friend. I, enjoy his humor, and respect the way he treats people. His character indicates to me that he is honest and worthy of my friendship.

Sincerely yours,

Lowell Epstein

The Honorable Royce C. Lamberth
United States District Court for the
District of Columbia
333 Constitution Avenue, NW
Washington, D.C.  20001


The Honorable Royce C. Lamberth,


The purpose of this letter is to provide a character reference for Mr. Terry Collier whom I have known as a personal friend and professional colleague for 18 years.


My name is Jake Evans, General Manager of Schooner Beach & Racquet Club, located in Myrtle Beach, South Carolina.  I have been employed with Schooner for the past 18 years.  I am also a government official in Atlantic Beach, a small town in the North Myrtle Beach area.  I am also a local business owner in Atlantic Beach.


In knowing Terry, I have found him to be a very giving and caring person.  He is very down to earth and truly committed to his friends and family.  Terry is truly a man of his word.  In my experience in working with Terry, he truly showed me how much family means to him.  He allowed me to come in to work later then my scheduled time, just so that I could spend additional quality time with my son.


To tell the truth, I really can't think of anything of consequence on the negative side of the personality ledger when it comes to Terry.  All in all, I would have to say that Terry Collier is a fine, well-balanced person with an abundance of positive qualities.


Sincerely,

Jake Evans
General Manager



OFFICE LOCATIONS:
Cape Cod, MA
Outer Banks, NC
Santee, SC
Myrtle Beach, SC
Hilton Head Island, SC
Orlando, FL

September 19, 2007

The Honorable Royce C. Lamberth
United States District Court for the
District of Columbia
333 Constitution Ave, NW
Washington, D.C. 20001

Re:    Terry Collier

Dear Judge Lamberth:

My name is Paul Goodrich and I am President and COO of Palmetto Marketing. I have worked with Palmetto Marketing since 1995 as its Sales Manager, Vice President and now President and Shareholder. I am a church member, with regular attendance and volunteer for a variety of community and church related activities and committees.

I am writing to share with you my relationship with Terry Collier. I can say he is a man I trust and have looked up to for a number of years. I met Terry in the early 1990's while I worked for one of his competitors. I was immediately impressed by his warmth towards me. I watched him interact with many SPM employees and was impressed he knew all their names and for many, family history as well.

In 1995, when people from SPM approached me to offer me an opportunity to work with them, I accepted primarily for the opportunity to work with Terry and have never regretted that decision.

While it is difficult to sum up years of positive experiences with any man, I will share a few things I have learned from Terry. I have observed him bending over to pick up cigarette butts on the ground instead of telling others to do the task.   He insisted, in our presentations to our Boards, that we only state to them absolute facts versus guesses and hunch's. He put owners first at our resorts and was always concerned about the impact on them of any program we instituted. With our staff (me included), he always looked out for our well being and made many of his business decisions while still caring for his team. Terry has always led and taught us through his example and not just his words.

I believe I am a better man and leader because of Terry Collier.  I, today, draw on much of what I have learned from him over the years and do better because of his teaching.  I thank you for your time and hope this letter helps paint a picture of the Terry we know.

Sincerely,

Paul D. Goodrich
President and COO

Main Office: 1051 Shine Avenue, Myrtle Beach, SC 29577
Telephone: (843) 238-5000•Fax: (843) 238-5001
info@palmettomarketing.com

To:    The Honorable Royce C. Lamberth
       United States District Court for the
          District of Columbia
       333 Constitution Avenue, NW
          Washington, D.C. 20001

My name is Veta Gore and I have worked with Terry Collier for 18 years.

I grew up on a local farm in the Conway community of South Carolina. I married

a local farmer and we have been married for 32 years with one son. We attend Pleasant Plane

Baptist Church in our community.

I started working for Terry Collier in September of 1989 after losing my job due to Hurricane

Hugo. I presently handle the sales for Southern Property Management. I was very thankful to have the

opportunity to be working in the same field as I was before. Terry has always been a great person to

work with. Even though I was not a top executive with the company, I have always felt free to call on

him. He has always taken time to listen and help me. I felt he had a open door policy and made me feel

like family.

I have seen this with other employees as well. I will always remember the concern that Terry

showed towards an associate for having chest pains during a company function. He talked to him and

kept him calm by letting him know that he was there and help was on the way. Even though he had

a lot of friends there and business was on his mind he put all his attention to that employee.

There was also a time an employee lost his son. Terry dropped everything to put that

employee first. He was there for him every day. If I were to lose someone, it would mean a lot to have

someone there for me, like Terry was for that employee. This is an example why I did not hesitate a

moment to call Terry when I heard a previous employee had passed away. Being the type of person

Terry is, he automatically showed concern for that employee and his family .He is always showing

concern even though he is very busy.

When it comes to work he is a hands on person. I also see him passing this on to his children, because he had them working side by side with us. They were easy to talk to, just as Terry is. He was a person that did not think twice about reaching down to pick up trash, so neither did I when I saw it on the resort. He always had a smile on his face and a hug for every employee. He included everyone, and made them feel like family. I don't remember a time that he made me feel bad in front of anyone, even though I made mistakes.

As a Christian I know that no one is perfect. The thing that I admire about Terry is that he does not hold a grudge even though I have seen people do him wrong. He is the type of person that makes you glad to be part of his company. These were just a few of the reasons why I liked working for Terry. It is always good to see Terry ,even though he has retied.

Veta Gore

In House Sales
Southern Property Management

JACKSON V. GREGORY
42 SHEFFIELD AVENUE
BEAUFORT, SC 29907

September 18, 2007

The Honorable Royce C. Lamberth
United States District Court for the
District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

  Re:  Terry Collier

Dear Judge Lamberth:

  I appreciate the opportunity to write this letter on behalf of my friend, Terry Collier.  In order to place my words in context, I will briefly summarize my background.  I was admitted to the S. C. Bar in 1967, and practiced law in Walterboro, SC 1969-1991.  From 1980-1991 I also served in the S. C. House of Representatives.  I became a State Circuit Court Judge in 1991 with chambers in Beaufort, SC, retiring in 2006.

  I believe that I initially met Terry through our mutual friend Roger Crook around 1969.  We all fraternized through the years with wives, children and friends on an on-going basis through the years mostly at Edisto Beach, SC where I had a house and Terry had business interests.

  In my opinion Terry Collier straight forward nice fellow.  He is generous and not at all pretentious. Your Honor, I hope you will see fit to give Terry a merciful and lenient sentence.

     Sincerely,

     Jackson V. Gregory



FIRST BAPTIST CHURCH
*The Caring Place*

September 25, 2007

The Honorable Royce C. Lambreth
United States District Court for the District of Columbia
333 Constitution Avenue NW
Washington, D.C.  20001

Dear Sir:

My name is Bruce Hancock, and I am writing in behalf of Terry Collier. I have been a pastor for the past thirty years, fifteen of which have been at my current church, the First Baptist Church of Camden, South Carolina.

This past summer my church allowed me to take a sabbatical leave. The only condition was that I spend the entire two month period away from home and the church in order to facilitate proper rest and renewal. Of course most pastors do not have adequate financial resources for this kind of experience.

However, one of our former church members, Dan Avant, contacted a long-time friend of his, Terry Collier, about the possibility of providing accommodations. Mr. Collier, whom I have never personally met, arranged for my wife and me to spend five weeks at some beautiful resort locations. The best part was that it was at absolutely no cost to us.

Though I was not privy to any of the details, the value of this gift in monetary terms was probably close to $5,000. As the T.V. commercial says, the value to my wife and me – priceless. We will always remember his kind act of generosity.

I think this speaks well of his character. I would humbly ask the Court to take this unselfish gesture into consideration when deliberating the outcome of his case.

Sincerely,

*Bruce E. Hancock*

Bruce E. Hancock
Pastor
First Baptist Church

1201 Broad Street

Carl F. Howard
1600 Longwood Rd.
Columbia, SC 29209

October 1, 2007

The Honorable Royce C. Lamberth
United States District Court for the
District of Columbia
333 Constitution Ave. NW
Washington, SC 20001

The Honorable Royce C. Lamberth:

My name is Carl F. "Doc" Howard.  I am 66 years old, a graduate of the University of South Carolina and a U.S. Army Veteran.  Before becoming fully engaged in the wholesale nursery business I was involved for many years in commercial real estate development and brokerage.

I have known Terry Collier for over thirty years and have associated with him socially, professionally and as members of Shandon United Methodist Church.  Terry Collier is also a friend of mine.  As I am writing this letter I am reeling from a great personal tragedy in my life.  Noone has been more responsive and caring as to my welfare than Terry.  I think, however that I am not a unique target of his concern and largesse as I have witnessed the same response in many situations and venues over the years.

Once a friend sent his son to me for counsel regarding giving up a lucrative job to join Terry's Company.  Knowing the son's work ethic, personality, and intelligence and knowing Terry's committment to an honorable business life and family life I had no qualms in recommending the move.  That was in 1993, I believe, and that union has survived and flourished .

I personally believe that Terry Collier is a valuable asset to his business, his family, his community and his friends.  I am honored to have an opportunity to express my feelings and would welcome any questions or the chance to elaborate as to my esteem for him.

Sincerely,

Carl F. "Doc" Howard

306 Johnston Street
St. George, SC 29477
September 22, 2007

The Honorable Royce C. Lamberth
U.S. District Court for the District of Columbia
333 Constitution Avenue NW
Washington, SC 20001

Dear Judge Lamberth:

I am writing as a character witness on behalf of Terry Collier. By way of introduction, I served as headmaster of the Episcopal Day School of the Church of the Good Shepherd in Augusta, Georgia for two decades. Each year I worked with 500 students and their parents, 50 faculty and staff members, the board of directors, the rector, vestry, members of the church, the public school administration and other public agencies. After my retirement I moved to St. George, SC (my husband's childhood home), and was elected mayor last spring. Due to my varied careers, I am confident in my ability to form accurate assessments of people and their character.

My late husband knew Terry Collier since he was a boy in St. George, even though Terry was much younger. I first met Terry when I became involved with the restoration of the Lourie Theater, an historic movie theater which we have restored as a community performing arts center. I now serve as the chief operating officer of the non-profit corporation. From the outset of our campaign to restore the theater to its former glory, Terry Collier has been a generous patron—giving generously of his time and money even though he no longer lives in St. George.

Terry Collier is a concrete example of one who remembers and appreciates the town and people of his youth. He was a doting son and grandson to his parents and grandmother, caring for their every need. Were I or any friend from his past to need Terry, I have complete faith that he would respond.

Terry Collier helped our cousin establish himself in business and served as his mentor. I have never heard anyone make a negative comment about him.

If you would like to contact me for any further information, please call me at my office (843-563-3032) or my home (843-563-3028).

Sincerely,

Anne J. Johnston

t 22 07 03:32p     Howell                    5247081                    p.1

Mary W. Howell
116 West River Drive
Beaufort, South Carolina 29907
October 22, 2007

The Honorable Royce C. Lamberth
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001


Dear Judge Lamberth:

My name is Mary Lee Williams Howell. St. George, South Carolina is
where I was born and went through school. I was graduated from Columbia
College in 1965 and was married to Ladson Howell in 1966. I taught school
until our children were born and was fortunate enough to be able to devote
my time to being a full time wife and mother. This afforded me the
opportunity to support our community through volunteering in various
capacities:  Girl Scout leader, Den Mother, the local American Cancer
Society board of directors, different committees of our Methodist Church,
garden clubs, Board of Directors of our children's school, volunteer income
tax preparer for low income families, helped secure financing for a
community center used primarily for elder-care and after school programs
for needy children, was graduated from Leadership Beaufort and have
worked in our election process from actively supporting candidates to
staffing our polling places since 1972. I have co-authored a 1300 page book
on the genealogy of our Williams family and enjoy kayaking. My husband
of almost 42 years is a retired attorney and our proudest accomplishments
are the parenting skills of our son and daughter-in-law and our daughter and
son-in-law exhibited to our five grandchildren.

Terry Collier and I have known each other since we were together in the
nursery at church. We started kindergarten together and have been friends
since. He was a great "protector" and guide of me as a somewhat naïve and
often times, reckless teenager. No one could have asked for a better friend.

At the University of South Carolina, Terry met Ladson and began to
recognize the similar values that he and I shared. It was Terry who picked



t 22 07 03:34p    Howell    5247081    p.1

the right time to introduce us and for this, I will always be thankful.

Just a few years ago, Terry and I were talking by phone. His former wife and the mother of his children had had serious surgery. His daughter was working in California at the time and could not come home. She was upset about her mother's condition so Terry flew out to be with his daughter and offer her comfort and support.

Terry Collier has a kind, gentle soul. He possesses a heart that brings wisdom and loyalty to his friends. How blessed my life has been because of him.

Thank you for taking time to consider my support for Terry.


Sincerely,

Mary W. Howell

Mary Lee (Sissy) Williams Howell
(Mrs. Ladson Fishburne Howell)

**THE JOHNSTON COMPANY**
INVESTMENTS
2711 MIDDLEBURG DRIVE
SUITE 311
COLUMBIA, SOUTH CAROLINA 29204

TELEPHONE
(803) 256-7581

August 27th, 2007

The Honorable Royce C. Lamberth
United States District Court for the
District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 2001

Dear Judge Lamberth,

My name is A. Richard Johnston Jr. and I am a friend of Terry Collier.    I grew up with
him in the small town of St. George, S. C. and even though I am his senior by a few
years, we have been life long friends and in later life, business partners.  After high
school, I graduated from Wofford College and entered the U.S. Coast Guard.  I then did a
year of graduate work at the University of South Carolina and entered the commercial
real estate business with the Edens Avant Company in Columbia, S.C.

In 1980, I formed my own investment company and my first endeavor was a joint venture
with the Collier Company where we purchased a 142 unit ocean front hotel and
successfully converted them into condominiums.  We then managed this property
together for several years until I bought his interest several years later.

This was a most rewarding experience for me as it is most enjoyable to be in business not
only with a friend but one who is also a neighbor.  It gets only better when the wives are
close and also the children.  I was a personal witness to the time and care he gave to the
raising of his children and how rightly and justifiably proud he is of the way they turned
out.

Terry gave of his time not to just his family but to his community and his state.  He was
instrumental in helping to elect Governor Richard Riley and later Governor James
Hodges to office.  He later served his state on the Board of the Parks, Recreation, and
Tourism under Governor Hodges.

Up until three years ago, we shared office space in the same suite and I have watched his
Management Company grow into one of the largest in the state.  I have been most
impressed with the integrity of the employees he has been able to attract to his team.  The

business ethics that Terry instilled in his colleagues is what made and allowed his company to become the success that it is today.

I was distressed to learn that Terry had pled guilty to one count of causing a false statement to be made to the Federal Election Commission. However, it did not surprise me that having done so, either wittingly or unwittingly, that he would step forward and admit his error so that he could get on with his life and work.

With that said, I would greatly appreciate any consideration that could be given to him in terms of leniency. His lesson has been learned and serving a sentence will not right the wrong nor cause him to be any different than he already is. Terry Collier is a fine and decent person who will continue to do for his family and contribute to the business community of his city and state. Thank you for your consideration in this matter.


Very truly yours,

A. Richard Johnston, Jr.

Boyd B. Jones
1 Braddock Point
Columbia, SC 29209
September 24, 2007

The Honorable Royce C. Lamberth
United States District Court for the
District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Re: David Terry Collier, Sr.

Dear Judge Lamberth:

Thank you for receiving this letter. I am Boyd Jones, a friend of Terry Collier. I have
been in the commercial banking business for 25 years and with The National Bank of
South Carolina for the past 16 years. I have personally known Terry Collier for 7 years.

Terry has been a client of The National Bank of South Carolina since the year 2000. He
has banked with us personally, and his company, SPM Resorts, has banked with us as
well. Both personally and corporately, Terry has handled his business in a professional
and satisfactory manner. He has always kept officials of our financial institution well
informed and up-to-  date on both personal and business issues – including the matter in
which I am writing you about.

I have witnessed Terry's generosity and his willingness to help others succeed. In
addition, I know of his commitment and love for his family. I know that Terry Collier
has acted honorably with our financial institution. He has shown a strong work ethic and
demonstrated citizenship to me and our team members. I wish the best for Terry and his
family.

Sincerely,

Boyd B. Jones

10/22/2007  11:15    8438320178                                    PAGE  01/01



1872 Sandridge Rd.
Dorchester, SC 29437
October 19, 2007

The Honorable Royce C. Lamberth
U.S. District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

    RE:  Terry Collier

Dear Honorable Royce Lamberth:

    I am writing to you regarding my friend Terry.  I have known Terry for over forty-two (42) years.

    Terry is a good man.  I have never known him to intentionally wrong anyone.  He is an honest and forthright man, just as his dad was.  Good stock, both of them.

    Terry participated in many school activities, and he was always willing to help anyone in need.  He was highly respected by his classmates and he was well thought of by our teachers.

    In our adult life, I have known him to be a just man and I am proud to have him as my friend.

                  Respectfully,

                  *Ronnie F. Judy*

                  Ronnie F. Judy
                  1872 Sandridge Rd.
                  Dorchester, SC  29437
                  Phone 843-563-3630

842 Hampton Hill Rd.
Columbia, SC  29209
September 21, 2007

The Honorable Royce C. Lamberth
United States District Court for the
District of Columbia
333 Constitution Avenue, NW
Washington, DC  20001

Dear Judge Lamberth:

My name is Jim Kitchens.  I am happily married, have 3 children and 10 grand
children.  All of us live in Columbia, SC.  I am seventy five (75) years old and
semi-retired.  For the last thirty five (35) years I have worked in commercial real
estate.  I graduated from Auburn University in 1954 with a degree in textile
engineering and a commission in the US Air Force.  I served two years in the
missile test program at Cape Canaveral, five years in technical sales with Owens
Corning Fiberglas, and ten years as a stock broker with Robinson Humphrey Co.
before going into the real estate business.  I work now with my son and son in-law
in a family investment company where we own and manage real estate and
securities.

I left the securities business in 1970 and went with a local real estate company.  In
1972 I formed my own company.  Terry did about the same thing, and we ended
up sharing an office and a secretary for the next fifteen years.  Terry became my
best friend.  If you really want to get to know someone, just live with them for a
long period of time.  I am ten years older than Terry, and I think he kind of looked
up to me as a trusted friend and counselor both in his business and personal life.
We both had a lot of laughs, some tears during those years and did many business
deals together.  We never had a cross word which says volumes about him.  He is
very creative, smart and hardworking, so it does not surprise me that he has been
successful.  All of the people that work for Terry seem to love him and respect him
because he plays fair and is just a nice guy.

Terry Collier Lettter
Page 2

During our close times together we both had a tragedy.  I had a teenage daughter killed in an automobile accident.  Terry was the one who called and came to my door at 2:00 A. M. and told me about this.  He was a big comfort to me at that terrible time and I will never forget it.  Nothing can compare with losing a child, but Terry's divorce was very traumatic to him.  He was especially concerned about the welfare of the children and was very involved with their activities both in school and out.  That interest has continued and we have talked many times about raising children during these crazy times.  Terry is now remarried to a wonderful lady and I know they are happy.  He remains very dedicated to his children.

I am shocked and dismayed about this situation that Terry is presently in with the Federal Government.  Knowing Terry as I do, I just find it hard to believe.  This thing has about killed him.  He is so embarrassed that he rarely comes to Columbia and he looks like he has aged ten years.  I am sincerely concerned about his health and I told him this just last week.

Judge, some people take things harder than others.  I think growing up in a small town in South Carolina, going to school at the University of SC, having a lot of friends around the state makes this especially embarrassing and hard for him.  Another thing, I know that Terry would never have knowingly done anything against the law.

As I said earlier, Terry has already suffered a tremendous amount and still has to live with this the rest of his life.  Please go as easy as you possibly can when you sentence him; please don't send him to prison.  He has already paid and will continue to pay a heavy price for what he unwittingly did.

Sincerely,

W. James Kitchens

# KNEECE, KNEECE & BROWN, L.L.P.

Attorneys and Counselors at Law
2520 Devine Street
Columbia, South Carolina 29205
Telephone: (803) 799-9393 - Telefax (803) 799-9396

ROBERT E. KNEECE, JR.
REXFORD P. KNEECE

ROBERT E. KNEECE
(1933 - 2000)

October 16, 2007

WILLIAM OTIS KNEECE

OF COUNSEL

ROBERT SIMS BROWN
(1939 - 2004)

Honorable Royce C. Lamberth
United States District Court for the
    District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

Re:    Mr. Terry Collier

Dear Judge Lamberth:

I am writing this letter on behalf of my friend Terry Collier. I respectfully ask that you consider these comments before he is sentenced by your Court. I have known Terry for approximately 15 years. I met him through his business partner and my closest friend. I have had the opportunity to spend a lot of time with Terry over the past 15 years and have always found him to be sincere and trustworthy. I am 42 years old and have lived in Columbia all of my life. I am married and have four children. I am a licensed attorney and have been practicing for approximately 15 years. Columbia is still a small town in many ways and the impact of Terry's situation has been difficult for many in this community. We all know this to be a onetime incident for Terry and hope and pray that he will recover from this ordeal. I know the toll it has taken on him and his family has been almost unbearable.

Terry has always been a successful and reputable business leader in our state and his bright outlook and guidance to my friend at a time when my friend was young and new to the business world was invaluable. I watched over the years as Terry guided his apprentice in the real estate world. More importantly, I watched as Terry provided not only my friend, but many others, including me, "wise old owl" advice whenever we asked for it. He was always available and never turned down a request. Terry has always conducted himself in an honest and forthright manner and I believe his wisdom and counseling have been a benefit to many. I have never seen or heard Terry act in an unfavorable light.

When Terry's business dealings took him into the political world, I believe it may have been a world for which he was ill-prepared. I don't know the details of his case, but I do know that the world of politics is sometimes complex and the expertise needed to navigate these sometimes treacherous waters is extensive. I don't believe Terry was experienced enough to conduct this type of business, even with the help of so many advisors. Nonetheless, he failed to comply with federal law and has accepted

responsibility.  I do not believe he had criminal intentions as he conducted his business, only perhaps serious misjudgments and naivety.

I respectfully ask that you please take Terry's true character into account when sentencing him and plead that you show mercy towards him.

Sincerely,

Rexford P. Kneece

**LAW OFFICES**
**LEWIS & BABCOCK, L.L.P.**
**POST OFFICE BOX 11208**
**COLUMBIA, SOUTH CAROLINA 29211**

TELEPHONE: 803 / 771-8000
FAX: 803 / 733-3534
INTERNET: firm@lewisbabcock.com

A. CAMDEN LEWIS
KEITH M. BABCOCK
MARY G. LEWIS
ARIAIL E. KING
PETER D. PROTOPAPAS
BRADY R. THOMAS
W. JONATHAN HARLING

STREET ADDRESS:
1513 HAMPTON STREET
COLUMBIA, SOUTH CAROLINA 29201

September 17, 2007

The Honorable Royce C. Lamberth
United States District Court
      for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

      RE:    Terry Collier

Dear Judge Lamberth:

      As you can see, I am an attorney in Columbia, South Carolina, and have been one for more years than I want to admit. For over twenty years I have known Terry Collier. In the past ten years he has become not only a client, but a close friend, as he is in business with my son-in-law. While this would seem to make me prejudiced, it only would do so if in my mind Mr. Collier had not treated my son-in-law fairly, honestly and been a loyal friend. I can say that he has met every one of those tests.

      I have known Mrs. Collier longer than Terry and can tell you that they are a wonderful family. Terry's son worked for me and is now an attorney. He is one fine young man, and if you judge the parent by the child, the parent is an excellent one, and I know Terry and Linda to be just that.

      Terry has built a very fine company in the recreation and vacation business in which my son-in-law is his partner. I have watched through the years how he has brought Michael, my son-in-law, along – taught him about the business, taught him about people, taught him how to be honest and fair with everyone with whom he deals.

      In any event, I am asking you to look at Terry as someone who simply made an unwitting mistake, has stepped up to take his medicine and for whom I ask whatever leniency you can see fit to give him.

Sincerely yours,

A. Camden Lewis

ACL/kc

August 21, 2007


The Honorable Royce C. Lamberth
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Honorable Lamberth:

My name is Lanse McColl and I have been an employee of SPM Resorts, Inc. for six years. Currently, I serve in the capacity of Regional Vice President of Operations, responsible for overseeing resort operations of our company's properties in the Myrtle Beach, South Carolina region.

From a professional standpoint, I have worked directly with Terry Collier for the past six years; however, I have known Terry for far longer than those six years on a personal level, due to the fact that he is also my uncle. I can honestly say, that from both a professional and personal standpoint, it would be difficult to find a finer gentleman.

I met Terry for the first time after my father passed away, at which point he had stepped in and taken a great interest in my life and my family. Without really knowing me, he went out of his way to help me, by way of offering assistance to further my education through Graduate School, among other things.

From a professional standpoint, he saw potential in me and afforded me the opportunity to work for the timeshare management company he founded, SPM Resorts, Inc. No one asked him to offer me this opportunity. He took the time to get to know me, realized my potential and wanted to afford me the chance to be successful professionally.

I believe that what I say regarding Terry's character and acts of kindness are important; however, more important, are the opinions of his peers. In my role as Regional Vice President of Operations at SPM Resorts, I have had the opportunity to work with the timeshare resorts that Terry Collier founded through his Management Company in Myrtle Beach. When I attend Board of Directors' Meetings and Board Dinners, which is a frequent occurrence, I am

always asked about Terry Collier. All Board Members go out of their way to share their feelings on what a fine businessman and gentleman Terry Collier is. In the competitive timeshare industry, that says a lot.

In closing, I would like to reiterate that Terry Collier has been an extremely positive influence in my life, both personally, when my father passed away, as well as professionally, in guiding me to achieve a successful career.

Sincerely,

Lanse McColl

August 23, 2007

The Honorable Royce C. Lamberth
United States District Court for the
    District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

RE:    Terry Collier

Dear Judge Lamberth:

My name is Walter D. Merchant.  I was first employed at the Schooner Beach & Racquet Club in Myrtle Beach, South Carolina in 1981, which is where I met Terry Collier.  I am currently the Maintenance Supervisor at the Schooner II Beach & Racquet Club in Myrtle Beach, South Carolina and have been employed there since 1986.

When I first met Mr. Collier, he would come by the resort property and always speak to me with a smile.  After a while, I got to know him a little better.  He would always speak to every employee personally (housekeepers, maintenance staff, etc.).  Everyone admired him because he treated them kindly and spoke to each person respectfully.  After a few more years, I came to know his children, mother and even his extended family.  Mr. Collier hired me for some side work.  I worked with him personally helping him to move and helping him to move his mother.  He always took care of his family and treated me like family.  Mr. Collier trusted me with his children, and I would travel to Columbia, South Carolina to pick them up for him.  It meant so much to me that he would trust me with the care of his children.  I am African-American, and Mr. Collier has always treated me fairly and respectfully.  In fact, everyone that I have ever seen him be in contact with has also been treated the same way.  Through all the time that I have known him, I have personally observed his giving nature to his family, friends and employees.

Over the years, Terry Collier and I became friends.  But even more, he was sometimes a father figure to me and sometimes like a brother.  His children still call me to this day just to say hello.  I was like a big brother to them and accepted like a family member.  Mr. Collier encouraged me over the years and helped me to where I am today.  When my father passed away, Mr. Collier came and picked me up from work.  He took the time to drive around with me that day and share my grief.  He told me that if there was anything could do for me, I only needed to ask.  I know that he truly meant those words, and I have never forgotten his kindness to me that day.

In closing, my few words just barely scratch the surface on what Mr. Collier has done for me in my life.  I love Terry Collier like a father and brother, but mostly, he has been a true friend to me, a wonderful father to his kids, a wonderful husband to his wife, and a loving son to his mother during her life.  I am fortunate to say that I have known him for over half of my life.

Sincerely,

Walter D. Merchant

**Harry M. Mims, Jr.**
Post Office Box 1406
Orangeburg, South Carolina 29116
Email-mimsh@sc.rr.com

Office: (803) 516-9989                                                          Fax (803) 531-5348

September 6, 2007

The Honorable Royce C. Lamberth
United States District Court for the
 District of Columbia
333 onstitution Avenue, NW
Washington, D.C. 20001

Dear Judge Lamberth:

My name is Harry Mims, Jr. I have known Terry Collier for sixty years. I am semi-retired from the construction industry. We are still active in a small way in development and property management. We grew up together in a wonderful, small community, St. George, in rural South Carolina and located in Dorchester County. Our parents instilled in us and taught us how to get along with everyone in all walks of life. This was during the1950's and early 1960's. Terry epitomized how a young person made St. George "The Town of Friendly People", as the welcome sign indicates when you enter this small community.

Terry carried all of his good character into his working life. He took on many challenges that no one else would begin to touch; for example, affordable vacations for working families and safe highways in our state. He never forgot the St. George community when people were in need. He was always there for them. I know of many occasions where Terry's generosity has helped people of all races.

Four years ago our son lost his job, had just gotten married, and was expecting a child. Terry heard about his situation, called him and offered him a job with his management company. This is one small example of how he reaches out to others, even though our son found employment elsewhere.

Terry is a fine caring gentleman who has empathy for the common man. He has always stood up for the less fortunate. I would hope and pray the Court would show leniency when imposing a sentence in Terry's situation. There are many opportunities in his own community when he could continue his good works.

It has been a privilege and honor for me to write this unsolicited letter on behalf of William Terry Collier. Thank you.

Sincerely,

Harry M. Mims, Jr.

WHIT MOORE



UNITED, REALTORS®

1711 GERVAIS STREET
COLUMBIA, SC 29201
BUS. (803) 758-1620
FAX (803) 254-0106

September 19, 2007

The Honorable Royce C. Lambeth
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, D. C. 20001

Dear Judge Lambeth,

   I am writing you on behalf of Terry Collier.
   I am 60 years old and have lived in Columbia for 55 years. I graduated from University of South Carolina and entered the real estate business in 1970. I have been with the same company for the entire time, currently known as Coldwell Banker United, one of the largest residential companies in the United States. I previously was the co-owner of this company but sold my interest in 1999.
   My friendship with Terry Collier began 30 years ago. We had a number of friends in common and I also knew of Terry through his excellent reputation in the Columbia business community.
   In the early 1980's Terry called me to help him sell a home he owned. It was our first business transaction together. Since that time we have had other opportunities to do business. Every time I have dealt with Terry has been a pleasure. He is a fine man who always puts others first.
   Over the years, I have been involved socially with Terry and his wife, Linda. They have many friends who love and admire both of them.
   Needless to say, I am very distressed about Terry's legal difficulty. I know that he is remorseful and has already paid a huge price for his mistake. I would greatly appreciate any consideration of leniency on his behalf.

Sincerely,

Whit Moore



# MACHINE
# DESIGN
# INCORPORATED

September 28, 2007

The Honorable Royce C. Lamberth
United States District Court for the
District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Lamberth:

I am writing to you on behalf of David Therrell Collier. I humbly ask the Court to take into consideration my intimate knowledge and opinions concerning the character and integrity of Mr. Collier, and mitigate the outcome of this case accordingly.

I am James Bland Quantz of Columbia, South Carolina. As owner and CEO of Machine Design Incorporated, I have developed novel technology that has been awarded over twenty U.S. patents. These patents currently control the technology by which ninety percent of the world's commercial pecans are processed. I am also CEO of James Bland Quantz, Inc, a commercial real estate investment and development firm. I have lived and been an active member of the Columbia, South Carolina area since 1964.

Mr. Collier has been a close personal friend for over forty-two years. He was a groomsman in my wedding in 1979. We also were business partners in the early development of the commercial real estate expansion in Columbia. In the 1970's, Mr. Collier and I headed the real estate division of Ewing-Hungiville, one of the largest construction and development companies in South Carolina. Our clients were on the most part Fortune 500 companies expanding operations into South Carolina. It is most important to note that Mr. Collier consummated a large portion of these transactions on a handshake alone. It did not take long for our clients to know without a doubt that Mr. Collier's personal integrity was beyond reproach and would not be compromised.

Mr. Collier is from a very modest, small town family. He paid the price for success through hard work and personal sacrifice. He has always been respected by his peers for his strong work ethic and unquestionable honesty. He is a great service to the people he represents in his business and to the people in this community. This legal proceeding has been devastating to both Mr. Collier and his family. The past few years have been hell on earth and should truly be considered as time served.

I do not know the facts I this case before the Court, but I do know Mr. Collier. I know his character. I know his honesty and integrity. I know without a doubt that Mr. Collier would

Page Two
September 28, 2007
------------------------------------

not knowingly compromise his personal creed by straying in a direction that would be contrary to public policy.

Thank you for your time and consideration.

Sincerely,

James Bland Quantz
President

/smf

September 26, 2007

The Honorable Royce C. Lamberth
United States District Court for the
District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Lamberth:

My name is Sally Means Quantz. I grew up in Spartanburg, SC where my father was a trial lawyer and my cousin is The Honorable Robert Foster Chapman, now of Camden, SC.

I have known Terry Collier for over 40 years. As a single young man I could always count on him for anything I might need. We lived next door to each other in a very "active" apartment complex. He was in my wedding and I have watched him grow into a very successful businessman and a wonderful, giving person. He has been involved with lots of community activities from United Way, Board member of USS Hunley, Special Olympics, Brookgreen Gardens, Board member of DeBordieu Community Association, Kiwanis Club, Board member of Parks, Recreation and Tourism, and he contributes annually to the University of South Carolina and Columbia College. He also has worked with and tried to help the Catawba Indian Nation for 10 years.

I have a serious heart condition and am waiting for a transplant. Terry has given me condos in Florida to stay in to keep me from getting sick in the winter. That is the kind of man he is – he can't do enough for others. I consider myself lucky to have such a caring and giving friend.

I have watched all three of his children grow up and he just had his first grandchild. He is devoted to his children and his ex-wife.

Thank you for your time and consideration.

Sincerely,

Sally M. Quantz
Sally Means Quantz

Richard W. Riley
46 Club Forest Lane
Greenville, SC  29605
(864) 250-2290

August 30, 2007

The Honorable Royce C. Lamberth
United States District Court for the
 District of Columbia
333 Constitution Avenue, NW
Washington, DC  20001

Dear Judge Lamberth:

I am a practicing attorney in Greenville, South Carolina, a former Governor of my State for eight years and I also served for eight years as United States Secretary of Education.

I have known and trusted Terry Collier as a valued friend for almost thirty years.  In my initial race for Governor in 1978, I was a long shot to win with early published polls showing that I had support from only 4% of the voters.  Terry was a young and energetic businessman and he and his wife became early supporters of my race for Governor.

Upon my election as Governor, my respect for Terry's integrity and ability led me to appoint him to the South Carolina Board of Parks, Recreation and Tourism Commission which is of critical importance to the State's tourism industry.  He served on the Board for six years and was a well respected member who served with distinction and made valuable contributions to the economic growth of our State.

I have remained in touch with Terry and his family over the years and know him to be a devoted father and a person who is beloved by his employees and greatly respected in the business community.  He has taken responsibility for the offense for which he is before your Court.  I would ask you to take into account Terry's long history as a valued and contributing member of our community as you make your decision.

Sincerely,

Richard W. Riley

RWR:pw

PAUL B. RODGERS, III
ATTORNEY AT LAW
———
POST OFFICE BOX 5907
COLUMBIA, SOUTH CAROLINA 29250

1122 LADY STREET, SUITE 815                                             TELEPHONE (803) 254-0700
COLUMBIA, SOUTH CAROLINA 29201                                         TELECOPIER (800) 254-0776

September 27, 2007

The Honorable Royce C. Lamberth
United States District Court
for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001

     Re:   D. Terry Collier

Dear Judge Lamberth:

     Please accept this correspondence as my character reference for D. Terry Collier. Mr. Collier is scheduled for sentencing before you in November following his recent guilty plea to one count of causing a false statement to be made to the Federal Election Commission.

     By way of background, I am a lawyer who has practiced civil litigation in Columbia, South Carolina since 1978. I am somewhat younger than Terry, but we have become close friends over the past ten to fifteen years. In addition to spending time with Terry and his wife Linda in Columbia, my wife and I have also been fortunate to enjoy many weekend trips with them.

     Although I have only limited first hand knowledge of Terry in a professional setting, from that limited knowledge, my conversations with Terry about his business interests, and from comments of others who have had a business relationship with Terry, I have been very impressed by his commitment to provide the best possible service and representation to his clients which includes maintaining a positive and responsive work environment for his employees. Of those individuals I know who have had a business relationship with Terry, their experiences with him have always been described in the most complimentary terms possible. Whether it is in a business or social setting, Terry is truly one of those few individuals about whom I have never heard anything but favorable comments.

     In considering Terry's character, I think it is especially important to recognize his strong and supportive relationship with his children. Terry's three children, a daughter and two sons, are involved in widely varied interests. His daughter is a talented singer and actress who has worked very hard for the past several years to develop her career in the entertainment field. Terry's oldest son is a practicing attorney. His younger son is a charter boat captain. Terry is incredibly supportive and proud of all three. As a father of a daughter and two sons, also with widely varied interests, I appreciate and have great respect for Terry's obvious love, affection and generous support of his children.

     Finally, I would like to briefly comment on my observation of the effect the current criminal

Page 2
Letter to The Honorable Royce C. Lamberth
September 27, 2007

process has had on Terry. It is obvious that Terry has been extremely embarrassed by his error in judgment resulting in the criminal charges against him and his recent guilty plea. I have not spoken with Terry about those charges other than to express my obvious regret for the situation in which Terry finds himself and my sincere hope that those charges and the current process do not result in any more significant disruption of the lives of Terry and his loved ones than is absolutely necessary. However, I have gotten the clear impression that having to address these criminal charges has been one of the most difficult experiences of Terry's life. Terry is an intelligent, highly motivated and hardworking individual who is familiar with addressing problems straight on and obtaining the best resolution possible. When he found himself facing the recent criminal charges, Terry recognized he had committed a very serious mistake and the only way to resolve the situation was to move through the daunting criminal process with as much integrity and dignity as possible.

I appreciate this opportunity to express my fondness, respect and admiration for Terry. He is truly a very fine individual who has accomplished much in his life and given generously to family, friends and community. He has acknowledged his wrongdoing before the Court and now awaits sentencing to move this extremely difficult phase of his life one step closer to resolution. Thank you very much for any consideration possible for Terry's many accomplishments and fine qualities as you reach your decision in his case.

Sincerely,

Paul B. Rodgers, III

PBR/mwt

The Honorable Royce C. Lamberth          Sept. 21, 2007
United States District Court for the
    District of Columbia
  333 Constitution Avenue, NW
    Washington, D.C. 20001


Dear Judge Lamberth,

    My name is Charles Rowland, and I am pleased to write this letter to this honorable court on behalf my friend Terry Collier.

    I am an editorial writer and columnist for the Walterboro, S.C. Press and Standard newspaper. I serve on the board of directors of the Coastal Community Foundation, headquartered in Charleston, S.C., one of the largest community foundations in our state. I also serve on the board of the South Carolina Artisans Center, and am a past chairman of our United Way campaign committee. My wife Sylvia is the executive director of our county library.

    I have known Terry since our children were in school together in Columbia, S.C. I have always thought of him as an exemplary father to his children, and a fine man for my own children to emulate. I still hold that opinion of him.

    Not long after my wife and I were married nearly six years ago, we ran into Terry at a social function in Columbia. It had been nearly a decade since I had seen him, because I had lived in Colorado for several years, and when I returned to South Carolina, it was to Walterboro rather than Columbia.

    When I introduced Terry to my wife, he said, "Why, I know Sylvia. You mean you two are married? That's just great! Congratulations! Charles, you couldn't have married a finer woman in the world."

    My point in telling of that moment is that Terry Collier has always shown visible, heartfelt gladness when good things happen to his friends.

    I know few people who are as well thought of and respected as Terry. Even in the weeks since his plea before this court, I have heard one acquaintance or friend of his after another express their distress over his circumstances and their continued affection and respect for him.

    I know Terry will always carry remorse for the actions that he committed, and admit that his plea was a just one.

Having said that, I would trust him in any circumstance in my life.


Respectfully yours,

Charles G. Rowland

10/23/2007  09:20    8438320178                                      PAGE  01/01

10-23-07
2803 Wire Rd.
St. George S.C. 29477


The Honorable Royce C. Lambeth
U.S. District Court for the District of
333 Constitution Ave. NW.   Columbia
Washington D.C. 20001

RE: Ferry Collier

Dear Honorable Royce C. Lambeth,

I am writing you regarding
my friend Ferry. I've known him
for over fifty (50) years. He is a very good
man. Honest and forthright man.
Ferry is always willing to
help anyone in need. He is highly respected
by his friends.


David A. Rumph SR

# DuRant, Schraibman & Lindsay
*Certified Public Accountants*

September 25, 2007

The Honorable Royce C. Lamberth
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

Dear Judge Lambert:

My name is Arnold Schraibman and I have been a long-time friend and personal CPA for Terry Collier.

I am a CPA in private practice in Columbia, SC and have been since receiving a degree from the University of South Carolina in 1964.

Terry, I and our families have spent much time together, socially and professionally, in our community for over 35 years. We also have many friends in common.

One of my sons, Michael, works for Terry. He has been given opportunities and education way beyond what most people would consider normal. It is common knowledge within Terry's company that he is kind and generous to all who work for him.

In preparing Terry's personal income tax returns for all these years, he has always provided us with complete and accurate information and has always paid his taxes timely.

The field of real estate is where I have gained much respect for him as a business person, as he is always more than fair with his clients.

I could go on for many pages talking about the excellent father Terry has been to his three children. When he was divorced, his office was in Myrtle Beach, and he kept an apartment in Columbia to be with his kids for all the time that was provided to him.

Terry is a compassionate and generous person and has many friends because of his genuine and sincere qualities. I feel very proud to be one of his best friends.

I can tell you that he is very sorry having committed this offense and cannot put into words the depth of his suffering. Please give him some leniency and mercy. The mental and emotional distress he is going through due to the public acknowledgement has been punishment in itself.

Respectfully,

Arnold Schraibman



OFFICE LOCATIONS
Columbia, SC (803) 252-4901
Hilton Head Island, SC (843) 785-9901
Myrtle Beach, SC (843) 238-5000
Orlando, FL (407) 650-3999

August 17, 2007

The Honorable Royce C. Lamberth
United States District Court for the
District of Columbia
333 Constitution Avenue, NW
Washington, D.C.  20001

Honorable Royce C. Lamberth:

    My name is Michael Schraibman and I am the CEO of SPM Resorts, Inc.  I have known Terry Collier the majority of my life.  While I was young, he was a neighbor and good friend of my parents and was always a lot of fun to be around.

    Over 17 years ago, I had the opportunity to go to work for Terry in his company SPM Resorts, Inc. that he started in Myrtle Beach in 1979.  I was in my mid twenties and within the first two weeks of working with Terry, he taught me three very important lessons that still remain with me today.  The first lesson was to pay all of your bills and pay them on time.  The second was that when dealing with employees, customers or prospective clients always put yourself into their shoes and it will always make for better business.  The third lesson was, if you wanted to be the first one in the office, you better be there before 7:00 am or you would pull up to the office with Terry already at his desk.

    During this 17 plus years, Terry and I have been partners in business but also very good friends and Terry and his wife Linda also introduced me to my wife 14 years ago.  For over 17 years as business partners in several companies and many development projects, Terry and I have never had an argument.  Terry's philosophy has always been to look out for "his employees", and in return, I have had that same attitude towards him.  On many occasions after a project was completed, Terry would insist I be paid an additional bonus or be compensated more than we had agreed to on the front end.  Terry's way of doing business and rewarding his people is very rare these days.  This type of generosity also made me want to do a better job.  I saw Terry's gratitude like this with all the employees.  While discussing senior management personal, Terry always made sure they had an opportunity for a company car and were paid salaries higher than our industry standards. Over the years SPM has grown significantly, and today we have over 500 employees, many of which started with Terry and have remained with him because of his integrity and fairness.  If Terry said he would do something for an employee, it was always done. Under Terry's leadership and integrity SPM has grown to be one of the most respected Timeshare management companies in the country.

Page Two
August 21, 2007

Another lesson I've learned from Terry but only realized it until I had a family myself (three children) was how important his family was and is to him. On many occasions and some were important meetings (new business opportunities) he would receive a call from one of his children, and excuse himself to take the call. His family always came first.

As the company grew, Terry had many meetings with an outside CPA firm to insure better financial information with more accountability for our clients; I've attached an actual copy of that material which is sent out to each of our clients every month. Not only did Terry insist on an outside CPA firm doing the monthly financials, but also insisted on another independent CPA firm to do the annual audits. Terry created this type of information to insure 100% accountability on all funds managed by our company and the operational information to keep everyone completely informed of the day- to- day business. Today our company manages over 55 million dollars for over 25 homeowners associations. With the operational and financial systems that Terry created, it allowed us the expertise to do "workouts" for banks, lenders and developers who were in financial trouble and or had to foreclosure on a property.

In addition to doing "workouts" for banks, Terry was appointed by the Court as a court receiver for a distressed resort property in North Myrtle Beach, which closed down after Hurricane Hugo. Terry was very instrumental in providing all parties involved with timely and accurate information. After two and ½ years of hard work and reconstruction under Terry's guidance and leadership, the resort was reopened and the property was sold to a new developer. People who have done business with Terry always want to do more business with him. In this case the resort lender was Greyhound Financial, in which, we did additional work for them over the next 12 years.

Terry has been generous to so many people, employees, family, friends and strangers, but one thing that always made an impression on me was how generous he was to his first wife. After Terry's first wife remarried, Terry had no further financial obligations to her. However, after she divorced her 2nd husband, Terry was generous financially to her, even in a very difficult situation, and many times it was done without her knowledge.

Page Three
August 21, 2007

     Terry has made so many positive impressions on me both professionally and personally and has been at the core of our business success.  In closing, if you knew Terry and needed his help, he would stop what he was doing and give you all his attention and his resources.  As CEO of SPM  Resorts, Inc., I thank Terry for being a mentor and giving me the coaching and working environment to thrive.  I'm, proud to be associated with Terry both professionally and personally and I am glad to have him as a very close friend.

          Sincerely,

          Michael Scharibman
          CEO
          SPM Resorts, Inc.

MS/js
Enclosure



OFFICE LOCATIONS
Columbia, SC (803) 252-4901
Hilton Head Island, SC (843) 785-9901
Myrtle Beach, SC (843) 238-5000
Orlando, FL (407) 650-3999

August 24, 2007

The Honorable Royce C. Lamberth
United States District Court for the
District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

The Honorable Judge Lamberth:

My name is Johnna Sessions and I am 45 years of age. Terry hired me in March of 1992, at which time there were less than ten employees in the corporate office. I am the controller for SPM Resorts, Inc. as well as Terry's personal administrative assistant. I am also responsible for all of Terry's personal affairs as well as his children, who are now adults. In June of this year, Terry welcomed his first grandchild, Shelton James Collier. He was ecstatic. Terry's first priority has always been his wife, Linda, his two sons, David and Jay, and his daughter, Maggie. His goal has always been to provide them with the best of opportunities and education.

We, as individuals, are all faced with daily choices. Terry has made some mistakes, but his achievements far exceed any mistakes he may have encountered along the way. Terry founded his company with strong and honest work ethics. With his leadership and skill, SPM Resorts, Inc. has become one of the major leaders in the timeshare property management industry today. Terry has always stressed the importance of working as a "team". He would often say in meetings, "The position of Resort Housekeeper is just as important, if not more important, as the job of Chairman of the Board". When Terry would visit resort properties, he would often be seen picking up cigarette butts around the grounds. He was meticulous about cleanliness and everyone knew it.

Terry has always shown his employees respect. He is a problem solver and always open for comments and suggestions. Independence can be a learning tool and Terry provides that working atmosphere for his employees, thus resulting in a successful business.

Main Office: 1051 Shine Avenue, Myrtle Beach, SC 29577
Telephone (843) 238-5000 • Fax (843) 238-5001
info@spmresorts.com

Page Two
August 24, 2007


Terry's success has not hindered the fact that he is always sensitive to those individuals in less fortunate situations and often without their knowledge.   I once recall Terry purchasing a pair of glasses for an employee who desperately needed them but didn't have the available funds, so he purchased the glasses for her and she reimbursed him weekly until she had paid him in full.  He possesses a strong commitment to his church, his community and always supportive to local charities and historical societies. Terry is a very compassionate man who puts others needs before his own.

I would just like to comment in closing that Terry's personal and professional life not only affects him, it also affects everyone close to him including his wife, family, friends, colleagues and his second family of 500 employees and their families.  His job is not finished; he has so much more to do.

Sincerely,

Johnna Sessions
Administrative Assistant

/js



**Smith Shanafelt, LLC**

Certified Public Accountants

*Laura P. Smith, CPA, PA*
*Kelli L. Shanafelt, CPA, PA*

September 18, 2007

The Honorable Royce C. Lamberth
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

Re: USA v Terry Collier

Dear Judge Lamberth,

Our firm works closely with SPM Resorts, Inc. by providing monthly accounts payable and financial statement services for many of the homeowner associations under their management. We also provide monthly financial statement and corporate tax preparation services for SPM Resorts. Mr. Terry Collier is the founder and majority shareholder of SPM Resorts.

My association with Mr. Collier and SPM Resorts began in 1996. He and his organization were among my first clients as a practicing CPA and I credit him with much of my early education of the property management industry. He showed me a great deal of respect, even as a young professional, placing much trust and confidence in me and through valuing my contributions to his organization. Over the past eleven years, I have gained an understanding of his relationships with his staff, timeshare owners and business partners. I have witnessed his treatment of his employees as equals, regardless of their rank within the company, and know that he considers them part of his extended family. He has demonstrated a compassion for his employees by making decisions which may not have been the best economically for his company, but that were in the interest of his employees and their families. His timeshare owners and business partners hold him in high regard as a fair businessman dedicated to servicing his customers.

In closing, Mr. Collier has earned my respect as a successful businessman. He has earned my especially deep respect for the humanity he brings to his business world and for his genuine interest in the people that surround and serve his organization.

Sincerely,

Kelli L. Shanafelt

1072 London Street • Myrtle Beach, South Carolina 29577
Telephone (843) 626-2110 • Fax (843) 626-4758

*J.L. Simmons, Jr.*
*808 North Hickory Street*
*Summerville, South Carolina 29483*

*September 22, 2007*

*The Honorable Royce C. Lambert*
*United States District Court*
*For the District of Columbia*
*333 Constitutions Avenue, NW*
*Washington, D.C.  20001*

*Dear The Honorable Royce C. Lambert:*

*This letter is written in behalf of our first cousin Mr. Terry Collier.  Terry, my brother Romie and I were born and raised in the small town of Saint George, South Carolina and even though we all left this quaint little town we continue to have fond memories and a love for the small community where we were raised.  Terry has been instrumental and is a strong advocate in the restoration of several long standing buildings in town such as the Lourie Theater.  He also contributed toward the restoration of the historical Kroger House that was once used in the main stage coach route of the South Carolina low country.*

*Terry is truly a professional and successful business man and as a result of this success he has always been thoughtful and generous in providing for his family and others needing his emotional and financial assistance.  Terry specifically assisted in the support of his elderly mother, aunt and uncle until their respective deaths.*

*We respectfully request that his outstanding generosity, community service and commitment to his family, employees, and business be considered and rewarded favorably in his behalf.*

*Respectfully yours,*
*J.L. Simmons, Jr.*

*Respectfully yours,*
*J.K. Simmons (Romie)*

# Nelson
# Mullins

**Nelson Mullins Riley & Scarborough LLP**
Attorneys and Counselors at Law
1320 Main Street / 17th Floor / Columbia, SC 29201
Tel: 803.799.2000 Fax: 803.255.5598
www.nelsonmullins.com

John C. B. Smith
Tel: 803.255.9475
Fax: 803.255.5598
cb.smith@nelsonmullins.com

September 17, 2007

The Honorable Royce C. Lamberth
United States District Court for
    the District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

        Re:    Terry Collier

Dear Judge Lamberth:

        I am currently Of Counsel to the Law Firm Nelson Mullins Riley and Scarborough and am a former partner and former managing partner of Nexsen Pruet Jacobs & Pollard. In addition to my law firm activities, I own a small real estate investment firm, John C. B. Smith Real Estate. I graduated from Washington & Lee University in 1967 and University of South Carolina School of Law in 1970. While at USC Law School I served on the Honor Council. After law school I served as a Captain in the Judge Advocated Generals Corps., U.S. Army. I currently serve as Lead Independent Director of The South Financial Group and a member of the Carolina First Bank Board. I am Chairman of the USC Education Foundation Board, which manages USC's cash endowment and former Chair of the Sisters of Charity Foundation Board. I am President of the USC Law School Partnership Board. In 2001, South Carolina's Governor appointed me to the South Carolina Education Lottery Commission with the charge to start a lottery for South Carolina from scratch. I was elected Chair by the other eight Commissioners and served in that capacity for approximately five years. At the conclusion of my tenure I was honored by a Joint Resolution of the S.C. House and Senate.

        I have known Terry Collier for over thirty years. Most of that time our friendship has been social in nature and I have found him to be personable, friendly and outgoing. My experience has been that Terry is true to his word, reliable and honest. When I was appointed to the Lottery Commission, Terry and I had something of a professional relationship in that he actively represented the Catawba Indian Tribe, whose interests were somewhat contrary to those of the South Carolina Education Lottery. Terry felt, as did others, that lottery ticket sales detracted from the Tribe's bingo revenue. I was aware that Terry worked diligently to assist the

The Honorable Royce C. Lamberth
United States District Court for
    the District of Columbia
September 17, 2007
Page 2


Tribe in its efforts to expand its operation to the Santee area of the state. At one point, Terry advised me that it might be necessary for hm to bring suit against me in my official capacity on behalf of the Tribe in order to advance the interests of the Tribe. Terry did not let our friendship interfere with his professional obligation to represent the interest of the Catawbas. In all respects, Terry conducted himself professionally and in an above board manner.

In all my experience with Terry, he has been a kind, caring and generous person. He is devoted to his wife and three children. I sincerely hope that the Court will consider leniency in Terry's sentencing. I feel that any incarceration would be devastating to Terry's family.

Sincerely,

John C. B. Smith, Jr.

JCBS,Jr/rrr



**Smith Shanafelt, LLC**

Certified Public Accountants

*Laura P. Smith, CPA, PA*
*Kelli L. Shanafelt, CPA, PA*

September 15, 2007

The Honorable Royce C. Lamberth
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, D. C. 20001

Re: USA v Terry Collier

Dear Judge Lamberth,

My firm, Smith Shanafelt, LLC, Certified Public Accountants, performs the financial statement and accounts payable function for many of the homeowner associations managed by SPM Resorts, Inc. in and outside of Myrtle Beach.   Terry Collier is the founder of SPM Resorts and currently owns the majority of the outstanding stock.  We have rendered accounting, bookkeeping and tax services for Mr. Collier's company for almost twenty years.

During the time we have served Mr. Collier's company, I have had occasion to see first-hand his work and have developed opinions about his honesty, integrity, business ethics and commitment to quality services to his customers, essentially all of which are homeowners associations of resort properties.  Based on experience of almost two decades, I can say that Mr. Collier has demonstrated a high degree of honesty, integrity and good business ethics.

As you may be aware, companies that manage resort properties for absentee owners occasionally develop a reputation for less that exceptional honesty with their clients.  Let me assure you that Mr. Collier is not one of that kind of business person.  Unhappy owners of resort properties rarely conceal their feelings; if the persons who deal with Mr. Collier on a frequent basis thought he was not a businessman of the highest integrity, I, as Mr. Collier's business CPA, certainly would have heard it by now.

Sincerely,

*Laura P. Smith*

Laura P. Smith

1072 London Street • Myrtle Beach, South Carolina 29577
Telephone (843) 626-2110 • Fax (843) 626-4758

Elizabeth G. Summersell
1147 Arthur Drive
Charleston, SC 29412

Dear Honorable Royce C. Lamberth,

My name is Elizabeth Summersell and I am writing on behalf of my cousin David T. "Terry" Collier. I am a nurse and have worked for the same home health agency for 20 years. My husband and I have been married for 45 years. We have 3 children, 2 girls that are teachers for the Charleston County School District and our son is a Charleston County Deputy Sheriff.

Terry was the only son of my aunt and uncle. Growing up, he was a loving caring son and never gave his parents any problems. He took excellent care of his aging mother and father. They never wanted for anything emotionally, physically, or materially. He also took on the responsibility of caring for our bachelor uncle in his elderly years. Terry was at his bedside in the Intensive care Unit when he died at the age of 87.

Every summer he generously made sure that his aunt, my mother, had a wonderful family vacation at the beach. We gathered in Myrtle Beach for many summers and shared family vacations. My mother looked forward to this time with Terry and his family.

Terry is a devoted, loving husband, and father, and most recently a proud grandfather. I have never known Terry to be intentionally or knowingly unkind or hurtful to anyone. Quite the opposite, he has always been very tender hearted and kind. I have always admired his hard work and dedication. I have always thought very highly of Terry and we have maintained a close relationship throughout the years.

Please take my sentiments into consideration when rendering your decision.

Respectfully,

Elizabeth G. Summersell

*Hy Sussman, M.D., F.A.C.P.*
*Nephrology*

October 31, 2007

The Honorable Royce C. Lamberth
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC  20001

Dear Judge Lamberth:

I am retired Medical College of Georgia faculty and presently work as an independent contractor in Nephrology traveling to stand in for physicians in my specialty. I also am a Medical Director for DaVita Healthcare (a national dialysis company), an outpatient dialysis clinic in North Augusta, South Carolina.

I have had the privilege of knowing Terry Collier for 25 years, and I have come to love him as a close personal friend. He has extended his generosity to me countless times, usually when least expected. From my view his character and integrity are impeccable. I would trust him to carry out my request for assistance of the most personal nature, including those involving my immediate family. He has looked out for my comfort and well being without being asked to do so.

I have witnessed his spontaneous assistance to people and causes, and these deeds, I have observed, always seem to give him a sense of satisfaction and pride.

It is my hope that the Court will take the fine qualities of this person in consideration when deciding about his future.

Sincerely,

*Hy Sussman*

Hy Sussman, M.D.

HS:trs

The Honorable Royce C. Lamberth                    September 23, 2007
United States District Court
for the District of Columbia
333 Constitution Avenue, NW
Washington, D.C.   20001


Dear Judge Lamberth:

Please note that this is a personal letter to you.

My name is Rebecca Swanson, of Columbia, South Carolina where I
currently serve as Executive Director of the Shepherd's Center of St.
Andrews, a learning program for active seniors in the community.  I'm a
graduate of the University of South Carolina from which I received two
advanced degrees.

 Although I am now working part-time, I am retired from Columbia
College, a four year liberal arts school for women, after twenty-nine
years of service as a professor and administrator.  It was there that I met
Linda Herlong who subsequently became the wife of Terry Collier.
Thus, I have known Linda for some thirty years, and Terry for seventeen
of those years.

Linda was age twenty-five when she joined the faculty at Columbia
College.  She subsequently rose within the academic ranks to the level of
Associate Professor and enjoyed a distinguished career in teaching and
academic administration. After serving for twenty-five years, she chose
early retirement in order to spend quality time with her husband.
Immediately after arrival at Columbia College, Linda quickly became a
trusted colleague, personal friend, and in her words, I became "her
mentor".  There is some question of who became whose mentor.

I am honored to write this letter of support for Terry and Linda.  Please
notice that I said for Terry AND Linda, for I hardly can think of one

without the other; they are an inseparable couple who share unconditional love and respect for each other. Terry brought new confidence, joy, and stability into Linda's life after her divorce from an abusive marital relationship. And Linda, herself later provided the same solace for Terry and his children after a difficult marriage.

The two have been happily married for thirteen years. Although they have no children of their own, both give love and attention, as well as tangible and intangible support to Terry's two sons, one daughter, and now a new grandson. This kind of attention has extended as his children have matured into adulthood. A recent example of this is when both Linda and Terry flew to Edinburgh, Scotland to see Terry's daughter's theatre performance during the Fringe Festival. He has also been delighted over the recent birth of his first grandson and rushed to be with the newest member of the family. Terry's total commitment to the welfare of Linda and his children remains as ever, his first priority in life. He would never, knowingly, betray their trust.

In 1972, Terry established the Collier Company, a real estate development company; later, he branched out into project management and development and established multiple companies. He is regarded as a successful businessman who reflects the highest level of honor and integrity.

Terry is one of the most effective leaders I have ever witnessed, both in business affairs as well as in service at both the state and community level. Two examples of such service come to mind. Terry is now serving on the prestigious board of the USS Hunley, and he served for six years on the board of South Carolina Parks, Recreation, and Tourism.

Terry Collier is a very caring and generous person. He is a known advocate for the Catawba Indian Nation. For over a decade he has worked to improve their economic level and standard of living. I know through his wife, Linda, that it was common practice for Terry to

provide Christmas presents for the children on the reservation. I also know, again through Linda's confidences as a personal friend, that at one point, when the Catawba Indian payroll could not be met, that Terry extended a personal loan of a significant amount to alleviate the situation. Again, when my husband was terminal with Lou Gehrig's disease, both Terry and Linda were always "there" for both of us, lending support, comfort, and encouragement in both tangible and intangible ways. Terry has also earned the respect and friendship of those who work with and for him as he is eager to make sure that everyone feels and knows they are valued contributors to the success of his many business ventures. I also know of an incident at Columbia College where Terry paid the tuition of a student who otherwise would have been unable to stay in school.

It is this Terry that I know. Words that have been used in the media and other public arenas such as devious, deceptive, and criminal do NOT reflect the character of this man. Other words and phrases that DO fit are: integrity, generous, caring, loving, humble, grateful, kind, witty, a friend to all in need, a family man, compassionate, devoted, bright, intelligent, intuitive, dependable, honest, talented, loyal, perseverance, a good listener, positive, a change agent, innovative, forward looking, nonjudgmental, considerate, concerned, interested, happy, a "the glass is half full" outlook on life, and trustworthy. When one is with him, he makes the ordinary seem special.

I cannot imagine that Terry would ever KNOWINGLY commit a criminal act. I can only relate knowing the intricacies of Campaign Finance Law with knowing the intricacies of requirements of accreditation agencies. It seems impossible to know the details of every rule and regulation, which appear to continually change and evolve. That Terry would consciously submit his wife, children, and entire family to the results of criminal activity just doesn't "compute".

It has been difficult for friends and admirers of this pair to witness the shock, the disbelief, the pain of public humiliation, the worry, the

rejection, the constant "not knowing", the self-doubt created, the confidence destroyed, the sleepless nights and the related ongoing emotional pain endured by this couple. For over two years they have suffered the excruciating stress of being in a suspended state of "not knowing" when and what will happen. Time and circumstances have affected both of them irreparably. Because of the suffering already endured by this couple, whose contributions attest to their being GOOD, decent human beings who seem trapped in a tangled web of uncommon circumstance, it is my hope that you, Judge Lamberth, will unravel this case and provide as much leniency as possible in the dissolution of it. Those of us who love and admire Terry and Linda Collier will be eternally grateful.

Sincerely,

Rebecca Swanson, PhD.
1014 Arcadia Lakes Drive
Columbia, South Carolina   29206
Phone:  (803) 782-0632

# THE TARRANT COMPANY, INC.

Commercial and
Industrial Real Estate

80 South Battery
P.O. Box 28
Charleston, SC 29402
Office 843/577-6676
Fax 843/577-6675

September 18, 2007

The Honorable Royce C. Lamberth
United States District Court for the
District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

RE:    David Therrell Collier

Dear Judge Lamberth:

My name is Guy Cheves Tarrant and I am a 64-year resident of Charleston, South
Carolina, where my family settled from Scotland in the mid -18th century. I am president
of The Tarrant Co., Inc., managing member of Tarrant Properties, LLC, and a licensed
real estate broker in S.C. since 1971. Prior to that I was in the banking business for seven
years, and graduated from Clemson University in 1965 with a B/S degree in Industrial
Management. I am a Certified Commercial & Investment Member (CCIM) of the
National Association of Realtors.

I formerly served as Chairman of the Boards for Mason Preparatory School of
Charleston, S.C. and the Charleston County Planning Commission. More recently, I
served as Vice Chairman of the board for Trident Technical College in Charleston, S.C.
and currently serve as Governor Mark Sanford's at large appointee to the S.C. State
Technical & Comprehensive Education Commission.

I have known Terry Collier for forty years and consider him to be my best friend. We got
married about the same time and have children about the same ages. We started work
together at the same bank as we began our careers in the late 1960's. We dated our wives
together, raised our children together, played sports (initially tennis, now golf) together,
were members of various social organizations together, travel together with our wives,
worked on various projects together, and basically, spent most of our adult years together.
Trust me when I say I know Terry Collier.

Playing tennis and golf teaches its participants a lot about life skills and character
development. I have played with and against Terry in both sports for over 35 years. The
small things that your opponent and/or partner does, especially in the game of golf,
speaks volumes about his personal integrity and character. Terry demonstrates the best of
both. Golf is a gentleman's game with a lot or rules, regulations and courtesies. Terry

Collier has always played these games with the utmost respect for those rules. Whether you win or lose, to or with him, he is more interested in the fellowship and the bonding time among friends than who won or lost the match.

My wife and I attended his retirement party in Charleston several months ago. I witnessed the personal comments and testaments made by some of his employees (his company employs over 500) that attended his "roast". Terry's generosity and commitment to these individuals was clearly and very personally expressed to those in attendance that evening.

In closing I think the most significant attribute of Terry Collier's character is his commitment to his family. From a humble, only child upbringing in the small rural town of St. George, S.C. to the father of three grown children with a new grandson, Terry has devoted most of himself to his family along the way. While his success as a businessman is self evident his success as a father and devoted husband is more significant.

I am praying that you will see some of what I've said in the many letters you have received about Terry and will have empathy and sympathy for his situation. He is paying the price in his heart and mind for the mistake he made. Please grant him some leniency that would include something other than jail. God knows that Terry Collier is a good person that deserves your compassion. Thank you.

Sincerely,

Guy C. Tarrant, CCIM

The Honorable Royce C. Lamberth
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, D. C. 20001

Your Honor,

My name is Teresa Tarrant. I have known Terry Collier since I was 18 years old and dating my husband of 36 years Guy Tarrant. I am now 55 years old and a retired physical therapist. Guy and I have two grown sons and two grandchildren.

I have had the privilledge of sharing most of my life with Terry and his family. He was at my wedding, my children's birthdays, school graduations and my older son's wedding. We have laughed, cried, and grown older together. We have vacationed as families and couples and made wonderful memories which have carried over to our children. I have watched his children grow and become fine young adults. His son, David, is a wonderful young man and accomplished attorney specializing in real estate law. His son, Jay is married and has just made Terry a proud grandfather. His daughter, Maggie, is a talented young lady living in New York working as a nanny.

Terry has devoted his life to making a loving home for his children. I saw him anquish over the breakup of his first marriage. I also saw him act with amazing generosity in giving his ex wife their home, alimony and agreed to joint custody. He did so to protect his children from an unpleasant divorce procedure.

He made sure his children were given loving, family time at his home in Columbia and Edisto Island; where they spent time fishing, boating, skiing and enjoying family. This fueled Jay's love of the outdoors and he is now a boat captain. Terry was devoted to his Uncle Jim whom we all knew. Uncle Jim never married and in his final years it was Terry who saw to his care needs. He also made sure his mother and his father were cared for in their final years.

Terry's marriage to Linda has been a blessing. He is a wonderful, considerate husband. They have a strong and loving relationship. We have spent many New Years Eves and special occasions with Terry and Linda and love them dearly. Terry would be one of the first people I would call if anything happened to my husband. I trust him completely. He is fiercely loyal to and generous with his friends. Guy and I went to his retirement party and observed the love and devotion from his many coworkers and staff.

I appreciate you taking the time to listen to me.
God bless,

*Teresa Tarrant*

Teresa Tarrant
80 South Battery
Charleston, South Carolina 29401
843-5098037

One Tenth Street, Suite 600
Augusta, GA 30901

T 706-724-2601
F 706-722-2410
Toll Free 800-241-2401

citi smith barney

August 27, 2007

The Honorable Royce C. Lamberth
United States District Court for the
District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

Dear Judge Lamberth,

I never felt that I would ever be called upon to write a letter such as this. I am not only flattered but graciously accept the opportunity to communicate with you on behalf of my dear friend, Terry Collier. I am a First Vice President and Financial Advisor with SmithBarney. Though he is not a client of mine, Terry Collier is my friend.

I have known Terry since the first day we spent together in the South Carolina Air National Guard; September, I believe, of 1962. We served as Air Traffic Controllers together back then and I recall how proud we were when our duty was complete and we were Honorably discharged. We have been through so much together these past 45 years....happy and sad times, births and deaths....he has been a confidant and true friend through the good and the bad. I hold him in the highest esteem and count him in the top ten people in my life.

One of Terry's strongest traits is his strong, sincere commitment to his family, his business and his friends. It is so comforting to know that if I ever needed him, he would be there for me and my family. Though not always convenient for him, he was there for our children's births, their Bar Mitzvahs and their weddings. It meant so much to us to have him share in these occasions.

In closing, at the age of 68, I feel I can attest to the fact that we make mistakes in our life....I know I have. As much as I love Terry Collier, he made a mistake. He has admitted that to me as well as the court. Terry Collier is a good person...not a criminal. I know he deeply regrets what has transpired and I too am disturbed but that does not lessen my opinion of him as my friend, a good citizen and a fine family man.

Thank you for this opportunity and your time. I wish you well.

Sincerely,

Haskell D. Toporek
First Vice President- Wealth Management
Financial Advisor

Citigroup Global Markets Inc.

711 Sears Street
St. George, South Carolina 29477

October 8, 2007

The Honorable Royce C. Lamberth
United States District Court of the District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

Dear Judge Lamberth:

I am writing on behalf of Terry Collier. I have known Terry since we were young children in St. George. Though I am two years older, we were good friends throughout our public school years. He left St. George after college. I returned after college and a tour in The United States Air Force to work in public education. Though we do not see each other very often, we have remained in touch through the years.

I know Terry to be a kind and generous man. My personal experience with his generosity comes from requests for donations to help develop a heritage center for Upper Dorchester County in St. George. I head the project. Terry provided generous support on two occasions when his hometown needed him. Though I do not know for sure why Terry did what he pled guilty to, I suspect he was trying to help someone in some way.

I believe that my time in public education has provided me with many opportunities to judge man's character. I believe that Terry Collier is a good man who made a mistake. I respectfully ask that you consider all the good that he can and will do as you make your decision about his sentence.

Sincerely,

Peter D. Weathers, Jr.

OFFICE LOCATIONS
Columbia, SC (803) 252-4901
Hilton Head Island, SC (843) 785-9901
Myrtle Beach, SC (843) 238-5000
Orlando, FL (407) 650-3999

August 22, 2007

The Honorable Royce C. Lamberth
United States District Court for the
    District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

RE:     Terry Collier

Dear Judge Lamberth:

I wanted to address a letter on behalf of Terry Collier and share with you my outstanding relationship both as an employee and a friend to Terry.

My name is William R. Young Jr., President/COO of SPM Resorts, Inc. I have been employed with SPM Resorts, since 1999. Prior to be hired by Terry Collier, my previous employment was with Hilton and Sheraton Hotels. Needless to say, I never thought that I would leave and venture off into the timeshare industry, but I did. I left the hotel business for one reason only, Terry Collier. After meeting Terry and reviewing his philosophies and business plan, it was obvious that he knew exactly where his company was going.

When I think of the opportunity Terry has given me to be the president of SPM Resorts and run the day-to-day operation, it says so much about his character and the trust that he has in people. I knew there were other people more qualified than myself to run his company, but nevertheless I was given the opportunity. Every day for a couple of years, he worked with me training on how to communicate with people, how to be a great leader, etc. When I think of all the hours and time we spent together, it's no wonder we as a company have been successful.

I have never met a man who truly cares about people like Terry does. Just to give you an example, Terry made me a partner of SPM Resorts. Did he have to? No. Terry also allowed me the opportunity to be an owner of our marketing company. While many may not view this as anything extraordinary, I must state that all of the tremendous opportunities were offered through trust and were done on a handshake. There were no written contracts, no written promises to compensate upon obtaining certain goals, only verbal commitments which Terry has always lived up to 100 percent.

It is difficult to find a man of such character and principle in the workplace. His honest, caring and trusting personality is beyond reproach and is immediately felt and known through all that come into contact with him. Through my past history with corporations, I have dealt with owners or executives who customarily operate through and by carefully crafted, written contracts that protect them and their company. Terry continues to believe in the adage that any worthwhile personnel or work-related relationship must begin with a genuine trust if it is to succeed.

When I think of all he has done for both me and my family, all I can say is here is a man who is dedicated to his team. I've been around Terry and his family for a few years, but it seems like 20 years. He is the most kind and giving person I have had the opportunity to be involved with during the past thirty (30) years of my career.

I truly believe that anyone who knows Terry has had the fortunate opportunity to know a trusting and caring friend who would do anything for them in their time of need.

The Honorable Royce C. Lamberth
Page 2
August 22, 2007

In conclusion, while Terry has been a support to me in my position, he has been a close friend and most important a man with integrity and love for people. I respect and love Terry for who he is and for that which he stands.

No matter the outcome, just know that Terry is a good honest man and loved among his friends and staff members.

Sincerely,

Bill Young
President/COO

August 30, 2007

The Honorable Royce C. Lamberth
Judge, United States District Court
  For The District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001

      RE:   Terry Collier

Dear Judge Lamberth:

      This letter is written to provide the Court some insight into the person of Terry Collier.

      I have known Terry for approximately 30 years. I consider him a friend and I regret that he has run afoul of the law.

      As you consider an appropriate sentence, it is my hope that you will take into consideration some of the fine qualities Terry possesses. He cares for his employees. He has done good things for the Native American population in his area. Terry is an individual who has learned from this mistake. His name is his greatest asset. It has been tarnished by reason of him pleading guilty and committing the offense. Any further punishment will not be as severe as what has happened to him as a result of his actions. It is my hope you will give consideration to leniency in his behalf. I am confident he has learned from this unfortunate experience.

      Best regards.

                    Sincerely,

                    David M. Zacks

DMZ/pw

# APPENDIX B

# Catawba Indian Nation

## 2002 Annual Economic and
## Development Plan and Budget

Prepared for the Catawba Indian Nation's Executive Committee by
New River Management and Development Company, LLC
January 2002

The purpose of the Catawba Indian Nation Annual Economic and Development Plan (AEDP) is to provide the Executive Committee a status of the existing businesses that are managed by New River Management and Development Company, LLC and the economic development efforts of the Catawba Indian Nation, as well as the plan for economic development in 2002.

I.    **Catawba Bingo And Its Operations**

In 2002, New River's focus will be on three components of the Catawba Bingo budget and operating plan.  They are:

- The impact of the South Carolina Lottery for Education on monthly attendance,

- The continued reduction and stabilization of operating expenses, and

- The implementation of an aggressive advertising and marketing plan.

The CIN is evaluating the possibilities of moving the bingo hall to Carowinds Blvd. These negotiations are under way, with no contracts signed as of December 2001.

Also, New River has suggested to the Governor that it may be possible to move both Catawba Bingo and Catawba Lightning Bingo (the Catawba's only gaming operations) under the regulatory authority of the South Carolina Lottery for Education Commission.  From a bingo standpoint, the DOR seems to have a hard time dealing with Catawba Bingo and the fact that we don't quite fit into the bingo "hole".  That, coupled with the fact that the gaming laws that deal with the Catawba Indian Nation and the State of South Carolina seem to contradict is many ways.  New River also feels that the Tribe is entitled to operate it's own lottery.  Therefore, the logical entity to regulate all Catawba gaming efforts would be the SC Lottery for Education Commission.  In addition, the Lottery Commission has no pre-conceived notions about bingo (other than it may be competition for ticket sales), and they may be more flexible with the regulation



The Catawba Indian Nation
**2002 Annual Economic Development Plan and Budget**                                    1

of Catawba Bingo, especially if they are able to get the tax revenues from bingo (and not the general fund).

### *Card Sales*

Card sales are based on historic averages and percentages, specifically 2000 and 2001 historical information. The reason we have chosen 2000 and 2001 actual information to base card sales and attendance on is because in 2002 payouts and game programs will remain basically the same as 2001 and 2000 (with some additional promotions every month). It is also important to note that payouts and game structure have a direct correlation to attendance. In 1998 and 1999, payouts, on average, exceeded 67 and 63 percent, respectively, which far exceeds the payout "standard" we have achieved over the past 24 months.

### *Bingo Tax (10%)*

Because of the Settlement Agreement with the State of South Carolina, Catawba Bingo must pay 10 percent of the face value of all cards sold to the State in the form of a bingo tax. In 2001, we were supplying our customers with "penny paper" (paper denominated at $0.01) in their $18 buy-in. Tax will be owed on this paper.

### *Admission Fee*

Due to a requirement in the South Carolina bingo law, Catawba Bingo charges an $18 per head admission fee at the door in 2001. In the 2002 budget, the Admission Fee figure is calculated by multiplying $18 by the average attendance for a particular day in a particular month.

### *Prize Payouts*

The Settlement Agreement with the State of South Carolina requires Catawba Bingo to payout in prizes 50 percent of its gross bingo revenues minus the 10 percent bingo tax. Bingo payouts have been reduced as follows; 64 percent in 1999, 56 percent in 2000, and 55 percent (through 11 months) in 2001. In 2002, our goal is to continue to



The Catawba Indian Nation
**2002 Annual Economic Development Plan and Budget**

2

reduce bingo payouts to around 51.6 percent, which is close to the payout limit of 50 percent.

### Bus Coordinator Fees

Bus coordinator fees were forecasted much the same way as card sales; they are both based on historic averages and percentages. In 2001, bus fees averaged about $151,000 per month. In 2002, Catawba Bingo will see no net reduction in busing fees and plan to see an increase in busing attendance. This will be accomplished by finding new coordinators who will come to Catawba Bingo at a reduced rate. We will not be giving complementary game packs to bus coordinators in 2002. We feel that the hall adequately compensates coordinators, and that if they want to play bingo at Catawba Bingo, they should pay like other customers. This will save the hall approximately $200,000 annually.

### Advertising & Promotion

In 2002, our advertising efforts will focus on direct mail and direct mail support. In addition, we will also aggressively utilize our in-house marketing capabilities, as well as other media outlets such as television to support direct mail. While we have reduced our outdoor media to one billboard, we have moved that billboard closer to Charlotte, thereby increasing the cost of the board.

II.    Catawba Café and Gift Shop

### Café Revenues

Food Sales are based on historic sales. We are hoping to see an increase in sales as attendance continues to grow in bingo. This year customers will not be able to use their circle club cards to purchase food from the café.

---



The Catawba Indian Nation
2002 Annual Economic Development Plan and Budget                                    3

Beverage Sales and phone card sales are based on historic sales. These are sales from all soda and coffee purchases. Phone card payouts are based on a 45 percent payout.

Special Events and Vending are a set amount each month. Special Events are Free Pepsi Night, Free Hot Dog Night, and any nightly special the Café may offer.

## Gift Shop Revenues

Souvenir, sundry, apparel, and bingo supply sales are based on historic averages. These are sales of bingo daubers, seat cushions, t-shirts, hats, cigarettes, lighters, candy, and bingo bags.

## Café and Gift Shop Cost of Sales

Cost of sales are based on a 40% food cost, a fixed beverage cost based on historic averages, and phone card orders that average 5 cases per month at $1700.00 per case.

Cost of labor represents the gross salaries and wages of all Café and Gift Shop employees. Taxes and benefits are equal to 12 percent of Café & Gift shop wages.

## Café and Gift Shop Expenses

This budget item is based on historic averages. There is a small increase this budget year due to an increase in the cost of paper cups. We have budgeted $100 per month for small kitchenware items. We do not expect to purchase any large items this year. We will also purchase new uniforms for café employees in 2002.

Meals and Lodging will primarily be used for food show travel. US Foodservice provides the hotel rooms to each of its four food shows. We are responsible for food and travel. Office supplies are typically Mélange thermal paper and other office supplies. Taxes and Licenses are based on 2000 and 2001 expenditures. These are county and city property taxes and SC DHEC and businesses licenses.



The Catawba Indian Nation
2002 Annual Economic Development Plan and Budget

4

If the bingo hall does move to the outlet mall at Carowinds Boulevard in 2002, then New River would negotiate with the owner of the mall to lease a small pizza restaurant in the food court. It is anticipated that this operation would provide some food to the hall, as well as selling to the general public. New River recommends that the profits from this operation be earmarked for the Tribe's Senior's Program.

---

### III.   Catawba Lightning Bingo

New River will continue to expand Catawba gaming opportunities with the continued operation of Catawba Lightning Bingo. The Lightning Bingo facility is currently inside the existing Catawba Bingo hall. On busy nights, we are expanding the seating to the regular bingo hall, increasing its capacity to 55 seats.

We are also in the process of evaluating electronic lightning bingo systems for use in the facility. When we go electronic, we will reduce expenses significantly (cost of paper and labor being the main expenses), and we will be able to play the games much faster. In addition, we will have tighter controls on inventory and cash as a result of the electronic bingo systems.

---

### IV.   The Corporate Nation Advisory Board Creation and Appointment

The Catawba Indian Nation will create an advisory board to review and evaluate the Catawba Indian Nation's Economic Development efforts. It will replace the Economic Development Board of the CIN.

A Board of Advisors for The Corporate Nation will be named. Conceptually, this Board will consist of seven members; three Tribal members and four members from the local business community. New River will work with the CIN to identify board members and develop this board. Ultimately, New River will report directly to the Board and assist the Board in reporting to the Executive Committee.

---



## V.    Land Sales and Development

In 200, the Catawba Indian Nation entered into a venture partnership agreement with Childress Klein Properties of Charlotte to develop the old Rock Hill Mall into a Super Kmart store. Several issues have made the development of this project difficult, specifically title insurance problems for the buyer and the financial stability of Kmart. New River worked during the third quarter to help resolve the title insurance problems, and was successful in doing so. Childress Klein continues to work with various lending institutions and sources, as well as other Kmart developers, to bring this project to fruition.

New River is also trying to sell Dock Holidays Restaurant in Myrtle Beach, as well as the adjacent 13 acres. There is a contract on this property, however a closing date has not yet been determined.

New River has also had discussions with an apartment developer about developing a multi-family complex on a portion of the Riverview Dairy Farm. The joint venture entity will be a South Carolina Limited Liability Company with the developer and New River as partners. The joint venture will serve as the general partner of a single asset limited partnership that will own and operate the underlying property.

The development will consist of 30 one-bedroom units, 60 two-bedroom units, and 60 three-bedroom units for a total of 150 units and built in accordance with the Construction Documents to be agreed upon by Lauren and New River.

The joint venture entity (the developer and New River) will obtain construction and permanent financing through the issuance of tax-exempt bonds in the approximate amount of $8,600,000 and through the sale of tax credits in the approximate amount of $3,200,000 for a total development cost of $11,800,000.

New River is still negotiating with the developer and will present the final project to the Executive Committee for their review and approval.

New River Development Company will work with both developers to ensure that the terms of all documents, contracts, budgets, and agreements are being met. In addition,



New River will make periodical financial reports to the Economic Development on land sales and development matters.

---

## VI. Advanced Gaming

With respect to future gaming interests of the Catawba Indian Nation, we will continue serve as the exclusive agent to work with the Executive Committee to negotiate the Nation's rights to expanded gaming in South Carolina and North Carolina.

New River will continue to coordinate intense lobbying efforts, meet with prospective management companies, tie up land, and work toward securing financing. Due to the sensitive nature of this project, New River will only report to the Executive Committee regarding any progress made regarding this effort.

---

## VII. Development of Economic Development Literature

By February 1, 2002, New River will coordinate the development of a comprehensive report that will detail the various economic development incentives and opportunities available to the Catawba Indian Nation. We will expand on the work previously done by New River on the available economic development incentives. Mariana Shulstad with the law firm of Leonard, Street and Deinard will develop this document for us. The Palmetto Economic Development Alliance, BellSouth, and Santee Cooper will all contribute funds for the development of this document.

The final document will be an outline that describes each of the options available – along with a more detailed analysis and discussion in a backup document. This would enable us to provide copies of the overview to potential partners without providing them all of them with the entire product.

---



9/6/2005

## 2002 CIN Economic and Development Budget

| | Total | January | February | March | April | May | June | July | August | Sept | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | |
| SPM, Inc. | $38,000.00 | $3,166.67 | $3,166.67 | $3,166.67 | $3,166.67 | $3,166.67 | $3,166.67 | $3,166.67 | $3,166.67 | $3,166.67 | $3,166.67 | $3,166.67 | $3,166.67 |
| Catawba Bingo | $768,700.00 | $204,516.67 | $174,016.67 | $39,516.67 | $29,516.67 | $54,516.67 | $39,516.67 | $54,516.67 | $29,516.67 | $29,516.67 | $54,516.67 | $29,516.67 | $29,516.67 |
| Total Income | $806,700.00 | $207,683.33 | $177,183.33 | $42,683.33 | $32,683.33 | $57,683.33 | $42,683.33 | $57,683.33 | $32,683.33 | $32,683.33 | $57,683.33 | $32,683.33 | $32,683.33 |
| | | | | | | | | | | | | | |
| **Expenses** | | | | | | | | | | | | | |
| **Advisory Committee Expenses** | | | | | | | | | | | | | |
| Travel & Lodging | $30,000.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 |
| Client Meals & Entert. | $8,000.00 | $666.67 | $666.67 | $666.67 | $666.67 | $666.67 | $666.67 | $666.67 | $666.67 | $666.67 | $666.67 | $666.67 | $666.67 |
| Total Salaries & Taxes | $38,000.00 | $3,166.67 | $3,166.67 | $3,166.67 | $3,166.67 | $3,166.67 | $3,166.67 | $3,166.67 | $3,166.67 | $3,166.67 | $3,166.67 | $3,166.67 | $3,166.67 |
| | | | | | | | | | | | | | |
| **Operating Expenses** | | | | | | | | | | | | | |
| Subcontracted Services | $20,400.00 | $1,700.00 | $1,700.00 | $1,700.00 | $1,700.00 | $1,700.00 | $1,700.00 | $1,700.00 | $1,700.00 | $1,700.00 | $1,700.00 | $1,700.00 | $1,700.00 |
| Accounting | $600.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 |
| Office Supplies | $600.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 |
| Travel & Lodging | $3,000.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 |
| Meals & Entertainment | $2,400.00 | $200.00 | $200.00 | $200.00 | $200.00 | $200.00 | $200.00 | $200.00 | $200.00 | $200.00 | $200.00 | $200.00 | $200.00 |
| Client Meals & Enter. | $1,200.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 |
| Total Operating Expenses | $28,200.00 | $2,350.00 | $2,350.00 | $2,350.00 | $2,350.00 | $2,350.00 | $2,350.00 | $2,350.00 | $2,350.00 | $2,350.00 | $2,350.00 | $2,350.00 | $2,350.00 |
| | | | | | | | | | | | | | |
| **Project Expenses** | | | | | | | | | | | | | |
| G7 | $536,000.00 | $111,333.33 | $161,333.33 | $26,833.33 | $16,833.33 | $41,833.33 | $26,833.33 | $41,833.33 | $16,833.33 | $16,833.33 | $41,833.33 | $16,833.33 | $16,833.33 |
| Research/Studies | $2,500.00 | $2,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| DH Expenses | $24,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 |
| Mall Maint. | $60,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 |
| Bingo Hall Taxes | $32,000.00 | $32,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Mall Taxes | $46,000.00 | $46,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Horry Co. Taxes | $40,000.00 | $3,333.33 | $3,333.33 | $3,333.33 | $3,333.33 | $3,333.33 | $3,333.33 | $3,333.33 | $3,333.33 | $3,333.33 | $3,333.33 | $3,333.33 | $3,333.33 |
| Vereen Inc. | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total Project Expenses | $204,500.00 | $202,166.67 | $171,666.67 | $37,166.67 | $27,166.67 | $52,166.67 | $37,166.67 | $52,166.67 | $27,166.67 | $27,166.67 | $52,166.67 | $27,166.67 | $27,166.67 |
| | | | | | | | | | | | | | |
| Total Expenses | $806,700.00 | $207,683.33 | $177,183.33 | $42,683.33 | $32,683.33 | $57,683.33 | $42,683.33 | $57,683.33 | $32,683.33 | $32,683.33 | $57,683.33 | $32,683.33 | $32,683.33 |
| | | | | | | | | | | | | | |
| Net Revenues | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

9/6/2005

## CIN G-7 Budget
### (DRAFT)

| | Budget | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Legal** | | | | | | | | | | | | | |
| Legal Fees | $100,000.00 | $8,333.33 | $8,333.33 | $8,333.33 | $8,333.33 | $8,333.33 | $8,333.33 | $8,333.33 | $8,333.33 | $8,333.33 | $8,333.33 | $8,333.33 | $8,333.33 |
| Title Work | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Legislative/Lobbying | $157,000.00 | $91,000.00 | $6,000.00 | $6,000.00 | $6,000.00 | $6,000.00 | $6,000.00 | $6,000.00 | $6,000.00 | $6,000.00 | $6,000.00 | $6,000.00 | $6,000.00 |
| Design | $11,000.00 | $500.00 | $500.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 |
| Contributions | $50,000.00 | $10,000.00 | $20,000.00 | $10,000.00 | $0.00 | $0.00 | $10,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Research/Studies** | | | | | | | | | | | | | |
| Gaming Consultant | $100,000.00 | $0.00 | $100,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Miley & Associates | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Environmental | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Travel | $18,000.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 |
| Land Option/Purchase | $100,000.00 | $0.00 | $25,000.00 | $0.00 | $0.00 | $25,000.00 | $0.00 | $25,000.00 | $0.00 | $0.00 | $25,000.00 | $0.00 | $0.00 |
| | $536,000.00 | $111,333.33 | $161,333.33 | $26,833.33 | $16,833.33 | $41,833.33 | $26,833.33 | $41,833.33 | $16,833.33 | $16,833.33 | $41,833.33 | $16,833.33 | $16,833.33 |

# APPENDIX C

FUNDING AND EQUIPMENT SUPPLY AGREEMENT

BETWEEN

THE CATAWBA INDIAN NATION

AND

CAROLINA HOSPITALITY & ENTERTAINMENT COMPANY, LLC

AND

RESERVATION DEVELOPMENT, LLC

AND

SIERRA DESIGN GROUP

DATED AS OF MAY 4, 2004

1.59    "Third Party Costs" means those costs described as Third Party Costs in the Initial Development Budget.

1.60    "Transfer" means any sale, pledge, assignment, mortgage, encumbrance, security interest, consensual lien, hypothecation, transfer or divestiture, the effect of which is to grant another an interest in the SDG Collateral or any portion thereof, either directly or indirectly, including an interest taken as security.

1.61    "Tribal Rights Litigation" shall mean any federal and state court litigation that CIN may in its reasonable discretion choose to initiate to affirm its rights to operate Grandfathered Class III gaming on its Reservation under the Federal Act and the Settlement Act.

## Article 2: SDG Funding

2.1    SDG Funding of the Initial Development Budget.    To support CIN's efforts to obtain Legislative Approval, subject to the provisions contained in this Agreement, SDG agrees to fund the Initial Development Budget attached hereto as Exhibit A.

2.1.1    At Closing, SDG agrees to fund CIN and CHEC Costs, and Third Party Costs included in the Initial Development Budget and accrued through Closing, not to exceed the aggregate amount of such costs shown on the Initial Development Budget for such period.    CHEC shall provide SDG with invoices for Third Party Costs incurred prior to Closing.

2.1.2    Subsequent to Closing (and subject to the termination rights of SDG set forth in §2.13 herein), SDG agrees to fund CIN and CHEC Costs incurred during the immediately preceding month. CHEC shall invoice SDG for all Third Party Costs, and may do so on a monthly or bi-monthly basis. SDG agrees to pay Third Party Costs properly itemized on such invoices within thirty (30) days of invoice receipt. SDG recognizes that Third Party Costs may vary between line items and may include parties and costs different from those identified in the Initial Development Budget, and subject to SDG's review and approval (in SDG's reasonable discretion, except as to suitability of parties receiving payment (as to which SDG's discretion shall be absolute)) of such costs, categories and payees, SDG agrees to fund all such costs incurred in pursuit of Legislative Approval up to the cumulative amount of Third Party Costs in the Initial Development Budget through the period for which invoices are submitted.

2.2    SDG Funding of Additional Development Costs.    SDG recognizes that Legislative Approval may not occur before June 30, 2004.    Accordingly, subject to the terms and provisions contained herein, SDG, in SDG's sole and absolute discretion, shall work with the CIN and CHEC to determine the amount of any additional funding required, on an annual basis, as follows:

2.2.1    If by June 1, 2004, Legislative Approval has not occurred, CHEC on behalf of the CIN shall prepare a twelve-month budget (the "Additional Development Budget") estimating the costs required to continue to seek the Legislative Amendments

# APPENDIX D

(Filed Under Seal)

# APPENDIX E

(Filed Under Seal)